UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 MAR 19 P 2: 05
U.S. DISTRICT COURT
BRIDGEPORT, CONN

NICHOLAS O. RUSSO, JR., : CIVIL ACTION NO.
: 3:00CV1794 (JCH)
PLAINTIFF, :
:
V. :
:
JOHN M. BAILEY, ET AL. : MARCH 19, 2004

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION
FOR SUMMARY JUDGMENT BY DEFENDANT, CITY OF HARTFORD**

**I    INTRODUCTION**

Pursuant to Rule 56 of the of the Federal Rules of Civil Procedure, the plaintiff hereby objects to the motion for summary judgement filed by the defendant, City of Hartford ("City Defendant"), in the case of <u>Russo v. Bailey</u>, Docket No. 3:00CV1794 (JCH). This case is one of three cases brought by the plaintiff that has been consolidated for discovery purposes. The defendant is not entitled to summary judgment as a matter of law because the plaintiff has been successful in presenting genuine issues of material facts.

**II.    STATEMENT OF FACTS**

**A.    PRELIMINARY STATEMENT**

The plaintiff, Nicholas O. Russo, Jr. (herinafter "Russo") was[1] a Detective with the

---

[1] The plaintiff will be referred to as a former Hartford Police Detective although he has not been formally notified of his termination by the City of Hartford. He has, however been denied all pay, benefits and seniority since his arrest on December 16, 1997(except for a short period of time when the criminal charges were dismissed by the Superior Court). Therefore, plaintiff considers to have been discharged by the defendant City of Hartford.

1

Hartford Police Department Hartford Police Department (hereinafter "HPD"). Beginning in September, 1994 Russo was assigned to the HPD Crimes Against Persons Unit [presently referred to as "Major Crimes"] (hereinafter, "CAPERS"). In 1995, Russo was assigned to the Federal Violent Crimes Task Force, or Federal Gang Task Force. (hereinafter "FGTF"). Russo's investigative work for the HPD and the FGTF was outstanding and exemplary. Plaintiff's 56(c)(2) Statement ¶¶ 5-16.

There was tremendous animosity and conflict between HPD Detectives assigned to CAPERS and FBI Agents and HPD Detectives assigned to the FGTF. Plaintiff's 56(c)(2) Statement Section II.. The FGTF's quick resolution, and therefore, deprivation of HPD Capers personnel overtime, of homicides and Russo's cooperation with the federal Government became a contentious issue in the ranks of the HPD and the Connecticut State's Attorney Office. As a result, Detective Russo became the target of selective enforcement of departmental rules and regulations, illegal drug testing, false arrest and imprisonment, harassment, stalking and derogatory comments and threats on his life.

Finally, in the fall of 1997 Russo became the subject of a vindictive criminal investigation, instigated by named defendants who wanted to ruin his credibility and career.

Russo's supervisors, including, Lieutenant Kenary, Captian Flaherty and Chief Croughwell were very bitter and then frightened about Russo's involvement with the Federal Government. Named defendants Croughwell, Lyons, Lawlor, and Flaherty believed Russo was providing incriminating information about corrupt acts they either committed, approved or covered up. On October 31, 1997, after learning from State Inspector Stephen Kumnick, Chief State's Attorney John Bailey and thereafter HPD Capers Detective Rovella that Russo was

2

assisting in a criminal investigation into corruption at the HPD, Croughwell, Lawlor and Lyons, among others, threatened to, " kick [Russo's] fucking ass." Thereafter, Croughwell ordered Russo taken into Custody, his weapon taken, illegally drug tested and removed from duty. Croughwell also ordered Russo to submit to a lie detector test (polygraph) to determine the truthfulness of Russo's denial of involvement in the Federal Corruption investigation. Given the threats and refusing to compromise the federal investigation, Russo refused to admit his involvment to these criminals.

Concerned with the expansive knowledge and investigative ability of Russo, and their own criminal and unethical conduct, the defendants' set about on a course of action aimed solely at destroying Detective Russo's reputation, career and life. Plaintiff's 56(c)(2) Statement Section II..

**B.    THE POPE PARK MURDER, ILLEGAL DRUG TESTING, DISCLOSURE OF TESTING AND OTHER HARASSMENT**

On January 9, 1997, Russo's supervisor, Daryl Roberts improperly marked Russo AWOL, after Russo called in sick, following the normal procedure and after providing Lt. Kenary and Sgt. Roberts with a note from his Physician. Plaintiff's 56(c)(2) Statement VII(A). Plaintiff was subjected to hostile and disparate treatment by his superiors at the Hartford Police Department. On January 9, 1997, Russo was subjected to an illegal drug test without reasonable cause or suspicion. Plaintiff's 56(c)(2) Statement Section XIII(A).    Following the Pope Park Murder in July, 1997, Russo lead the criminal investigation for the FGTF which two days after the murder lead to the arrest, and later, conviction of the murderer Julio Ramos, the resentment of Russo dramatically increased. (Plaintiff's 56(c)(2) Statement Section II(A))

In 1997, Russo volunteered to assist U.S. Attorneys John Durham and James Glasser in a

3

federal corruption investigation into the HPD. <u>Plaintiff's 56(c)(2) Statement ¶ 61, 63, 68, 69.</u> Russo's involvement with the federal corruption probe was leaked to the targets of the probe by State's Attorney Inspector Stephen Kumnick and then Chief State's Attorney John Bailey. The targets of the federal investigation included the defendants: Flaherty, Kenary, Lyons, Lawlor and Croughwell. <u>Plaintiff's 56(c)(2) Statement ¶¶ 61-63, 169-173.</u>

In response to, and in retaliation for what Chief Croughwell suspected to be a threat against him and his department, Chief Croughwell engaged in the following extreme, outrageous, illegal and unlawful acts in a direct attempt to cause injury, pain, humiliation, defamation and financial loss upon Russo:

Croughwell conspired with Flaherty to illegally arrest and detain Russo under the pretext of required drug testing. Croughwell, Flaherty and Reynolds all violated the HPD Drug Testing Policy. <u>Plaintiff's 56(c)(2) Statement Section XIII.</u> On or about November 5, 1997, days after Croughwell threatened to physically harm Russo, Croughwell ordered Flaherty and two other police sergeants to go to United States Attorney's office in New Haven, Connecticut to illegally take Russo into custody, take his hand gun and drive him from the United States Attorney's Office where Russo was working for the FGTF. Plaintiff was in fear for his life. <u>Plaintiff's 56(c)(2) Statement Section XIII</u>; Flaherty physically took the plaintiff back to Hartford and forced him to immediately submit to a drug test in Bloomfield, Connecticut.
As ordered by Croughwell, Flaherty stripped Plaintiff of his firearm. While in custody, plaintiff was forced to urinate in the street. . <u>Plaintiff's 56(c)(2) Statement Section XIII.</u>

The defendants' thereafter set out on a course to destroy the character of Plaintiff by taking this highly confidential testing information and disseminating it amongst the general

4

population of the Police Department even before the results were returned, and on November 5, 1997, the information was revealed by the Hartford Police Department to departmental personnel and other persons, including Maxine Bernstein, a reporter for *The Hartford Courant*. The HPD Drug Testing Policy strictly forbids any disclosure of an officer being tested. Plaintiff's 56(c)(2) Statement Section XIII.

### C.    THE CRIMINAL INVESTIGATION AND TYLENOL 3

In his continued efforts to destroy Russo's credibility and career in order to protect himself and his department from the corruption probe, the defendants initiated a criminal investigation of Russo along with the State's Attorney for the Judicial District of Hartford, James E. Thomas. Plaintiff's 56(c)(2) Statement Section V.

The defendants' also duped a low-level Diversionary Inspector of the Federal Drug Enforcement Administration ("DEA") to support their criminal investigation of Russo. This Diversionary Investigator, Marcus Brown (hereinafter "Brown"), joined Kenary, Flaherty, SGT Hajdaz and State's Attorney Inspector Skinner in the investigation. These officers rushed to build a case, any case, against Russo.

Without any complaint, this Joint Investigative Team (hereinafter "JIT") conducted an expansive illegitimate[2] and unprecedented investigation to determine if Russo was abusing Tylenol 3 that they illegally learned he was prescribed by his physian. This fishing expedition was a vindictive investigation to gather incriminating evidence. Plaintiff's 56(c)(2) Statement Section V.

---

[2] The United State's Attorney's Office, and in particular, Russo's supervisor, Deputy U.S. Attorney John Durham was unaware of the criminal investigation of Russo, until Russo's arrest.

5

As part of this investigation, Brown entered pharmacies in Detective Russo's neighborhood and around the vicinity of Russo's physician, Dr. Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Id. Brown was not conducting routine administrative inspections, but instead was aiding the Hartford Police Department and the State's Attorney's Office in their criminal investigation into Detective Russo. Id.

The defendants' arrested Russo on December 16, 1997 and charged him with Forgery in the second degree and illegally obtaining a controlled substance, Tylenol #3, by fraud. Plaintiff's 56(c)(2) Statement Section XIII XV. While Russo was under investigation and just prior to his arrest he was transferred by the defendants' from Capers to the Fraud Division.

On December 16, 1997, the Plaintiff was suspended without pay pending the outcome of his criminal trial. From December 16, 1997, to the present, the Union Defendant did not challenge the Hartford Police Department's suspension of the Plaintiff.

On September 15, 2000, the Superior Court ruled that the evidence seized during the criminal investigation of Detective Russo was obtained illegally. Plaintiff's 56(c)(2) Statement¶ 189-190. On that same day, the Prosecution moved and the Court dismissed all charges against Detective Russo. Id.

From September 15, 2000 to the present, Defendant Rudewicz illegally suspended the Plaintiff without pay. Id.

6

### D.  MARQUIS RETALIATION AND MORE THREATS

On or about September 15, 2000 when the criminal case against Russo was dismissed by the Superior Court and February 2002, when the Connecticut Supreme Court dubiously reversed and remanded the criminal case, despite repeated requests by Russo and court intervention, the City and Chief Marquis, did not take any steps to provide a safe work environment for Russo so that he was able to return to work.

Russo was never provided any reinstatement support or administrative assistance. The Plaintiff was not paid salary, or benefits from the date his suspension legally ended, September 15, 2000, to October 31, 2000, other officers similarly situated had been paid. Russo was denied medical insurance coverage that other officers received from September 15, 2000 to October 31, 2000. Plaintiff's 56(c)(2) Statement¶ 190, 191, 196, 199, 202, 203, 214, 219, 220, 221.

The City further interfered with Russo's attempts to receive wroker's compensation benefits following Russo's quadruple bypass surgery in December 2001. Plaintiff's 56(c)(2) Statement¶ 216-218.

### III.  LEGAL ARGUMENT

#### A.  Standard or Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, 217 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

7

show that there is no genuine issue as to any material fact...." Miner v. Gen. Falls, 999 F.2d 655, 661 (2d Cir. 1993)(citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

After discovery, if the nonmoving party "has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). See also, Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

**B.      Material Facts are in Dispute over Plaintiff's Termination by City Defendant, Therefore Summary Judgment is inappropriate on Count Eight.**

Because Plaintiff has been terminated by the City Defendant, Count Eight of Plaintiff's Complaint must stand.

**1.      Plaintiff has been terminated by City Defendant.**

In Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 480, 427 A.2d 385 (1980), the Connecticut Supreme Court recognized a public policy limitation on the traditional employment at-will doctrine. Antinerella v. Rioux, 229 Conn. 479, 492, 642 A.2d 699 (1994). In Sheets, the Court sanctioned a common law cause of action for wrongful discharge in situations in which the

8

reason for the discharge involved impropriety derived from some important violation of public policy. Sheets, 179 Conn. 475.

City Defendant argues that Plaintiff has not actually been terminated, that he has merely been suspended by the City. (See City Defendant Mem. Summary Judgment, 5-6.) In Defendant's Local Rule 56(a)1 statement they note that he has been suspended without pay for over one year and seven months. (Defendant's Local Rule 56(a)1, ¶ 2.) The City has created a category for Russo that is unprecedented. Russo's status has fluctuated and changed numerous times since his suspension in 2000. Plaintiff's Local Rule Statement 56(a)2 ¶ 196-203, 219, 220.

### 2. Plaintiff has been constructively discharged

"'Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.'" Brittell v. Department of Correction, 247 Conn. 148, 178 (1998) (quoting Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)).

Following the Pope Park Murder, where the Fed. Task Force arrested Ramos for the murder, the CAPers Division, as well as Croughwell created a hostile work environment for members of the Federal Task force, specifically:

> "A: A rift that was caused when the task force arrested and indicted an individual responsible for a murder.
> Q Is this the Pope Park murder?
> A Yes.
> Q Can you describe some of the ways that you were mistreated?
> A Once again, left out of the loop, not made privy to the statuses of certain investigations.
> Q You were a sergeant though, right?
> A Yes. Authority was circumvented by administration. The veracity was questioned.
> Q Your veracity?
> A Oh, yeah.

9

> Q  By whom?
> A  Chief Croughwell. . . . A  I don't know if I mentioned this, but just overall mistrust from the detectives involved in the Hartford murder.
> Q  Were you shunned by these people?
> A  Yes." (Huertas Dep. at 71).

Dr. Hall sends letter to the HPD saying that it is a hostile work environment Russo cannot work in such circumstances. (Exhibit 20.) The work atmosphere toward Russo in 1997 was hostile. He was "locked out, locked out of his own office, basically, which thereby prevents you from doing research on open cases." (Huertas Dep. at 51-52.) Huertas testified as to the friction, stating:

> "Q.  Is it fair to say that there was tension between agencies?
> A  Yes.
> Q  How would you describe that?
> A  Laymen's terms, pissing contest.
> Q  Between the federal investigation and the state?
> A  Federal and the state, yes.
> Q  Which side was Nick Russo on in this pissing contest?
> MR. GOUMAS:  Object to the form.
> MR. SHEA:  Objection to the form.
> A  I think he was on the side of justice. I don't think he was on one side or the other, just get
>     to the truth.
> Q  Is it fair to say he might have been caught in the middle of it?
> A  Yes.
> Q  Did Nick Russo want to make sure that someone like Gilberto Rivera was wrongly prosecuted and jailed?
> MR. SHEA:  Objection to the form.
> MR. GOUMAS:  Object to the form.
> A  I think it would be fair that he would not want to have somebody wrongly prosecuted. (Huertas Dep. at 112.)

Dr. Mark Hall provided treatment to Russo since 1997 and repeatedly said that while Russo was fit for duty but that the HPD provided a hostile work environment to which he could not return. (Exhibit 20.) The City has clearly set up a hostile environment and has prevented

10

Russo from returning to work. Russo has been constructively discharged because he cannot return to the work environment.

Further, the City considered Russo resigned when he did not report for work on November 13, 2000 as indicated in the letter dated November 6, 2000 from Acting Chief Rudewicz. Police Defendants #2382 56(c)1 Statement ¶ 17. Further, the City, through Corporation Counsel Helen Apostolidis, deemed Russo to have resigned when he did not return to work on November 13, 2000. Police Defendants #2382 56(c)1 Statement ¶ 19. Russo has resigned from the HPD through his actions and his inability to return to such a hostile environment. Therefore, the City's Motion for Summary Judgment should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment against Counts Eight of Plaintiff's complaint should not be granted.

THE PLAINTIFF,<br>
NICHOLAS O. RUSSO, JR.<br><br>
By: _____<br>
James S. Brewer<br>
Erin I. O'Neil<br>
818 Farmington Avenue<br>
West Hartford, CT 06119<br>
(860) 523-4055<br>
Federal Bar # ct 23073

## CERTIFICATION

This is to certify that the foregoing has been faxed on March 19, 2004, to all counsel and pro se parties of record:

Charles L. Howard, Esq.
Gregg P. Goumas Esq.
Derek Mogck, Esq.
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

Frank Szilagyi, Esq.
Silvester, Daly & Delaney
72 Russ Street
Hartford, CT 06106

John P. Shea, Jr.
Sabia & Hartley, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205

Attorney Helen Apostolidis
Office of Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

_____
Erin I. O'Neil