UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAR 19 P 2:05

U.S. DISTRICT COURT
BRIDGEPORT, CONN

NICHOLAS O. RUSSO, JR., : CIVIL ACTION NO.
: 3:00CV1794 (JCH)
    PLAINTIFF, :
:
V. :
:
JOHN M. BAILEY, ET AL. : MARCH 19, 2004

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION FOR
SUMMARY JUDGMENT BY POLICE DEFENDANTS.**

Pursuant to Rule 56 of the of the Federal Rules of Civil Procedure, the plaintiff hereby objects to the motion for summary judgement filed by the defendants, Joseph Croughwell, James Flaherty, David Kenary, Daryl Roberts, Christopher Lyons, Robert Lawlor, James Rovella, Charles Lilley and Robert Rudewicz ("Police defendants"), in the case of Russo v. Bailey, Docket No. 3:00CV1794 (JCH). This case is one of three cases brought by the plaintiff that has been consolidated. The defendant is not entitled to summary judgment as a matter of law because the plaintiff has been successful in presenting genuine issues of material facts.

**I.    INTRODUCTION**

This action arises under Title 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and common law of the State of Connecticut.

1

## II.  STATEMENT OF FACTS

### A.  PRELIMINARY STATEMENT

The plaintiff, Nicholas O. Russo, Jr. (herinafter "Russo") was[1] a Detective with the Hartford Police Department Hartford Police Department (hereinafter "HPD") . Beginning in September, 1994 Russo was assigned to the HPD Crimes Against Persons Unit [presently referred to as "Major Crimes"] (hereinafter, "CAPERS"). In 1995, Russo was assigned to the Federal Violent Crimes Task Force, or Federal Gang Task Force. (hereinafter "FGTF"). Russo's investigative work for the HPD and the FGTF was outstanding and exemplary. Plaintiff's 56(c)(2) Statement ¶¶ 5-16.

There was tremendous animosity and conflict between HPD Detectives assigned to CAPERS and FBI Agents and HPD Detectives assigned to the FGTF. Plaintiff's 56(c)(2) Statement Section II.. The FGTF's quick resolution, and therefore, deprivation of HPD Capers personnel overtime, of homicides and Russo's cooperation with the federal Government became a contentious issue in the ranks of the HPD and the Connecticut State's Attorney Office. As a result, Detective Russo became the target of selective enforcement of departmental rules and regulations, illegal drug testing, false arrest and imprisonment, harassment, stalking and derogatory comments and threats on his life.

Finally, in the fall of 1997 Russo became the subject of a vindictive criminal investigation, instigated by named defendants who wanted to ruin his credibility and career.

---

[1] The plaintiff will be referred to as a former Hartford Police Detective although he has not been formally notified of his termination by the City of Hartford. He has, however been denied all pay, benefits and seniority since his arrest on December 16, 1997(except for a short period of time when the criminal charges were dismissed by the Superior Court). Therefore, plaintiff considers to have been discharged by the defendant City of Hartford.

2

Russo's supervisors, including, Lieutenant Kenary, Captian Flaherty and Chief Croughwell were very bitter and then frightened about Russo's involvement with the Federal Government. Named defendants Croughwell, Lyons, Lawlor, and Flaherty believed Russo was providing incriminating information about corrupt acts they either committed, approved or covered up. On October 31, 1997, after learning from State Inspector Stephen Kumnick, Chief State's Attorney John Bailey and thereafter HPD Capers Detective Rovella that Russo was assisting in a criminal investigation into corruption at the HPD, Croughwell, Lawlor and Lyons, among others, threatened to, " kick [Russo's] fucking ass." Thereafter, Croughwell ordered Russo taken into Custody, his weapon taken, illegally drug tested and removed from duty. Croughwell also ordered Russo to submit to a lie detector test (polygraph) to determine the truthfulness of Russo's denial of involvement in the Federal Corruption investigation. Given the threats and refusing to compromise the federal investigation, Russo refused to admit his involvment to these criminals.

Concerned with the expansive knowledge and investigative ability of Russo, and their own criminal and unethical conduct, the defendants' set about on a course of action aimed solely at destroying Detective Russo's reputation, career and life. <u>Plaintiff's 56(c)(2) Statement Section II.</u>.

**B.  THE POPE PARK MURDER, ILLEGAL DRUG TESTING, DISCLOSURE OF TESTING AND OTHER HARASSMENT**

On January 9, 1997, Russo's supervisor, Daryl Roberts improperly marked Russo AWOL, after Russo called in sick, following the normal procedure and after providing Lt. Kenary and Sgt. Roberts with a note from his Physician. <u>Plaintiff's 56(c)(2) Statement VII(A)</u>. Plaintiff was subjected to hostile and disparate treatment by his superiors at the Hartford Police

3

Department. On January 9, 1997, Russo was subjected to an illegal drug test without reasonable cause or suspicion. Plaintiff's 56(c)(2) Statement Section XIII(A). Following the Pope Park Murder in July, 1997, Russo lead the criminal investigation for the FGTF which two days after the murder lead to the arrest, and later, conviction of the murderer Julio Ramos, the resentment of Russo dramatically increased. (Plaintiff's 56(c)(2) Statement Section II(A))

In 1997, Russo volunteered to assist U.S. Attorneys John Durham and James Glasser in a federal corruption investigation into the HPD. Plaintiff's 56(c)(2) Statement ¶ 61, 63, 68, 69. Russo's involvement with the federal corruption probe was leaked to the targets of the probe by State's Attorney Inspector Stephen Kumnick and then Chief State's Attorney John Bailey. The targets of the federal investigation included the defendants: Flaherty, Kenary, Lyons, Lawlor and Croughwell. Plaintiff's 56(c)(2) Statement ¶¶ 61-63, 169-173.

In response to, and in retaliation for what Chief Croughwell suspected to be a threat against him and his department, Chief Croughwell engaged in the following extreme, outrageous, illegal and unlawful acts in a direct attempt to cause injury, pain, humiliation, defamation and financial loss upon Russo:

Croughwell conspired with Flaherty to illegally arrest and detain Russo under the pretext of required drug testing. Croughwell, Flaherty and Reynolds all violated the HPD Drug Testing Policy. Plaintiff's 56(c)(2) Statement Section XIII. On or about November 5, 1997, days after Croughwell threatened to physically harm Russo, Croughwell ordered Flaherty and two other police sergeants to go to United States Attorney's office in New Haven, Connecticut to illegally take Russo into custody, take his hand gun and drive him from the United States Attorney's Office where Russo was working for the FGTF. Plaintiff was in fear for his life. Plaintiff's

4

56(c)(2) Statement Section XIII; Flaherty physically took the plaintiff back to Hartford and forced him to immediately submit to a drug test in Bloomfield, Connecticut.

As ordered by Croughwell, Flaherty stripped Plaintiff of his firearm. While in custody, plaintiff was forced to urinate in the street. . Plaintiff's 56(c)(2) Statement Section XIII.

The defendants' thereafter set out on a course to destroy the character of Plaintiff by taking this highly confidential testing information and disseminating it amongst the general population of the Police Department even before the results were returned, and on November 5, 1997, the information was revealed by the Hartford Police Department to departmental personnel and other persons, including Maxine Bernstein, a reporter for *The Hartford Courant.* The HPD Drug Testing Policy strictly forbids any disclosure of an officer being tested. Plaintiff's 56(c)(2) Statement Section XIII.

### C. THE CRIMINAL INVESTIGATION AND TYLENOL 3

In his continued efforts to destroy Russo's credibility and career in order to protect himself and his department from the corruption probe, the defendants initiated a criminal investigation of Russo along with the State's Attorney for the Judicial District of Hartford, James E. Thomas. Plaintiff's 56(c)(2) Statement Section V.

The defendants' also duped a low-level Diversionary Inspector of the Federal Drug Enforcement Administration ("DEA") to support their criminal investigation of Russo. This Diversionary Investigator, Marcus Brown (hereinafter "Brown"), joined Kenary, Flaherty, SGT Hajdaz and State's Attorney Inspector Skinner in the investigation. These officers rushed to build a case, any case, against Russo.

5

Without any complaint, this Joint Investigative Team (hereinafter "JIT") conducted an expansive illegitimate[2] and unprecedented investigation to determine if Russo was abusing Tylenol 3 that they illegally learned he was prescribed by his physian. This fishing expedition was a vindictive investigation to gather incriminating evidence. Plaintiff's 56(c)(2) Statement Section V.

As part of this investigation, Brown entered pharmacies in Detective Russo's neighborhood and around the vicinity of Russo's physician, Dr. Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Id. Brown was not conducting routine administrative inspections, but instead was aiding the Hartford Police Department and the State's Attorney's Office in their criminal investigation into Detective Russo. Id.

The defendants' arrested Russo on December 16, 1997 and charged him with Forgery in the second degree and illegally obtaining a controlled substance, Tylenol #3, by fraud. Plaintiff's 56(c)(2) Statement Section XIII XV. While Russo was under investigation and just prior to his arrest he was transferred by the defendants' from Capers to the Fraud Division.

On December 16, 1997, the Plaintiff was suspended without pay pending the outcome of his criminal trial. From December 16, 1997, to the present, the Union Defendant did not challenge the Hartford Police Department's suspension of the Plaintiff.

On September 15, 2000, the Superior Court ruled that the evidence seized during the criminal investigation of Detective Russo was obtained illegally. Plaintiff's 56(c)(2) Statement¶

---

[2]The United State's Attorney's Office, and in particular, Russo's supervisor, Deputy U.S. Attorney John Durham was unaware of the criminal investigation of Russo, until Russo's arrest.

189-190. On that same day, the Prosecution moved and the Court dismissed all charges against Detective Russo. Id.

From September 15, 2000 to the present, Defendant Rudewicz illegally suspended the Plaintiff without pay. Id.

### D.  MARQUIS RETALIATION AND MORE THREATS

On or about September 15, 2000 when the criminal case against Russo was dismissed by the Superior Court and February 2002, when the Connecticut Supreme Court dubiously reversed and remanded the criminal case, despite repeated requests by Russo and court intervention, the City and Chief Marquis, did not take any steps to provide a safe work environment for Russo so that he was able to return to work.

Russo was never provided any reinstatement support or administrative assistance. The Plaintiff was not paid salary, or benefits from the date his suspension legally ended, September 15, 2000, to October 31, 2000, other officers similarly situated had been paid. Russo was denied medical insurance coverage that other officers received from September 15, 2000 to October 31, 2000. Plaintiff's 56(c)(2) Statement¶ 190, 191, 196, 199, 202, 203, 214, 219, 220, 221.

The City further interfered with Russo's attempts to receive worker's compensation benefits following Russo's quadruple bypass surgery in December 2001. Plaintiff's 56(c)(2) Statement¶ 216-218.

### III.  LEGAL ARGUMENT

#### A.  STANDARD OR REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that

there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, 217 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." Miner v. Gen. Falls, 999 F.2d 655, 661 (2d Cir. 1993)(citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

After discovery, if the nonmoving party "has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). See also, Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

**B.    POLICE DEFENDANTS HAVE RETALIATED AGAINST PLAINTIFF FOR HIS SPEECH ON A MATTER OF PUBLIC CONCERN IN VIOLATION OF HIS FIRST AMENDMENT RIGHTS, AND THEREFORE, POLICE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT. (FIRST COUNT)**

To prevail on such a § 1983 claim, the plaintiff must prove, inter alia, that the defendant

caused the deprivation of his or her rights. See Monell v. Department of Social Servs., 436 U.S. 658, 692, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). To prevail on a First Amendment retaliation claim the plaintiff must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001). Plaintiff has sufficiently established retaliation for First Amendment activity.

### (1) Russo's Speech Was Protected.

Whether speech addresses a matter of public concern is determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To fall within the realm of public concern, moreover, an employee's speech must 'relate to a ... matter of political, social, or other concern to the community.'" Locurto v. Giuliani, 269 F. Supp. 2d 368, 385 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

In addition, such a decision requires a "focus on the motive of the speaker . . . to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). "Speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." Id. at 164 (citing Connick, 461 U.S. at 147). "Speech is more likely to be of public concern if the speaker is speaking as a citizen on matters of public interest, and not solely as an employee on matters only of personal interest." Sacco v. Pataki, 982 F. Supp. 231, 240 (S.D.N.Y. 1997). "Virtually every citizen has a personal

9

interest in matters of public concern; after all, each citizen is a member of the public and is, in some way, impacted by the resolution of societal problems. The determinative question is whether that interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." Blum v. Schelegel, 18 F.3d 1005, 1012 (2d Cir. 1994).

In October 1997, Russo volunteered to assist U.S. Attorneys John Durham and James Glasser in a federal corruption investigation into the HPD. Plaintiff's 56(c)(2) Statement ¶ 61, 63, 68, 69. Russo volunteered information to the US Attorneys regarding corruption. Russo Vol. IV at 96-97. "I was asked a series of questions which I voluntarily gave information. . . . but as far as that I wasn't compelled." Id. Russo's involvement with the federal corruption probe was leaked to the targets of the probe, including Flaherty, Kenary, Lyons, Lawlor and Croughwell. Plaintiff's 56(c)(2) Statement ¶¶ 61-63, 169-173.

Russo's investigation of corruption while made possible because of his position as a police officer his cooperation with the Federal Government's investigation into corruption in the HPD were motivated by a belief that corruption is wrong and a corrupt police department is not in the best interests of the public. Russo was not required to participate in the corruption probe. His cooperation with US Attorneys John Durham and James Glasser was not part of his job duties as a CAPERS detective or as a Federal Marshall. Russo's status as Hartford Detective or Federal Marshall would not have been jeopardized if he did not participate with the corrpution probe.

Russo was acutely aware that there was great tension and animosity between the HPD CAPERS unit and the Fed. Task Force, including CAPERS detectives refusing to assist Russo had already felt the brunt and effects of the conflict between Hartford and the Feds. This tension

10

and conflict was due to Russo's extraordinary work commitment to the Fed. Task Force and his unwillingness to arrest an innocent, Gilberto Rivera. CAPERs members did not appreciate his efforts to investigate and arrest those who were guilty of crimes. Russo's quick and efficient arrest of Julio Ramos deprived other CAPERS members of overtime. Russo felt the direct effects of this contempt in 1996 and 1997.

Russo agreed to assist the federal investigation despite his knowledge of the extreme contempt held by the HPD, specifically, CAPERS, against federal involvement. Russo was employed by the HPD but he volunteered to provide information about his employer. Russo assistance with the federal investigation was not for his own personal benefit and was not done as part of his employment with the HPD or his assignment with the Fed. Task Force. His speech was of a matter of public concern as it involved corruption in the HPD.

Russo also filed three federal lawsuits against the HPD and individual defendants.

**(2) The Defendant Took Adverse Action Against Russo.**

On October 31, 1997, Russo was threatened with physical harm by Chief Croughwell, Lawlor and Lyons. Plaintiff's 56(c)(2) Statement Section IX(A). In November 1997, Russo was subject to an illegal drug test that was not based upon reasonable suspicion. Russo was the target of a criminal investigation that resulted in his suspension and arrest. Following the filing of the present lawsuits, the first filed in November, 1997, Russo has suffered the above adverse action.

Russo continued to be threatened by Lawlor and was followed and threatened on several occasions, in 2000. The retaliation continues to the present. Following the filing of these lawsuits, the City, who is a defendant in each of the actions, has suspended him, denied him medical benefits, refused to reinstate him following the dismissal of the criminal charges in

11

September 2000. The city has also interfered with and contested Russo's entitlement to worker's compensation benefits, with direct interference by the City's attorney John Shea who, although he did not have an appearance in the worker's compensation case, was present and testified to prevent Russo from receiving benefits. The City continues to retaliate against Russo, even after the Worker's compensation Commissioner found that Russo was entitled to benefits, and further denied the City's Motion to Correct his ruling, the City has appealed the finding, further refusing to provide Russo his benefits.

### (3) There Was a Causal Connection Between the Protected Speech and the Adverse Action.

Russo's supervisors, specifically Flaherty and Kenary, had made direct threats regarding Russo and felt hatred toward Russo for his efforts with the Fed. Task Force. Plaintiff's 56(c)(2) Statement ¶29. Flaherty and Kenary were directly involved in the criminal investigation of Russo and the illegal drug test on November 4, 1997. Flaherty took Russo into custody during the November 1997 drug test and wouldn't let him leave the police car. The day after Russo spoke with Kumnick about the corruption probe, Croughwell, Lawlor and Lyons threatened Russo with physical harm. Within days, even hours of finding out that Russo had communicated with the federal government regarding corruption in the HPD, Russo was under criminal investigation, was imprisoned and forced to take a drug test, was physically threatened. Croughwell testified that the incident where Lyons, Lawlor and Edelwich threatened Russo in Croughwell's office occurred before Croughwell asked James Thomas to investigate Russo for prescription fraud. (Croughwell Dep. at 188.) Within a month of communicating with the federal government Russo had been arrested and suspended.

12

Russo's communication to Kumnick regarding Russo's involvement in the corruption investigation identified Lawlor, Lyons and Edelwich and "their bosses" as targets of the probe. These same individuals had reason to be afraid of a corruption probe and had reason to retaliate against Russo and destroy his credibility. Edelwich, Lawlor and Lyons were all involved in the illegal possession of drugs and drug paraphernalia in order to plant drugs on gang members in order to make arrests.    Plaintiff's 56(c)(2) Statement Section III. Croughwell, Lawlor, Lyons and Edelwich knew that Russo's communication with the federal probe would uncover their illegal activities and they worked to destroy his credibility. Lilley, Flaherty and Kenary eagerly joined Croughwell's efforts with their involvement with the criminal investigation and drug test.

These actions against Russo and the continued denial of Russo's benefits and rights are in direct relation to Russo's communication with the federal government on their corruption probe and his federal lawsuits.

Russo's communication and assistance with the federal investigation into corruption and his federal lawsuits against the City and named individuals were protected speech. The defendants, Croughwell, Lawlor, Lyons, Flaherty and Kenary all worked together to discredit and end Russo's career after learning of Russo's involvement with the federal probe. Russo has established issues of fact as to whether Russo's speech was protected, therefore a claim of First Amendment Retaliation, therefore the Police defendants' Motion for Summary Judgment on Count One of Russo v. Baily (#1794) should be denied.

### C.    THE POLICE DEFENDANTS HAVE VIOLATED PLAINTIFF'S RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT (SECOND COUNT).

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall

13

"deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "At its core, equal protection prohibits the government from treating similarly situated persons differently." Sound Aircraft Servs. v. Town of E. Hampton, 192 F.3d 329 (1999), see City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985); Brady v. Town of Colchester, 863 F.2d 205, 216 (2d Cir. 1988).

### 1. Plaintiff, as a class of one, has irrationally and arbitrarily, received intentionally disparate treatment from Defendant Police Officers.

Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, the Second Circuit has long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. Harlan Assoc. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2000). In Village of Willowbrook v. Olech, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, (2000) (per curiam), "the Supreme Court affirmed the validity of such class of one claims where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. To prevail on a class of one equal-protection claim, plaintiff must show, not only irrational and wholly arbitrary acts, but also intentional disparate treatment." Barstow v. Shea, 196 F. Supp. 2d 141, 148 (D. Conn. 2002) (citing Olech, 528 U.S. at 564); see also Russo v. City of Hartford, Docket No. 3-97-CV-2380 (D. Conn. 2001) (stating, "successful equal protection claims may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment.").