**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NICHOLAS O. RUSSO, JR., | : | |
| | : | CIVIL ACTION NUMBER |
| PLAINTIFF | : | 3:97CV2380(JCH)(lead case) |
| | : | 3:00CV2382(JCH) |
| | : | 3:00CV1794(JCH) |
| vs. | : | |
| | : | |
| CITY OF HARTFORD, ET AL. | : | MARCH 18, 2004 |

**JOINT LOCAL RULE 56(a)2 STATEMENT IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(a)2 of the Local Rules of Civil Procedure, Plaintiff Nicholas Russo

("Russo") hereby submits his statement of material facts as to which it is contended there are

genuine issues to be tried.:

**I.    RUSSO'S EMPLOYMENT HISTORY**

1.    In approximately July 1995, Russo was assigned to the Federal Violent Crimes Task

       Force.  (Russo Dep., 6/12/02 at 184.)

2.    In approximately July 1995, Russo was the  head investigator for the Federal Violent

       Crimes Task Force and assisted Federal Agents in arresting gang members guilty on the

       murder of Marcelina Delgado. (The Hartford Police Department ("HPD") had arrested

       the wrong person.)  (Lyons Dep., at 209.)

3.    In a letter to Chief Croughwell ("Croughwell"), Peter Markle, Chief of the Organized

       Crime Drug Enforcement Task Force confirmed Russo's active participation with

       Federal Investigations.  (Exhibit 31.)

4.    On July 21, 1997, Russo was transferred to the Task Force and his assignment

responsibilities were detailed. (Exhibit 33.)

5.     Over his career, Russo has twenty-eight investigations leading to twenty-eight

convictions of homicides.  Croughwell considered him a good homicide detective.

(Croughwell Dep., at 222-23.)

6.     Prior to Russo's arrest he did not fail to report for assignments in the Task Force.

(Huertas Dep. at 76.)

7.     Russo was a good homicide detective. (Croughwell Dep. at 222-23.)

8.     Russo was detailed, dedicated and successful at his work, successes included solving the

murder of Marcelina DelGado, while part of the Fed. Gang Task force, which lead to the

conviction of the murderers by federal prosecutors. (Huertas Dep. at 30, 32.)

9.     Russo had "phenomenal" success in developing informants. (Huertas Dep. at 33.)

10.    Russo was very careful and versatile as a Union Steward. (Huertas Dep. at 44.)

11.    Sergeant Huertas ("Huertas") was Russo's supervisor on the gang task force. (Huertas

Dep. at 45.)

12.    Russo was "a good officer, very loyal, very dedicated, highly decorated, and he was a

team  player.  And our mission was to basically put the bad guys away." (Huertas Dep.

at 49.)

13.    There was no deterioration in Russo's work performance in 1997, before his arrest.

Huertas Dep. at 49.)

14.    Russo was not a "dirty cop" and was credible (Durham Dep. at 16-17, 82.)

15.     US Attorney John Durham ("Durham") thought that Russo was "extraordinarily hard

working.  He worked an incredible number of hours.  He essentially never said no when

you asked something be done, even if it was an inconvenient  time and he had already

worked a lot of hours.  You could  pretty much rely on -- pretty much rely -- you could

rely  on what he told you on what witnesses told him.  If we brought a person into the

grand jury, for example, to be questioned, what the person would provide to us as a

general rule would be consistent with what Detective Russo had written up or advised

the witness had   said.  That's my general experience with Detective Russo." (Durham

Dep. at 82.)

16.     Russo's job performance was not an issue during 1997, as Durham stated:

"A. . . . .You know, there were people saying that Nicky is using prescription drugs or
whatever.  And I told the chief, 'Look, I have not seen any indication of that,  which is
the truth then and is the truth now.'
Q    So he wasn't like late for work, missing assignments.  His behavior was not poor in
1997?
MR. SHEA:  Objection to the form.
MR. HOWARD:  Objection to the form.
A    He was not missing assignments.  He was not missing work that I can recall.  In all
candor, I have to say that Russo was one of the person we could rely on to actually get
assignments done." (Durham Dep. at. 128.)

17.     There is no evidence that Russo bought misappropriated cigarettes. (Dunham Dep. at

82.)

## II.     CONFLICT BETWEEN HPD AND The Federal Government

### A.     <u>Pope Park Murder</u>.

18.     On June 15, 1997, Enrique Ramirez, a gang leader, also known as "Rick the Ruler"  was

murdered at Pope Park in Hartford, CT.

19.     On June 16, 1997,  Russo worked with Federal Agents to arrest Julio Ramos.  The

federal investigation focused on Ramos after Ramos had been audio-taped under

surveillance, admitting to the murder and to where he had disposed of the murder

weapon.  (F.B.I. Sentencing Memorandum, <u>Rivera v. Bailey</u>, at 5, 7-9); (Lyons Dep. at

206.)

20.     The police defendants were angry with the swift and efficient investigation by the federal authorities. They were expecting to earn a significant amount of overtime pay working on the case. In the past they had earned significant overtime on an earlier murder investigation, namely the Irma Horvath murder. In fact, Leito actually named a truck he bought with his overtime pay "Irma" after the victim of the murder. (Rovella Dep. at 119-123.)

21.     The CAPers unit decided to pursue an independent investigation of the murder and rebuffed efforts by the federal authorities to work jointly with CAPers. (FBI Sentencing Memo., Rivera v. Bailey, at 9.) Mazzamurro created the initial posturing of the CAPers unit opposing cooperation with federal authorities. (FBI Sentencing Memo., Rivera v. Bailey, at 9.)

22.     It was not until after the CAPers' investigation had progressed that Rivera had become a suspect. (Thomas Affidavit, Rivera v. Bailey, at 2-3.) It was not until August 5, 1997 that a warrant for Rivera was drafted, (Thomas Affidavit, Rivera v. Bailey, at 3) , almost two months after the federal warrant had been executed and Ramos had been taken into custody.

23.     There was no progression in the Hartford Police investigation. (Pitkin Dep., Rivera v. Bailey, at 131-132.)

24.     Thomas directed then Assistant State's Attorney Joan Alexander to work on the arrest warrant of Gilberto Rivera with the Hartford Detectives and he was arrested on December 26, 1997, five months after Ramos had confessed and was arrested for the murder. (Thomas Dep., Rivera v. Bailey, at 54).

25.     CAPers failed to offer any assistance to the federal authorities in the arrest of Ramos

even though they were told in advance that an arrest was pending and when and where it

would take place.  (Thomas Dep., <u>Rivera v. Bailey</u>, at 49.)

26.     Rivera was arrested within weeks of Russo's arrest: On approximately, December 24,

1997, the second warrant was executed for Rivera.  (Arrest Warrant, <u>Rivera v. Bailey</u>.)

27.     Russo and Gilberto Rivera were conveniently arraigned on the same day at the Hartford

Superior Court:

"A    What I do remember is my recollection is when they were arraigned Nick Russo,
there were a number of police officers –
MR. HOWARD: I'm sorry.  Could you speak up.
A    There were a number of police officers I recall that attended the arraignment,
inspectors, prosecutors.
Q    The state's attorneys' officials, right?
A    Yes.
Q    There weren't Hartford police officers there, were there?
A    Maybe they were inspectors from the state's attorneys' office.
Q    Prosecutors?
A    Yes.
Q    Do you have any rules in your office about sort of this voyeurism of defendants?  Is
there a rule or practice against having everyone in the prosecutors' office going down
and see somebody get arraigned? . . .
Q    Could you see any symbolism with that arraignment, any message sent to you or
people that work for the gang task force?
A    Sophomoric or otherwise?
Q    Yes.  I'm not giving anyone any credit for being professional or intelligent.
MR. SHEA: Objection to the form.
A    If it were orchestrated that way, and I don't know that it is, that wouldn't surprise me
based upon my experience with some of these folks." (Durham Dep. at 132-34.)

**B.     <u>Tension Between HPD & Fed. Gang Task Force Members</u>**

28.     Lieutenant David Kenary ("Kenary") questioned Russo's loyalty to the HPD because of

his involvement and work with the Federal Government and testified that: "Nick Russo

forgot whose badge he was wearing." (Kenary dep., <u>Rivera v. Bailey</u>, at 92.)

29.     Karen Tabara ("Tabara"), the former senior administrative assistant to Croughwell over

heard Kenary and Flaherty  say on numerous occasions: "Fuckin' Russo, we'll get him."

(Tabara Testimony, Exhibit 35.)

30.     Kenary was angry at Russo for his involvement with the Federal Task Force. (Lawlor

Dep. at 203.)

31.     Sergeant Daryl Roberts ("Roberts") felt that Russo had forgotten that he was a Police

Officer because of his work with the federal agents. (Roberts Dep. at 165.)

32.     CAPers excluded the Fed. Gang Task Force members including: "There was a mandate,

verbal from Chief Croughwell that we would be notified on all gang-related homicides.

And I felt that we were left out of the loop and misinformed on homicides, particular

homicides that were in fact gang related and they made a partial effort to notify us of

acts of violence which I clearly knew based on my experience that they were 100

percent gang related.  Another example, the term I want to use is railroaded.  We went to

serve a federal subpoena which was part of our duties and I got the distinct impression

and also the person that was with me that the person that we were about to serve was pre

warned that we were coming. . . . [by] member of the CAPers division."(Huertas Dep. at

55.)

33.     Following the Pope Park Murder, where the Fed. Task Force arrested Ramos for the

murder, the CAPers Division, as well as Croughwell created a hostile work environment

for members of the Federal Task force, specifically:

"A: A  rift that was caused when the task force arrested and indicted an individual
responsible for a murder.
Q    Is this the Pope Park murder?
A    Yes.
Q    Can you describe some of the ways that you were  mistreated?
A    Once again, left out of the loop, not made privy to the statuses of certain
investigations.
Q    You were a sergeant though, right?
A    Yes.  Authority was circumvented by  administration.  The veracity was questioned.
Q    Your veracity?

A   Oh, yeah.
Q   By whom?
A   Chief Croughwell. . . . A   I don't know if I mentioned this, but just overall mistrust from the detectives involved in the Hartford murder.
Q   Were you shunned by these people?
A   Yes." (Huertas Dep. at 71).

34.    Roberts was transferred because he disobeyed an order by Captain Robert Casati ("Casati") to send detectives to assist federal authorities in a homicide case. (Roberts Dep. at 166,184.)

35.    In 1997, Roberts felt that Russo should have been working with the police department not with the Federal Government, especially working on the Pope Park murder with the HPD not with the Federal Government. (Roberts Dep. at 165-66.)

36.    The HPD mistreated Russo while he worked with the Fed. Gang Task Force. (Durham Dep. at 94-5.) Sergeant Christopher Lyons ("Lyons"), "was not particularly supportive of the joint effort that was being made by the task force. There was relatively constant tension in these matters." (Durham Dep. at 135.)

37.    Refusing to assist the Federal Government in the Pope Park murder demonstrated the lack of cooperation between the HPD and the Fed. Gang Task Force. (Roberts Dep. at 198.)

38.    On June 29, 1996, Russo wrote a letter to Durham and Sergeant Charles Lilley ("Lilley"), to complain about the tensions between the HPD specifically how Lilley and Roberts were not cooperating or sharing information with the Federal Task Force which caused friction and dangerous situations. (Exhibit W.)

39.    Huertas testified as to the friction, stating:

"Q.  Is it fair to say that there was tension between agencies?
A   Yes.
Q   How would you describe that?

A    Laymen's terms, pissing contest.
Q    Between the federal investigation and the state?
A    Federal and the state, yes.
Q    Which side was Nick Russo on in this pissing contest?
MR. GOUMAS:  Object to the form.
MR. SHEA:  Objection to the form.
 A   I think he was on the side of justice.  I don't think he was on one side or the other, just get
      to the truth.
Q    Is it fair to say he might have been caught in the middle of it?
A    Yes.
Q    Did Nick Russo want to make sure that someone like Gilberto Rivera was wrongly
      prosecuted and jailed?
MR. SHEA:  Objection to the form.
MR. GOUMAS:  Object to the form.
A    I think it would be fair that he would not want to have somebody wrongly
prosecuted.
(Huertas Dep. at 112.)

## III.     THE DRUG FACTORY KIT

40.    Once evidence is seized it is tagged, inventoried, and placed in the property room, tested

or brought to the executive officer who will tag them.  Seized evidence is not to be kept

anywhere other than the property room. (Edelwich Dep. at 133; Miele Dep. at 58;

Huertas Dep. at. 25.)

41.    However, Lieutenant O'Connell ("O'Connell") found 147 bags of heroin and other

contraband outside of the property room in the Intelligence Division when he took over

the Intelligence Division from Lyons and detailed what was found in an inventory.

(Exhibit I -1.)

42.    Evidence is not to be kept in an officer's office or desk. There is no provision or policy

for an officer to keep drugs and drug paraphernalia for training purposes. (Huertas Dep.

at. 26.)

43.    Nor are officers allowed to keep evidence on their person on in their desk. (Miele Dep.

at. 60.)

44.   To be in possession of 147 bags of heroin and other drug contraband would be a "Serious violation in department policy and possible criminal and state statutes." (Huertas Dep. at 115).

45.   "Due to the amount of narcotics and related paraphernalia found in the box, and the fact that it was not secured as required by Hartford Police policy this investigation was criminal in nature." (Exhibit I).

46.   The amount of drugs found by O'Connell provides probable cause to arrest the person for possession with intent to distribute and such amount is not indicative of a training purpose. (Flaherty Dep. at 39, 87.)

47.   Lawlor knew of the cocaine, heroin and marijuana stored in the Intelligence Division and had access to the drugs while he worked in the Intelligence Division. (Miele Dep. at 133, 137; Lawlor Dep. at 54.)

48.   The drugs were given to Sergeant Stephen Miele ("Miele") and Officer Michael Edelwich ("Edelwich") together at the same time, but neither can remember who gave them the drugs, when the drugs were given to them or where the drugs were given to them. (Edelwich Dep. at 67-69, 73; Steven Miele Dep. at 82, 128.)

49.   Miele can not remember if the drugs came from a West Hartford police officer or a Hartford Police Officer. (Miele Dep. at 84.)

50.   Miele does not know what a field sample is and does not know of any policy regarding "field samples". (Miele Dep. at 85.)

51.   Prior to testifying both Miele, Lawlor and Hasdasz spoke with Edelwich about being deposed. (Edelwich Dep. at 47.)

52.   Miele's supervisor, Lyons testified that the Intelligence Division did not do training.

(Exhibit I, COH 443.)

53.    However, Miele testified that The Drug Factory Kit was used for training purposes. (Miele Dep. at 89-90.)

54.    "Lawlor stated the drug box was already in the Intelligence Division prior to his arrival and he. . . did not conduct any drug training classes and he had no knowledge of where the box came from." (Exhibit I, COH 443.)

55.    The drug training classes are alleged to have occurred in 1995 and were not ongoing in 1997. (Miele Dep. at 119; Edelwich Dep. at 82.)

56.    Lawlor, Lyons, Miele and Edelwich maintained a Drug Factory Kit, in the Intelligence Division which contained at one point up to 147 bags of heroin, marijuana, cutting agents, and other drug paraphernalia and contraband. Edelwich and Miele stored the 147 bags of heroin in an unlocked credenza in the Intelligence office. (Miele Dep. at 79-80, 91; Edelwich Dep. at 58.)

57.    This Kit was used to plant drugs on gang members in order to effectuate arrests on gang members and other Hartford residents, which is a crime. Lyons, Lawlor and Edelwich's possession and access to the drug kit compromised their credibility as officers because they could have used the drugs to plant on gang members. (Huertas Dep. at 63; Croughwell Dep. at 77);

58.    Planting drugs on suspects is a felony and if Lyons, Lawlor and Edelwich were involved in such criminal actions they could be charged with a felony. (Huertas Dep. at 65).

59.    It is also a crime to take drugs and money from drug dealers.  (Flaherty Dep. at 32.)

60.    Lyons and Lawlor planted evidence on gang members during their tenure on the HPD. (Croughwell Dep. at 77.)

### IV.    RUSSO INVOLVED IN CORRUPTION INVESTIGATION

61.    On October 13, 1997, Russo met with Inspector Stephen Kumnick of the State's

Attorney's Office at a soccer game.  Russo  discussed the federal corruption probe of the

HPD with which Russo was assisting the Federal Government.  (Russo Dep., 6/24/03, at

52-56, 115-16; Croughwell Dep. at 148, 194-95.)

62.    Detective Robert Lawlor ("Lawlor") told Croughwell that  "he got a call  I believe it was

from Kumnick stating that Russo and Kumnick had a conversation at a soccer match that

their children were in.  Russo told Kumnick . . . . that the FBI was going to be doing an

investigation of corruption in the police department, to include Lawlor and Edelwich and

some bosses." (Croughwell Dep. at 148.)

63.    Russo spoke with Kumnick about the corruption probe as directed by the Federal

Government because Kumnick was a source of investigation about corruption in the

HPD, and was an inspector for the chief state's attorney's office. (Croughwell Dep. at

194-199.)

64.    On approximately March 9, 1998,  Russo voluntarily went to the F.B.I..(in Meridan), as

requested by the F.B.I., to work on an unsolved murder in Massachusetts (the Dog Man

Case) in which three Hartford police officers were suspects.  Russo met with F.B.I.

Special Agent Kevin Kline ("Kline") and two Massachusetts State Troopers.  (Russo

Dep. 6/24/03, at 59.)

65.    Croughwell defines corruption as: "an act either committed or an act of omission by a

police  officer which is illegal or improper which causes that  officer to receive some

sort of remuneration for the  acts of omission or commission of an act, generally."

(Croughwell Dep. at 21.)

66.     Croughwell knew of corruption at the HPD. (Croughwell Dep. at 22, 24.)

67.     In a memorandum, from Kumnick to Chief Inspector David Best ("Best"), dated

10/30/97, the corruption case investigation is divulged to the HPD. (Exhibit 2).

68.     Durham told Assistant U.S. Attorney Jim Glasser ("Glasser") to contact Russo to find

information about corruption in the HPD. (Durham Dep. at 38-39.)

69.     Durham "told Nick Russo that Jim Glasser was going to conduct an investigation

involving corruption in Hartford.  Would he be willing to talk to him." (Durham Dep. at

40.)

**V.     HPD INITIATES INVESTIGATION OF RUSSO**

70.     Croughwell ordered Captain Jeffrey Flaherty ("Flaherty"),  to attend the meeting at the

State's Attorney's office and to discuss Russo.  (Flaherty Dep. at 130.)

71.     Kenary left a phone message with State's Attorney James Thomas ("Thomas") on

November 12, 1997, leaving his pager and home number with a message to call Kenary.

(Exhibit K).

72.     Hasdasz was assigned by Flaherty to assist the DEA and the State's Attorney's office to

investigate Russo. (Hajdasz Dep. at 64.)

73.     Kenary and Hasdasz of the HPD were assigned to the investigation of Russo. (Flaherty

Dep. at 132.)

74.     Flaherty supervised Hasdasz and Kenary in their investigation of Russo. (Flaherty Dep.

at 136.)

75.     State's Attorney Investigator Lawrence Skinner ("Skinner") made notes regarding the

investigation of Russo dated from September 24, 1997. (Exhibit L).

76.    Kenary was a HPD Lieutenant in 1997 under the supervision of Flaherty. (Flaherty Dep.

at 139.)

77.    Flaherty did not keep records of the Russo investigation that he was involved in.

(Flaherty Dep. at 151.)

78.    Even though Flaherty was involved and supervised the investigation of Russo, Flaherty

did not know of any evidence against Russo when he started the investigation as he

stated:

"Q      To start the investigation of Nick Russo, what evidence was there?
A      I don't know.
Q      There was none; right?
MR. HOWARD:  Objection.
A      I don't know.
Q.    You don't even know how that investigation started, do you?
A      No." (Flaherty Dep. at 217.)

## VI.    THE INVESTIGATION OF RUSSO

79.    Diversionary Inspector of the Drug Enforcement Agency Marcus Brown ("Brown") was

involved in the Russo investigation and authored an investigatory report. (Croughwell

Dep. at 112; Exhibit N.)

80.    Kenary and Hazdas were the investigators for the HPD regarding the allegations against

Russo. (Croughwell Dep. at 116.)

81.    In the fall of 1997, Croughwell assigned Kenary to investigate Russo, after Croughwell

had met with James Thomas about Russo. (Croughwell Dep. at 116.)

82.    Croughwell and Thomas discussed Russo and an investigation into Russo in November,

1997. (Croughwell Dep. at 116.)

-13-

83.   Croughwell asked James Thomas to investigate Russo and to be in charge of the JIT. (Croughwell Dep. at 117, 122.)

84.   Flaherty told Croughwell that Russo had been prescribed 5,000 pills. (Croughwell Dep. at 119.)

85.   Croughwell asked the State's Attorney's office to investigate Russo but did not ask the State's Attorney's office to investigate Lawlor for allegations of perjury.  (Croughwell Dep. at 117-119.)

86.   On approximately, January1997, Kenary talked to Drug Enforcement Agency (D.E.A.) agents Frank DeCarlo ("DeCarlo") and Kurt Reid ("Reid")who gave Kenary the name of Marcus Brown, a Diversionary Inspector of the D.E.A., and told Kenary that they will have Brown call him.  (Kenary Dep. at 134-135); (Croughwell Dep. at 190).

87.   Kenary was angry at Russo for his involvement with the Fed. Gang Task Force. (Lawlor Dep. at  203.)

88.   Early in October 1997, Kenary runs into Reid and DeCarlo again at a bar at the airport. They ask him if Brown had ever called him.  Kenary tells them "no". (Kenary Dep. at 138-140.)

89.   One week later in October 1997, Kenary calls Brown to set up a meeting.  (This was stated in the search warrant affidavit, however, Kenary stated in his deposition that Brown called him.) (Kenary Dep. at 138-140.)

90.   As part of this investigation, Brown entered pharmacies in Russo's neighborhood and around the vicinity of Dr. Santo Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Brown was not conducting routine

administrative inspections,  but instead was aiding the HPD in their criminal investigation into Russo, which both Brown and the state admit to.  (Exhibit Q - November 14, 1997 Affidavit and Application for Search and Seizure Warrant for Dr. Buccheri's office.)

91.  On November 13, 1997, Brown and Skinner went to Dr. Bucchieri's office without a warrant and obtained information from searching Russo's medical file in Dr. Bucchieri's office. (Brown Dep., <u>Rivera v. Bailey,</u> at 47-51;  Bucchieri Dep., 5/16/0, <u>Rivera v. Bailey,</u> at 78-81; 94-99.)

92.  Brown and Skinner drafted a search warrant with the information he had obtained through searching Russo's medical file at Dr. Bucchieri's file. (Brown Dep. at .47, 48, 51, 91, 92.)

93.  Brown used the information obtained at Dr. Bucchieri's office on November 13, 1997, to draft the search warrant dated November 14, 1997. (Brown Dep. at .91-96; Exhibit Q.)

94.  Brown identified himself to Bucchieri as an Agent, which is a police official. (Exhibit Q.)

95.  On November 14, 1997, Brown seized 20 pages of Russo's prescription records from Dr. Bucchieri's office. (Brown Dep. at 69.)

96.  Brown did not have a warrant to obtain the medical file from Dr. Bucchieri's office, but Brown looked through and seized the entire original medical file. (Brown Dep. at 45-48, 70, 71, 74, 94-96.)

97.  When Brown and Skinner went to Bucchieri's office on November 17, 1997, they asked for Russo's medical records.  (Bucchieri Dep., 5/16/01, at 53.)

98.     Bucchieri was subsequently questioned by Brown and Skinner without a warrant. (Brown Dep. at 82-83.)

99.     Dr. Bucchieri provided Brown and Skinner with the names of pharmacies in which Russo had prescriptions as well as the medical file. (Bucchieri Dep., 5/16/01, at 132-134.)

100.    When Bucchieri was questioned at the State's Attorney's office, accompanied by his attorney Ed Daly, Bucchieri was allowed to refuse to answer questions. (Hajdasz Dep. at 266.)

101.    Beginning on October 31, 1997, Brown went to pharmacies located in the vicinity of both Buccheri's office and the defendant's home and, without a search warrant, asked each of the pharmacies to provide him with the defendant's prescription records.[1] (Exhibit Z at 15-24.)

102.    The records contained information about prescriptions that each pharmacy had filled for the defendant, including the name of the prescribing physician, the date on which the defendant had submitted the prescription to the pharmacy, the type and quantity of drug prescribed and the price of the drug. (Exhibit Z at 15-24.)

103.    The pharmacies complied with Brown's requests. Brown later returned to each pharmacy and, again by request, obtained copies of the actual prescription forms that the defendant had presented to the pharmacies. (Exhibit Z at 15-24, 15-25.)

104.    The Connecticut Superior Court, The Honorable Judge Schimelman found, following a

---

[1] Facts contained in Exhibit Z were found by Judge Schimelman in his ruling following a hearing on Russo's Motion to Suppress that included testimony from Marcus Brown.

hearing on a Motion to Suppress, that Russo was the focus of the investigation by Brown and Kenary not an investigation of Bucchieri. (Exhibit Z at 15-25, 15-26, 15-27.)

105.   A report prepared by Brown on November 19, 1997, identifies Russo as the target of Brown's investigation. (Exhibit Z at 15-26.)

106.   Prior to preparing the November 19, 1997 report, Brown had not requested records of Buccheri's prescribing practices but, instead, had requested only Russo's records. (Exhibit Z at 15-27.)

107.   Judge Schimelman found that the purpose of Brown's investigation was to determine whether Russo had been abusing controlled substances, and that Buccheri was involved only because he was Russo's physician. (Exhibit Z at 15-27.)

108.   Judge Schimelman found that Brown was not conducting an administrative inspection of the pharmacy pursuant to 21 U.S.C. §§ 880 when he obtained the defendant's prescription records but, rather, was acting in pursuance of a criminal investigation of the defendant in cooperation with the HPD. (Exhibit Z at 15-32.)

109.   Brown's investigation into Detective Russo's private prescriptions involved his going to the previously mentioned pharmacies and demanding to see Detective Russo's patient profile and, upon returning to the pharmacies, demanding Detective Russo's actual prescriptions, which he took into custody.  (Exhibit Z at 15-24, 15-25, 15-27.)

110.   Agent Brown took these actions without seeking a criminal or even an administrative search warrant. (Exhibit Z at 15-24.)

111.   Kenary's investigated Russo's confidential medical records.  (Lilley Dep. at 117-124,

129-144, 149-152; Kenary Dep. at 77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 181-184; Croughwell Dep. at 137-156, 169-200, 249-256.)

112. In January 1997 Lilley, Kenary, Casati, and Croughwell, all of the HPD, contacted Dr. Buccheri and questioned him about his treatment of Russo, and discussed illegal disclosures of Russo's medical treatment; specifically, information pertaining to certain drugs which the doctor was both giving and prescribing to Russo. (Lilley Dep. at 117-124, 129-144, 149-152; Kenary Dep. at 77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 181-184; Croughwell Dep. at 137-156, 169-200, 249-256).

113. Kenary contacted the DEA in January, 1997, and spoke with DeCarlo and Reid who referred Kenary to Marcus Brown, a Diversionary Inspector of the Drug Enforcement Agency (DEA). (Kenary Dep. at 134-135.)

114. Kenary testified that he again "ran" into DeCarlo and Reid at a "bar" in October, 1997 and that they offered to have Mr. Brown contact him. (Kenary Dep. at 138-140.)

## VII. RUSSO WAS INTENTIONALLY TREATED DIFFERENTLY FROM OTHERS SIMILARLY SITUATED.

### A. Russo Placed On AWOL Status.

115. On January 7, 1997, Russo called in sick to Roberts. Roberts recorded the voice messages and gave the recordings to Kenary in the presence of Croughwell and Casati. (Kenary Dep., Rivera v. Bailey, at. 125, 126; Exhibit 28).

116. The next day a meeting was held regarding the voicemail tape of Russo's sick call. Present at the meeting were: Casati, Croughwell, Kenary, Ward, Roberts, and Doctors Braunsford and McCants (E.A.P.). (Russo Dep, 6/24/03, at 147-48.)

117. On approximately, January 10, 1997, Russo submitted a doctor's note (dated January

-18-

10, 1997) indicating he was under Dr. Buccheri's care from January 7th through January13th, for influenza, with Union President Dennis O'Brien as a witness and that Russo could return to work on January 13, 1997. (Kenary Dep., <u>Rivera v. Bailey</u>, at 100.)

118.    Kenary thought the note was suspicious and looked like female handwriting. (Kenary Dep., <u>Rivera v. Bailey</u>, at 101.)

119.    Lilley then contacted Dr. Bucchieri regarding Russo's absence and Dr. Bucchieri's note. (Lilley Dep. at 117, 118, 123).

120.    It is disputed as to who initiated the phone call to Dr. Bucchieri: Kenary testified that on January 10, 1997 (12:50 p.m.), Kenary initiated a call to Dr. Buccheri regarding the Doctor's note. In a memo to Casati dated January 10, 1997, Kenary stated that Lilley made the initial call to Dr. Buccheri. Lilley testified that he called Dr. Buccheri first. (Kenary Dep., <u>Rivera v. Bailey</u>, at 110-112; Exhibit T; Lilley Dep. at 117, 118, 123.)

121.    On approximately, January 10, 1997, Dr. Bucchieri confirmed on a telephone call with Kenary and in a faxed letter that Russo had treated with Dr. Bucchieri and that he had treated Russo on January 7th through January11th for "*unofficial*" visits.(Kenary Dep., <u>Rivera v. Bailey</u>, at 117-122; Lilley Dep. at 117-124, 129-144, 149-152; Kenary Dep. at 77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 1,81-184; Croughwell Dep. at 137-156, 169-200, 249-256).

122.    On approximately,  January 9, 1997, Russo was marked AWOL by Roberts which is in violation of General Order 8-1, which provides the procedures for reporting sick, which Russo followed, in that Russo called Roberts out sick in accordance with the

procedures. (Exhibit J.)

123.    Roberts did not receive training as a Supervisor on how to identify physical signs of

intoxication or drug abuse.:

" A.   Yes.  That came in traffic training when I was a DUI officer, driving while

intoxicated."(Roberts Dep. at 125.)

124.    Roberts testified that:

"Q.   If someone calls you up and says, "I know I'm supposed to be working today, but
I'm taking a medication that makes me drowsy, I would like to book off sick," you
would let them off.  Right?
A.   Yes.  If they said that, yes."  (Roberts Dep. at 135.)

125.    Despite the doctor's note, Kenary placed Russo on AWOL status. (Kenary Dep., <u>Rivera

v. Bailey</u>, at 103.)

**B.        Russo Ordered to Report Everyday to HPD / OT Denied**..

126.    Kenary testified that Casati ordered Kenary to order Russo to check in with the HPD

everyday. (Kenary Dep., <u>Rivera v. Bailey</u>, at 115.)

127.    No other officer was required to report and submit a daily itinerary. (Croughwell Dep.

at 211.)

128.    After Russo's partner, John Murdock, ("Murdock") was assaulted by his supervisor,

Anthony Cancel ("Cancel") and retired in 1996, Russo was not given a replacement

partner even though every other detective had a partner. (Roberts Dep. at 211.)

**C.        Russo Intentionally Locked Out of the CAPers Office.**

129.    In the Spring of 1997, the locks to the CAPers office were changed and no key was

given to Russo. (Kenary Dep., <u>Rivera v. Bailey</u>, at 128.)

130.    Roberts does not remember if he told Russo that he could not have a key to the CAPers

office. (Roberts Dep. at 76.)

131.    The work atmosphere toward Russo in 1997 was hostile.  He was "locked out, locked

        out of his own office, basically, which thereby prevents you from doing research on

        open cases." (Huertas Dep. at 51-52.)

132.    Roberts does not dispute that he told Russo that Russo had to come to CAPers to close

        out some paperwork but that he would not receive any overtime to do so. (Roberts Dep.

        at 96-97.)

133.    In April 1997, Roberts told Russo that he had changed the locks to CAPers and that he

        did not change the locks to CAPers, that Casati or Kenary changed the locks.

        Specifically Roberts testified that:.

        "Q.   Did you tell him on that date that you changed the locks on the doors to CAPers?
        A.   I may have.
        Q.   Do you have a recollection or is it no?
        A.   I recollect having a conversation about the locks.
        Q.   You did change the locks on the doors around that time.  Right?
        A.   I didn't change them.  We had them changed.
        Q.   Were you responsible for having them changed or who made the decision?
        A.   Casati.  He was the Deputy Chief of the division.
        Q.   Who initiated the lock change; do you know?
        A.   I'm not sure.
        Q.   Was it Kenary?
        A.   It may have been.  I don't know." ( Roberts Dep. at 97-98.)

134.    Roberts did not give Russo a key to CAPers although he spoke to Russo about changing

        the locks. (Roberts Dep. at 100.)

135.    Roberts knew that Russo did not have a key .( Roberts Dep. at  105.)

        **D.      Disparate Treatment**

136.    Croughwell asked the State's Attorney's office to investigate Russo but did not ask the

        State's Attorney's office to investigate the allegations of perjury against Lawlor.

(Croughwell Dep. at 117-119.)

137.    There is not a policy or prior practice of the HPD having the State's Attorneys Office investigate a police officer prior to Russo but Croughwell had the State Attorney's office investigate Russo. (Flaherty Dep. at 32.)

138.    The City does not provide for suspension with pay but Russo received pay while suspended. (Croughwell Dep. at 110; Exhibit 21.)

139.    In a memorandum dated November 4, 1997, Flaherty ordered Russo to go on sick leave. (Exhibit 5.)

140.    In a memorandum, from Huertas to Russo, dated April 2, 1997, Russo is informed that he was not entitled to receive over time pay. (Exhibit 6.)

141.    The overtime log dated March 29, 1997, shows that every other officer assigned to the CAPers division received overtime pay and Russo was not given such pay. (Exhibit 7.)

142.    Russo complained to Kenary that he was given an excessive workload and he was not provided with any assistance from other officers. (Exhibit 21.)

143.    Russo requested a partner for assistance. (Exhibit 22.)

144.    The HPD had not investigated anyone, either officer or general public, for prescription drug fraud except Russo. (Hajdasz Dep. at 175.)

145.    Russo was the only officer Croughwell ordered on sick leave following a drug test. (Flaherty Dep. at 100-101.)

146.    Russo is the only officer who had his weapon taken away during a drug test. (Flaherty Dep. at 102-104.)

147.    Miele sexually assaulted a prostitute in New Britain, Connecticut and was not

investigated or arrested or disciplined. Russo was investigated and arrested.  (Russo Dep. 6/25/03, at 214-221.)

148.    Assistant Chief McKoy ("McKoy") was found by New Britain Police soliciting a prostitute.  This incident was known by the HPD but was not investigated and Chief McKoy was not arrested. Russo was investigated and arrested. (Russo Dep. 6/25/03, at 77-92.)

149.    It is a crime to receive compensation from the City of Hartford through fraudulent means. (Hajdasz Dep. at 156.)

150.    Unofficial compensation time is not recognized by the HPD. (Flaherty Dep. at 210-11; Hajdasz Dep. at 154)

151.     Sergeant James Rovella ("Rovella") falsified and forged time cards in order to steal overtime from the HPD.  Even though the HPD does not recognize "unofficial compensation time" Rovella claimed that it was unofficial compensation time.  These actions could have been investigated, and Rovella could have been arrested; however, he was not.  Russo was investigated and arrested.  (Rovella Dep. at 34-63; Flaherty Dep. at 210-11; Hajdasz Dep. at 160.)

152.    Lawlor stalked, followed and threatened Russo. He was not investigated or arrested for this. (Exhibit 32.)

153.    Croughwell threatened Russo over the telephone and told him Lawlor and Lyons would beat him up stating, "I've got two guys here who want to kick your ass." Croughwell was not investigated or arrested for this.  Nicholas Russo was investigated and arrested. (Croughwell Dep. at 191-199.)

154.   Lyons threatened to beat up Russo for his involvement  with the Federal corruption
       investigation.  He was not investigated or arrested for this.  Russo was investigated and
       arrested. (Croughwell Dep. at 191-199.)

155.   Lyons was in possession of drugs and drug paraphernalia, 125 bags of heroin and 25
       bags of crack cocaine and was not arrested. Russo was investigated and arrested. (Miele
       Dep. at 78-108; Calderone Dep. at 135-148;  Russo Dep. 6/25/03, at 214-221; Kenary
       Dep. at 153-160; Lawlor Dep. at 56-84; Croughwell Dep. at 229-240; Lyons Dep. at
       181-203.)

156.   Acting Chief Robert Rudewicz ("Rudewicz") drove his vehicle into the Gold Building
       in Hartford and was found in possession of cocaine in his vehicle. He was not
       investigated or arrested. Russo was investigated and arrested.  In May, 2003, Rudewicz
       was found intoxicated in his vehicle in Goodwin Park in Hartford at 2:00 a.m.  He was
       not investigated or arrested. (Russo Dep. at 77-92.)

157.   Officer Eric Coleman ("Coleman") was found possessing cocaine and tested positive
       for possessing cocaine.  Coleman was not disciplined or arrested and was allowed to
       resign.  Russo was not allowed to resign, but was investigated and arrested. (Russo Dep.
       at 77-92.)

158.   Croughwell promoted Sergeant Cancel to Lieutenant after he assaulted a subordinate
       with a gun. (Croughwell Dep. at 172.)

159.   Cancel was suspended for a few days and the suspension ran concurrently with his
       scheduled days off after assaulting a subordinate. (Croughwell Dep. at 172.)

160.   Sergeant Scott Vinci and Sergeant Michael Fallon were accused of stealing overtime

-24-

and wages and were subsequently promoted to Lieutenant. (Croughwell Dep. at 243-44.)

161. Edelwich and Miele were in possession of drugs and drug paraphernalia, 125 bags of heroin and 25 bags of crack cocaine and were not arrested, an internal affairs investigation was not done, and neither were suspended and neither were forced to take a reasonable suspicion drug test . Russo was investigated and arrested. (Miele Dep. at 78-108; Calderone Dep. at 135-148;  Russo Dep. 6/23/03, at 214-221; Kenary Dep. at 153-160; Croughwell Dep. at 229-240; Lawlor Dep. at 56-84; Lyons Dep. at 181-203.).

162. The HPD did not internally investigate Miele, Edelwich or Lawlor for the drug possession. (Miele Dep. at 131; Huertas Dep. at  116.)

163. After the drugs and other contraband were discovered in the Intelligence Unit, no officers assigned to the Intelligence Division were given a drug test, either random or a reasonable suspicion drug test. (Lawlor Dep. at  5.)

**E.    There Is No Rational Basis for the Difference in Treatment and the Defendants' Conduct Was Irrational and Wholly Arbitrary.**

163. It was improper for Roberts to deny Russo access to the CAPers office by denying him a key after the locks were changed. (Roberts Dep. at 102.)

164. A supervisor does not have the authority to prevent an officer from earning overtime if the officer has worked the overtime hours. (Roberts Dep. at 79, 80.)

165. Flaherty ordered Huertas not to give Russo any overtime in April, 1997, which is not allowed by the collective bargaining agreement. (Huertas Dep. at 50-51.)

**VIII.  SUBSTANTIVE DUE PROCESS CLAUSE AS TO THE POLICE DEFENDANTS.**

-25-

### A.    Defendants Actions Were Arbitrary, or Conscience Shocking.

166.    **On October 31, 1997**, Russo was threatened with bodily harm by Croughwell for his involvement with a federal corruption probe of the HPD, specifically, Lyons, Lawlor, Edelwich and Miele. (Plaintiff's 56(a)(2) Statement ¶ 152-55, 172-82; Russo Dep., 6/24/03, at 110, 115, 133; Edelwich Dep. at. 90-91; Croughwell Dep. at 133-34, 158, 188; Lawlor Dep. at 117, 119, 133, 139, 155, 159-160; Lyons Dep, at 128-130, 142, 145, 146, 154.)

167.    Croughwell, in response to Russo's cooperation with the federal government, and the threat that posed to the police department, then conspired with Flaherty and Kenary, to illegally arrest and detain Detective Russo under the pretext of a required drug evaluation. (Plaintiff's 56(a)(2) Statement §§ I-IX.)

168.    Between the time that Brown's investigation showed that Russo had obtained 5,000 pills of Tylenol 3 and Russo's arrest, none of Russo's supervisors, including Croughwell, Kenary, Flaherty or Roberts did anything to ensure that Russo was receiving counseling or treatment or that his health was not in jeopardy except to ask for a doctor's note and to give him a drug test. (Croughwell Dep. at. 256-7.)

### IX.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO CROUGHWELL, LYONS AND LAWLOR, MARQUIS

### A.    The Defendant Intended or Should Have Known That Emotional Distress Was a Likely Result of Their Conduct/ The Defendants Conduct Was Extreme and Outrageous.

169.    **On October 31, 1997**, Russo was threatened with bodily harm by Croughwell. (Dep., 6/24/03, at 110, 115, 133; Edelwich Dep. at. 90-91; Croughwell Dep. at 133-34, 158, 188; Lawlor Dep. at 117, 119, 133, 139, 155, 159-160; Lyons Dep. at 128-130, 142,

145, 146, 154.)

170.    On October 13, 1997, Russo met with Kumnick at a soccer game. Russo discussed the federal corruption probe of the HPD that Russo was to be involved in. (Russo Dep., 6/24/03 at 52-56, 115-116); Croughwell Dep. at 148, 194-195.)

171.    On October 31, 1997, Rovella told Lawlor that Lyons, Lawlor and Edelwich were under investigation by the Federal Government for corruption and that Kumnick had told him such information after speaking with Russo. (Lawlor Dep. at 116, 117, 139; Edelwich Dep. at 59; Russo Dep., 7/2/02, at 50-51.)

172.    Lawlor told Croughwell something to the effect that "he got a call  I believe it was from Kumnick stating that Russo and Kumnick had a conversation at a soccer match that their children were in.  Russo told Kumnick . . . . that the FBI was going to be doing an investigation of corruption in the police department, to include Lawlor and Edelwich and some bosses." (Croughwell Dep. at 148, 136.)

173.    That same day, Lawlor, Lyons and Edelwich went to Croughwell's office to tell Croughwell about the conversation with Rovella. The meeting between Lawlor, Lyons, Edelwich and Croughwell in Croughwell's office centered around the "alleged set of comments that Nick had made to [Rovella]", specifically that Russo was assisting the Federal Government with a corruption probe of HPD officers. (Lawlor Dep. at 114, 119, 155.)

174.    Croughwell could have but did not contact anyone from the Federal Government to confirm that there was an investigation of corruption against HPD officers. (Croughwell Dep. at 191-192.)

175.   Croughwell telephoned and paged Russo while Lyons, Lawlor and Edelwich were in his office on October 31, 1997. (Lawlor Dep. at 133, 139; Croughwell Dep. at 133, 134, 158.)

176.   During the telephone conversation with Russo on October 31, 1997, Detectives Lawlor, Lyons and Edelwich were in Croughwell's office and were very upset with Russo. (Croughwell Dep. at 147, 148; Edelwich Dep. at 87.)

177.   Edelwich was angry at Russo because Edelwich found out that he was a target in an investigation of corruption. (Edelwich Dep. at 84.)

178.   During the conversation Croughwell threatened Russo and stated that he had "three guys here who want to kick your fucking ass" (Russo Dep.,7/2/02, at 228-231.)

179.   In regard to this conversation Edelwich testified:

"Q   Were you there when Chief Croughwell called Russo
A   I think so, yes.
Q   What did he say to Russo
A   He asked him what's going on.  "I have these three guys in my office."
 (Edelwich Dep. at 90.)
* * * * * *
"Q   Did you hear what Chief Croughwell said to Russo when he called that day
A   He did say that These three guys are in my office and they want to know what's going on.  Something to that sort.  I don't remember verbatim." (Edelwich Dep. at 91.)

180.   Lyons is aggressive. (Huertas Dep. at 21.)

181.   Croughwell testified that the incident where Lyons, Lawlor and Edelwich threatened Russo in Croughwell's office occurred before Croughwell asked James Thomas to investigate Russo for prescription fraud. (Croughwell Dep. at 188.)

   **B.      The Conduct Caused Plaintiff Severe Emotional Distress.**

182.   In approximately, March 1997,  Russo began seeing a psychologist, Dr. Hall.  (Russo

-28-

Dep., 6/24/03, at 155.)

183.    Russo then saw Dr. Hall, from December 1997 through the present. (Russo  Dep.,
        6/25/03, at 96.)

184.    On approximately December 29, 1997,  Russo entered the Institute of the Living.
        (Russo Dep., 6/25/03, at 97-99, 110.)

185.    In 1998, Russo began seeing Dr. Goodwin, a psychiatrist. (Russo Affidavit.)

186.    On July 11, 2002,  Russo was taken to hospital by ambulance, inpatient overnight, mid-
        way through the deposition. (Russo Affidavit.)

## X.    THE CITY

187.    Around April or May 2002, Russo is ordered to report to Manchester Police Department
        to take part in an interview/meeting, at this meeting Lieutenant Neil Drife, Sergeant Ed
        Pawlina  were to be present, concerning an internal matter. (Implied in letter that it was
        not safe to go to HPD, they sent him to Manchester) A failure to appear by Russo would
        warrant charges under the Code of Conduct. Russo was unpaid at this time.  (Exhibit
        14.)

188.    Even though the criminal case was transferred to New London in October, 1998, the
        HPD was still investigating and meetings were still held in the State's Attorney's office
        in Hartford. (Hajdasz Dep. at 273.)

189.    In August, 2000 , the Connecticut Superior Court granted Russo's Motion to Suppress
        the evidence against him for violations of the Fourth Amendment and dismissed the
        criminal case against Russo. (Exhibit Z .)

190.    In October, 2000, following the dismissal of the criminal case against him,  Russo was

reinstated as a Detective with the HPD with benefits.  (Russo Dep., 6/25/03, at 170.)

191.   Dr. Hall sent a letter to the HPD saying that it is a hostile work environment Russo

cannot work in such circumstances. (Exhibit 20.)

192.   On July 17, 1997, Russo was transferred to the Federal Gang Task Force. (Exhibit 8.)

193.   On September 18, 1997, Russo was transferred to the Federal Gang Task Force.

(Exhibit 9.)

194.   On October 29, 1997, Russo was disciplined for being AWOL in January, 1997.

(Exhibit 10.)

195.   On December 3, 1997, Russo was transferred from the Federal Gang Task Force to

Fraud Unit. (Exhibit 11.)

196.   On October 27, 2000, Russo was reinstated  from being suspended. (Exhibit 13.)

197.   Russo was listed as "suspended" while he was out sick. (Exhibit 15.)

198.   Russo was charged AWOL on January 11, 1997, as certified by Roberts. (Exhibit 16.)

199.   In October, 2000, in response to the plaintiff's protective order, the court, Judge Hall,

gave an oral decision as to what conditions Hartford Police must meet for Russo's

return to work.  Judge Hall ordered City of Hartford to provide a plan for Russo to

return to work safely.  The City of Hartford fails to provide Russo with a supervisor,

prior to his return, to ensure his safety in the force.

200.   In November, 2000,  Russo was issued a lump-sum paycheck.  In a letter from the city,

he was told that it was back-pay earned up until the time of his dismissal, and that he

would begin to receive a weekly check..  (Russo Dep., 6/25/03, at 171-72.)

201.   From November, 2000 through February, 2001,  Russo's benefits are reinstated and he

receives checks for 40 hours-per-week work.   The checks did not state that the payments were for accrued time. (Plaintiff's Affidavit, ¶ 9.)

202.   Russo requested to be returned to work in a safe environment to Chief Marquis on April 12, 2001. (Exhibit 29; Exhibit 30.)

203.   City never offered to get certification from state troopers rather than in-house in Hartford or from another city for his safety. Rudewicz waited until the training elapsed before reinstating Russo. Rudewicz Dep. at 169.   Past practice was to allow officers to train in other locations than Hartford.  (Plaintiff's Affidavit, ¶ 8.)

204.   In November 27, 2000 , Lawlor or Lieutenant Kornbrath ("Kornbrath") stalked and followed Russo in a car, this incident was not properly investigated and the investigation was not conducted by an impartial investigator. Marquis failed to "take appropriate investigatory, supervisory and, or, disciplinary action against City of Hartford supervisors with regard to the negligent, reckless, malicious, deliberate, indifferent, willful, intentional and unlawful conduct complained of.".  (Russo Dep., 6/25/03, at 178-79, 183;  Lawlor Dep., at 106-07; Exhibit 32.)

205.   On February 19, 2002, the Supreme Court of Connecticut overrules the Superior Court's granting of Russo's Motion to Suppress and remands the case for trial.  (Russo Affidavit.)

206.   On February 19, 2002 ,  Russo filed a Motion to reconsider en banc and filed a Motion to Recuse Judge Palmer which was denied.  (Russo Affidavit.)

207.   Justice Richard Palmer stated in a signed ORDER: " I have no personal relationship with Lt. Kenary, and have never had one. . . . although it is possible that I may have met

Lt. Kenary in my official capacity as United States Attorney or Chief State's Attorney

between 1980 and 1993, I do not recall any such meeting." (Exhibit X.)

208.    Kenary and Justice Palmer did have a social relationship:

"Q    Did you know of any relationship between Lieutenant Kenary and Richard
Palmer?  Did you ever hear about anything like that?
MR. GOUMAS:  Object to the form.
A    I think I witnessed -- I might have seen them like socially, that type of thing.
Q    Palmer and Kenary?
A    Yeah.
Q    Do you know where you saw them socially?
 A    The local watering hole, Arch Street Tavern.
Q    Oh, the Arch Street.  Right down the street from the federal building in Hartford?
 A    You could say that, yeah.
Q    Lot of judges go there?
MR. GOUMAS:  Objection to the form.
MR. SHEA:    Objection to the form.
A    I've seen at least one there.
Q    Okay.  Me too.  So you saw Palmer and Kenary in the Arch Street together?
A    I think one time, yeah."  (Huertas Dep. at 89.)

209.    On October 14, 2003, the criminal trial begins. (Plaintiff's affidavit.)

210.    On November 3, 2003,  Russo was convicted on six counts out of seven counts of

illegally obtaining prescription drugs.  (Plaintiff's affidavit.)

211.    On January 6, 2003, Russo is sentenced and was given probation. (Plaintiff's affidavit.)

212.    On December 7, 2001,  Russo has open heart surgery, and the City provides him with

health coverage for the surgery.   (Russo Dep., 6/25/03, at 19.)

213.    On January, 2002,  Russo filed for worker's compensation.  (Plaintiff's affidavit.)

214.    The City contested the benefits.

215.    On July 12, 2002, two days following Russo's deposition he was notified that health

benefits were discontinued as of June 30, 2002. (Plaintiff's affidavit.)

216.    On June 30, 2003,  John Shea appeared at the Workman's Compensation hearings and

assisting Workman's Compensation attorneys without an appearance. (Exhibit 36, at 61-67.)

217. In January 2004, the Worker's Compensation Commissioner rules in favor of Russo and awards him worker's compensation benefits after a three day hearing. (Plaintiff's Affidavit.)

218. The City appealed the commissioner's decision and filed a Motion to Correct the decision which was "Denied in Its Entirety". (Exhibit O.)

219. Russo was listed as "Suspended" from December 15, 1997 through November 2000. On November 11, 2000, Russo is listed as "AWOP". Russo is listed as "AWOL" and "AWOP" alternately between November, 2000 through May 30, 2002. In July 2002, Russo is listed as "Suspended". Neither "AWOP" nor "AWOL" are recognized categories for absent employees by the Union or HPD. (Exhibit Y; Testimony of Frank Szilagy, Exhibit 36 at 19-29.)

220. On November 1, 2000, the Personnel Department did not require Russo with any conditions to return to work other than to present a fit for duty release and to meet certification requirements. (Exhibit 19.)

221. Dr. Mark Hall provided treatment to Russo since 1997 and repeatedly said that while Russo was fit for duty but that the HPD provided a hostile work environment to which he could not return. (Exhibit 20.)

## XI.    BREACH OF DUTY OF FAIR REPRESENTATION AS TO UNION

### A.    The Union Acted Arbitrarily, Discriminatorily or in Bad Faith

222. On January 26, 1999, Larry Reynolds  corresponded with Attorney Brewer regarding

Russo's grievances thus indicating that he was aware of all of the issues involving Russo. (Exhibit 17.)

223.    Reynolds was informed by Brewer that the union was to represent Russo.  (Exhibit 18.)

      **B.**    **The Union's Acted Fraudulently or Deceitfully** Plaintiff's 56(c)(2) Statement ¶ 230.

      **C.**    **The Union Did Not Act to Further the Best Interests of its Members.** Plaintiff's 56(c)(2) Statement ¶ 230.

## XIII.    VIOLATION OF FOURTH AMENDMENT

      **A.**    **Just Cause Drug Test**

224.    Roberts based the just cause memo on the telephone calls with Russo and was only able to make a determination by what he heard and was not able to identify any physical signs of intoxication. (Roberts Dep. at 124-125.)

225.    Roberts did a just cause memorandum in January 1997 to drug test Russo which was initiated by Roberts' personal observations. (Roberts Dep. at 116,  lines 10-25.)

226.    The results of the just cause drug test must be given to the testee within 24 hours of the test and they were never given to Russo despite repeated requests to Croughwell from the Union and Russo.   (Russo Vol. II at 221-225; Roberts Dep. at 212.)

      **B.**    **Reasonable Suspicion Drug Test**

227.    Croughwell ordered Flaherty to take Russo to the HPD and then to a drug test facility. The drug test was not done pursuant to the Drug Test Policy and Russo was taken in custody, had his gun taken away and was intimidated and threatened by Sergeants Hajdasz, Huertas, Lt. Flaherty, and was not allowed to leave the police car.  In violation

of the Drug Testing Policy, Russo was not given the opportunity to refute the allegations against him. The Drug Test was part of the criminal investigation that was initiated against him by Croughwell. (Huertas Dep. at 79-85; Flaherty Dep. at 223; Croughwell Dep. at 172, 174.)

228. Prior to forcing Russo to a drug test in the fall of 1997, Croughwell did not have knowledge that Russo had a drug or alcohol problem. (Croughwell Dep. at 176.)

229. Flaherty took Russo's gun and never gave it back to him. Flaherty was not concerned about Russo's risk of hurting himself or others as evidenced by Flaherty's failure to pat down Russo for other weapons and following the drug test none of the supervisors or union or EAP members assisted Russo or provided him with any assistance, including an EAP referral. (Huertas Dep. at 105.)

230. Lt. Flaherty, Srgt. Hasdazs and Srgt. Huertas, all who were on duty and armed, drove to New Haven and took Russo into custody for the drug test. Flaherty took away Russo's gun and Russo drove Russo to the HPD and then to the Medtox facility. Larry Reynolds was also present and did not advocate on behalf of Russo during the ride. (Huertas Dep. at 79-85; Flaherty Dep. at 223.)

231. Even as Russo was being drug tested, Flaherty did not know the reason for the drug test because he had not written the reasonable suspicion memorandum yet. (Flaherty Dep. at 223-224). Croughwell ordered the drug test before the reasonable suspicion memorandum was written. (Flaherty Dep. at 153.)

232. After the drug test of Russo had occurred, Flaherty ordered Hasdasz to type the reasonable suspicion memorandum after Flaherty had drafted it.(Flaherty Dep. at 228-

29);

233. Flaherty was ordered by Croughwell to write down the reasons for the reasonable suspicion drug test but Flaherty had not observed any of the symptoms himself and did not know the reasons for the drug test. (Flaherty Dep. at 152-153.)

234. Russo was too afraid to speak during the ride from New Haven to the HPD because he had a reasonable fear that he would be either pushed out of the car and Flaherty could blame it on Russo jumping out of the car. Plaintiff's affidavit, ¶ 10. After Russo was transported from New Haven to the HPD, Russo asked to use the bathroom and Flaherty did not allow Russo to leave the car. (Huertas Dep. at 98-99.)

235. Captain Flaherty ordered Russo off sick after the drug test was administered which is in violation of General Orders 8-1 (Exhibit J), because sick time is provided only for illness, enforced quarantine or bodily injury, which Russo was not. (Exhibits J, K; Huertas Dep. at 103.)

236. Flaherty marked the type of drug test as "Random" on the MedTox form although it was not random and there was a box for Reasonable Suspicion. (Exhibit V.)

237. The Collective Bargaining Agreement (hereinafter "Contract") between the H.P. Union and the City of Hartford includes the Drug testing policy and employees rights. (Exhibit A.)

238. The Code of Conduct governs the conduct of Hartford police personnel. (Exhibit B.)

239.    The Drug Testing Policy provides in Policy Section 2 Procedure 3 provides the

Purpose, the Policy and Affected Employees provisions of the policy were violated by

Roberts, Croughwell, Flaherty, Kenary and the City of Hartford in that: the Purpose of

drug testing policy was to identify those employees with substance abuse problems and

provide assistance to the employee, the policy was not to be used as a disciplinary

method." (Exhibit C.)

240.    Section VI, Confidentiality Section was violated when test administration and "will

assure absolute confidentially of employees, no information should be furnished to

anyone authorized to this policy, no procedures shall be in any personnel file except

when records are part of a disciplinary action." (Exhibit C.)

241.    The Drug Policy is set forth in General Order 8-34, effective January 10, 1994.

(Exhibit D.)

242.    The Method of Reasonable Cause is set forth in Section C of General Order 8-34,

provides: (2) " prior to the implementation the City shall be responsible for providing

training to all supervisory personnel". . . Supervisory personnel who have received the

mandated training for reasonable suspicion testing in relation to this policy and having a

reasonable suspicion that an employee this training was not provided to Russo's

supervisors.  (Russo Vol. 1 at 91; Exhibit D.)

243.    The Drug Testing Policy is not effective until terms of the Drug Testing Policy were

met, including that all supervisory personnel were given testing. Russo's supervisors

were not trained and the procedures were not met.  (Exhibit A.)

244.    Section I (1) of General Order 8-34 provides that the Drug Testing Policy is to be

confidential, has non-punitive purpose and is not to be used for disciplinary purposes. (Exhibit D.)

245. The Last Chance Agreement allows the employee the ability to a 30 day suspension and EAP assistance was never offered to Russo by the City or Croughwell, Roberts, Kenary, Flaherty, Lilley, Lyons which is in violation of the Drug Testing Policy procedures. (Exhibit E.)

246. General Order 8-18, provides the procedures for the Employee Assistance Program (hereinafter "EAP") Section B provides that the EAP: "shall not be used to deprive an employee of collective bargaining or other rights . . . . The Program shall be administered so that an employee will not suffer any punishment, prejudice or jeopardy solely for participating in EAP.  Russo was never offered assistance from the EAP even though he was subjected to two drug tests within eight (8) months.  (Exhibit F.)

247. Flaherty testified that in fact the reasonable suspicion drug test occurred before he even wrote the memo:

A    "[Croughwell] told me the reason for the drug test and to document it and have the memo  on his desk the first thing in the morning.
Q    Because he already ordered the drug test before the memo was done; right? . . .
A    Yes.
Q    So Nick Russo was reasonably caused drug tested and then Joe Croughwell told you
        what the reason would be after the fact? . . .
A    Yes.
Q    That's the scenario.  Even though you made no observations and you didn't ask for a reasonable cause drug test for Russo, you wrote the memo?
A    Correct." (Flaherty Dep. at 153-4.)

## XIV.   CREDIBILITY ISSUE OF WITNESSES

248. The testimony of Lawlor on page 17 of his deposition is in direct conflict with his

testimony on page 20.:

" Q       Were you ever accused of misstating facts  in a prosecution involving Assistant

Prosecutor Assistant State's Attorney Taylor?
A       No."(Lawlor Dep. at 17).

* * * * *

 "Q. Do you know who Jim Thomas is?
A. Yes.
Q.  Do you know if he ever complained to Chief Croughwell that you had misstated
facts in a criminal case involving -- that was brought by Assistant State's Attorney
Taylor?
A       No." (Lawlor Dep. at  17.)

* * * * *

" Q       Okay.  Who was the prosecutor on the case that you improperly prepared for
court testimony?
A       Carl Taylor.
Q       Did he complain about your testimony to anyone?
MR. HOWARD:  Objection to the form of the question.
Q       Do you know if he complained about your testimony?
A       I believe so.
Q       Who did he complain to?
MR. HOWARD:  Objection to the form of the question.
MR. BREWER:  I'll rephrase it.
Q       Do you know who he complained to?
A       I believe Jim Thomas.
"Q       You're saying that Carl Taylor and Jim Thomas complained to Chief Croughwell
         about your testimony; right?
A       Yes." (Lawlor Dep. at   20)

249.    Lawlor has used excessive force and has shot at suspects. (Lawlor Dep. at 146-47.)

250.    Lawlor perjured himself while testifying in criminal trials.    (Durham Dep. at 47.)

251.    "Detective Lawlor was very active, an aggressive police officer.  And I think by

reputation, I think Detective Lawlor's sort of nickname was Robocop." (Durham Dep. at

61.)

252.    Kenary has lied to other officers. (Roberts Dep. at 204-205.)

253.    Rovella had an extra marital affair with Joan Alexander. Having an adulterous affair with a married Hartford police officer during work hours is considered conduct unbecoming and a violation of the code of conduct. (Lawlor Dep. at 171; Roberts Dep. at 69-70.)

254.    Complaints of excessive force had been made against Lyons and complaints had been made against Lawlor for not being prepared to testify in a criminal prosecution. (Croughwell Dep. at 64-66, 73.)

255.    Lyons and Lawlor beat and planted evidence on gang members during their tenure on the Hartford Police Crime Suppression Unit. (Croughwell Dep. at 77.)

256.    There was a internal affairs investigation conducted against Lawlor for perjury for testimony during case with Assistant State's Attorney Carl Taylor. (Exhibit 1; Croughwell Dep. at 90.)

257.    Roberts heard that Croughwell would come to work drunk and using painkillers and Roberts saw bottles of pain killers on Croughwell desk at work. (Roberts Dep. at 70.)

258.    Stephen Miele did not tell his supervisors or US Attorneys that he worked with about his memory problem stemming from his traumatic brain injury. (Durham Dep. at 116.)

259.    Lawlor was under investigation by Internal Affairs in 2000 for running a red light and harassing Russo.(Lawlor Dep. at 106.)

260.    An Internal affairs investigation was conducted on Lyons for complaints of mistreatment made by citizens against Lyons, including intimidation and aggressive acts against citizens, which resulted in Lyons transfer. (Huertas Dep. at 18.)

261.    Kline and Jim Glasser has a history of retaliation.  Assistant Chief Hogan testified:

"Q. Were you retaliated against because you complained about Kline's investigative techniques?
A. I was threatened with arrest by the US attorney because I verbalized it to him.
Q. I don't want you to think I have ESP or anything, but did Jim Glasser have anything to do       with that?
A. Jim Glasser and his daddy, the judge from New York.
Q. Jim Glasser, the assistant U.S. attorney threatened you with arrest?
A. Yes." (Hogan Dep. at  25-26.)

262.    Assistant Chief Hogan observed Croughwell intoxicated while on duty. (Hogan Dep. at 50-52.)

263.     After Glasser threatened Assistant Chief Hogan with arrest Hogan was the victim of an attempted set up with a prostitute. (Hogan Dep. at  59-63.)


XV.    **SEARCH / WARRANT FOR RUSSO**

264.    Between the drug test in January 1997 and Russo's arrest, Croughwell did not have any evidence that Russo was abusing drugs.  (Croughwell Deposition, p. 255, lines 15-24.)

265.    Between the time that Brown's investigation showed that Russo had obtained 5,000 pills of Tylenol 3 and Russo's arrest, non of Russo's supervisors, including Croughwell, Kenary, Flaherty or Roberts did anything to ensure that Russo was receiving counseling or treatment or that his health was not in jeopardy except to ask for a doctor's note and to give him a drug test. (Croughwell Deposition, p. 256-7.)

266.     On approximately December 15, 1997,  Hajdasz met at the State's Attorney's office with Brown, Joan Alexander, and Hammick.  There they draft the warrant for Russo's arrest.  Thomas reviews the warrant and it was signed by the Judge.

267.    On approximately, December 15, 1997 ,  Kenary stated in a  memo to keep

case/investigation open.

268.    On approximately, December 15, 1997, arrest warrant executed for Russo..

269.    Between the drug test in January 1997 and Russo's arrest, Croughwell did not have any

evidence that Russo was abusing drugs.  (Croughwell Depo., p. 255, lines 15-24.)

270.    On approximately, December 16, 1997, a Search warrant executed for Russo's house for

prescription pills, pill containers, and any unfilled prescriptions.  Search warrant claims

that "nothing was seized".  However, Russo's son's medication was taken as well as

some of Russo's police items (badge, etc.)

271.    On approximately, December 16, 1997 ,  Russo arrested by Hajdasz and Skinner, and

charged with four counts of "Illegally Obtaining a Controlled  Substance" and four

counts "Forgery in the Second Degree."  (Russo Dep. Dated June 25, 2003, p.60, lines

24-2.)

272.    Russo was arrested at his home and was walked out in front of his neighbors to the

police car that was parked across the parking lot in order to embarrass him even though

there is no legitimate reason for extending the amount of distance someone has to walk

in handcuffs outside their residence. (Flaherty Deposition, p. 173, lines 1-5.)

273.    The City has a history of retaliating against individuals who speak out or make

complaints against Hartford officers. Stack v. City of Hartford, (jury found Sergeant

liable for retaliation against plaintiff who made complaint against HPD); Fago v. City

of Hartford, (City retaliated against plaintiff for testifying in court against officers).

THE PLAINTIFF,
NICHOLAS O. RUSSO, JR.

-42-

By:_____
James Brewer
Erin I. O'Neil
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT  06119
(860) 523-4055
Federal Bar # ct 23073