UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICHOLAS RUSSO, | : | |
| Plaintiff | : | CIVIL ACTION NOS. |
| v. | : | 3-97-cv-2380 (JCH) (lead case) |
| | : | 3-00-cv-1794 (JCH) |
| CITY OF HARTFORD, et al. | : | 3-00-cv-2382 (JCH) |
| Defendants. | : | |
| | : | SEPTEMBER 30, 2004 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT[1]**

## I.    INTRODUCTION

This litigation involves three federal civil rights actions brought pursuant to 42 U.S.C. § 1983 by the plaintiff, Hartford Police Detective Nicholas Russo, against Hartford police officers and supervisors, the Hartford Police Union and Union officers, and the City of Hartford.  Russo alleges various federal constitutional and state law violations arising out of events preceding and surrounding his arrest on December 16, 1997, and his subsequent suspension from his police duties.  Russo filed three related lawsuits,  Russo v. City of Hartford, et al., 3:97cv2380 (JCH); Russo v. Bailey, et al., 3:00cv1794 (JCH); and Russo v. Marquis, et al., 3:00cv2382 (JCH), which have been consolidated for pre-trial purposes.  Pending before the court are motions for summary judgment filed by all defendants in each of the actions.

---

[1]  The court issues today a Ruling on various Motions to Strike, which Motions related to the record submitted to the court in connection with the summary judgment motions addressed in this Ruling.

II.    **FACTUAL BACKGROUND**[2]

Russo has been employed as a police officer for the City of Hartford Police

Department("HPD") since 1981.  For more than six years, Russo served as a Detective

with the Crimes Against Persons(CAPers") division of the Hartford Police Department.

In June 1995, Russo was also assigned to the Federal Violent Crimes Unit in Hartford.

He served as a detective in both capacities until his arrest on December 16, 1997.  As a

result of that arrest, on November 3, 2003, Russo was ultimately convicted of six felony

counts.

On January 7, 1997, Russo did not report to work and failed to report for the

following two days.  During this three day period, Russo left voicemails for Sargent

Daryl Roberts and the two also had multiple phone conversations.  In a voicemail from

the morning of January 7, in which Russo indicated that he was sick and would not be

at work, Roberts observed that Russo's speech was slurred and disorganized.  During a

phone conversation with Russo shortly thereafter, Roberts made similar observations

about Russo's voice.  Russo left another voicemail later that morning, in which Roberts

observed that Russo's voice had become sluggish and jittery.  Roberts made

recordings of the voicemails and provided them to David Kenary, a lieutenant assigned

to the CAPers division.

On January 10, 1997, Lieutenant Kenary ordered Russo to bring a doctor's note

---

[2]  The facts relied upon for purposes of summary judgment are all those facts set forth
in the defendants' Local Rule 56(a)1 Statements which are supported by affidavits of competent
witnesses or other admissible evidence and which facts are not controverted by the plaintiff with
appropriate reference to affidavits of competent witnesses or other admissible evidence.  The
controverted facts are construed in a light most favorable to the plaintiff.

to explain his absence from work.  Russo brought a note from his physician stating that he had been absent from work for three days because he was being treated for influenza.  Thereafter, Lieutenant Kenary and Charles Lilley, a sergeant assigned to the CAPers division, contacted Russo's physician to confirm the authenticity of the note. The physician stated that he had not seen Russo in weeks.  In a later conversation, the physician told Lieutenant Kenary that he had given Russo drug samples, but had not recorded the transactions because they were unofficial.

On January 9, Chief Croughwell listened to the recorded voicemails and read memoranda prepared by Sergeant Roberts and Sergeant Lilley which documented the information and their observations of Russo. Croughwell then asked Russo to submit to a drug test.

In the spring of 1997, the locks to the CAPers office were changed, and Russo was not given a key.  Russo requested a key from Daryl Roberts, a sergeant in the CAPers division.  Sergeant Roberts did not give him a key.  The CAPers office was typically opened and unlocked from 7:00 AM until 11:00 or 11:30 PM.

Sergeant  Roberts, Lieutenant Kenary, and Sergeant Lilley ordered Russo to report to them each morning with his itinerary for the day.  On several occasions, they also ordered him to report at the end of the day with a signed memo from the United States Attorney's office detailing what Russo had done that day.  Additionally, the contents of Russo's desk in the CAPers office were removed and the desk was moved.

On June 15, 1997, a murder took place in the City of Hartford.  Both the HPD and the Federal Violent Crimes Unit investigated the murder.  Russo investigated the

murder as a member of the Federal Violent Crimes Unit and helped effectuate the arrest of a suspect. The HPD had arrested a different suspect. In the news media, Russo criticized the HPD's arrest of its suspect. Russo's affiliation with the federal authorities and, specifically his involvement in their arrest of the murder suspect, caused tension within the CAPers division of the HPD.

In the fall of 1997, Lieutenant Kenary contacted the Drug Enforcement Administration ("DEA") to initiate a criminal investigation of Russo's physician. The State's Attorney also initiated a criminal investigation of Russo's physician in September 1997, for which purpose he formed a joint investigation team including, among others, Chief Croughwell, Captain Flaherty, and Lieutenant Kenary.

In October 1997, Russo began working with the United States Attorney's Office on a probe investigating corruption in the HPD. On or about October 13, 1997, Russo told Stephen Kumnick, an Inspector in the Attorney General's office, about the corruption probe. On or about October 30, 1997, Inspector Kumnick told James Rovella, one of Russo's fellow detectives in the CAPers division, about the probe and Russo's involvement in it. In turn, Detective Rovella notified two potential targets of the probe, Sergeant Christopher Lyons and Detective Robert Lawlor. Sergeant Lyons and Detective Lawlor then spoke with Chief Croughwell about the probe and threatened to physically harm Russo. In their presence, Chief Croughwell called Russo at home and conveyed the threats. During that conversation, Russo heard Sergeant Lyons and Detective Lawlor also personally threaten him. The Attorney General notified Chief Croughwell of the probe in an October 31, 1997 memorandum detailing Russo's

conversation with Inspector Kumnick.

During October and November, in the course of investigating Russo's physician and at the direction of Inspector Skinner, Lieutenant Kenary obtained Russo's prescription records from Russo's physician as well as numerous area pharmacies. On November 4, 1997, Captain Flaherty and two police sergeants confronted Russo at the United States Attorney's Office in New Haven, Connecticut. Captain Flaherty told Russo that Chief Croughwell had ordered that Russo immediately submit to a drug test. Captain Flaherty relieved Russo of his firearm, escorted Russo to the back seat of an unmarked police vehicle, and brought him to a drug testing facility. While at the testing facility, Captain Flaherty also interrogated Russo.

During the return trip to Hartford, Captain Flaherty told Russo that Chief Croughwell had ordered him that Russo's firearm not be returned to him and that Russo be placed on sick leave until Chief Croughwell received the results of the drug test. During the trip, Russo was not advised of his <u>Miranda</u> rights. Subsequently, Captain Flaherty told Russo that Chief Croughwell had changed his mind and wanted Russo either to report to work in a limited capacity (no gun or field duty) or voluntarily use his sick leave. In addition, Captain Flaherty stated that Chief Croughwell had ordered Russo not to drive a car home and not to drive a car to work the next day. On Chief Croughwell's orders, a police sergeant drove Russo home.

On or about November 5, 1997, before the results of the drug test had returned from the lab, news of the test was disseminated generally to members of the HPD. In turn, that information about the drug test was given to a newspaper reporter who

contacted Russo about the matter and indicated that she intended to print a story about Russo.

On December 15, 1997, after meeting with other members of the joint investigation team, the Attorney General's office drafted an arrest warrant for Russo. On December 16, 1997, a member of the state police and a member of the HPD (neither of whom are named as defendants) searched Russo's home. He was arrested and charged with four counts each of Forgery in the Second Degree and Illegally Obtaining a Controlled Substance by Fraud. Chief Croughwell suspended Russo without pay pending the outcome of the criminal matter.

On September 14, 2000, the Connecticut Superior Court granted Russo's motion to suppress the prescriptions obtained from the pharmacies. The following day, all charges against Russo were dismissed. The State appealed that ruling. Rudewicz informed the Union that Russo would be reinstated effective October 29, 2000. The reinstatement was conditioned on Russo documenting his fitness for duty and meeting POST certification requirements. On December 4, 2000, Bruce Marquis became Chief of Police and adopted Rudewicz' position concerning Russo's reinstatement. Russo has not been reinstated since, and he has not received any pay or benefits since January 2001. On February 19, 2002, the Connecticut Supreme Court reversed the Superior Court, and the criminal charges were reinstated. On November 3, 2003, Russo was convicted on six felony counts. He is currently suspended without pay.

The Hartford Police Union prematurely challenged Russo's suspension in August of 2000. After the dismissal of criminal charges in September 2000, the Union pressed

the grievance for Russo's reinstatement.  Russo alleges that the Union failed to act and

did so in furtherance of an implicit agreement between the HPD defendants and the

Union defendants.  From December 16, 1997 to December 31, 1998, Lawrence

Reynolds was the president of the Hartford Police Union.  From January 1, 1999 to the

present, Michael Wood has been the president of the Union.  During all times relevant

to this action, Thomas Hardwick was the vice-president of the Hartford Police Union.

Additional facts, undisputed or construed in a light most favorable to Russo, will

be discussed as to individual claims.

## III.    DISCUSSION

### A.    Standard

The several defendants in these cases have filed motions for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In a motion for summary

judgement, the burden is on the moving party to establish that there are no genuine

issues of material fact in dispute and that it is entitled to judgement as a matter of law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering

Corp., 221 F.3d 293, 300 (2d Cir. 2000).  The burden of showing that no genuine

factual dispute exists rests upon the moving party.  Carlton v. Mystic Transp., Inc., 202

F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd.

Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its

burden, in order to defeat the motion the nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present

such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R.,

230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## B.   Russo v. City of Hartford, et al., 3:97-cv-2380 (JCH) [Dkt. Nos. 453 (Police Defendants) and 459 (City)]

In this action, Russo alleges that Chief Croughwell and Captain Flaherty (the "Police Defendants"), and the City of Hartford ("City") deprived him of constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and his rights under Connecticut common law.  All three defendants have moved for summary judgment.

### 1.   Police Defendants

Russo brings claims under 42 U.S.C. § 1983 against the Police Defendants as well as the City.  Under 42 U.S.C. § 1983, an individual may bring a claim for damages against another who, acting under the color of state law, deprived him of a federal right. Richardson v. McNight, 521 U.S. 399, 403 (1997).  Thus, "to prevail on a section 1983 claim, a plaintiff must prove that the challenged conduct was attributable at least in part

to a person acting under color of state law, and that the conduct deprived the plaintiff of

a right, privilege or immunity secured by the Constitution or laws of the United States."

Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 136-37 (2d Cir. 1999) (citing

Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1983)).  Russo alleges deprivation

of his rights under the First Amendment, the Fourth Amendment, and the Fourteenth

Amendment.

### a.    Retaliation under the First Amendment

Russo contends that, in retaliation for his cooperation with federal investigators,

probing corruption in the HPD, Russo was subjected to an illegal drug test in November

1997, the results of which were illegally leaked to the media, and targeted in a criminal

investigation that resulted in his suspension and arrest.  The Police Defendants have

moved for summary judgment on the ground that the alleged conduct was not protected

under the First Amendment, and that there is no causal connection between the drug

test and Russo's speech.

The Supreme Court has recognized that the state has an interest as an

employer in regulating speech by employees so as to promote the efficiency of public

services performed by its employees.  Connick v. Myers, 461 U.S. 138, 140 (1983).

However, "a public employee does not relinquish First Amendment rights to comment

on matters of public interest by virtue of government employment."  Id.  Acknowledging

the wide variety of fact situations where critical statements by a public employee may

be thought to furnish grounds for dismissal, the Supreme Court has declined to "lay

down a general standard against which all such statements may be judged."  Pickering

v. Board of Educ., 391 U.S. 563, 569 (1968). Instead, to assess the extent to which a state may regulate the speech of its employees, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568.

Before this balancing test is reached, a plaintiff making a First Amendment retaliation claim under section 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected; (2) he suffered an adverse employment decision; and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.  Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87 (1977).[3]  If a plaintiff establishes these three factors, the defendant may, nevertheless, avoid liability by making either of two showings:

> One way the government may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech.  Alternatively, the government may show that plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech.  If the government relies on the latter rationale and the balance of interests indeed weighs in the government's favor, plaintiff may still succeed by proving that the adverse action was in fact motivated by retaliation rather than by fear of disruption.

---

[3]  While Defendants address the first and third prongs of this test, they do not argue that the drug test and investigation do not constitute adverse employment actions as required with respect to the second prong of the test.

Mandell v. The County of Suffolk, 316 F.3d 368, 384 (2d Cir. 2003). Defendants rest

their argument that there was no First Amendment violation almost entirely on their

contention that Russo did not engage in protected speech when speaking with federal

agents because he was required to do so incident to his job. Defendants do not

address the remaining factors of the Mount Healthy test. Nevertheless, finding that

there is a material fact at issue as to whether the speech satisfies the public concern

inquiry, the court addresses the remaining prongs.

        **i.    Protected Speech.** The First Amendment protects

only speech which may "be fairly characterized as constituting speech on a matter of

public concern." Connick, 461 U.S. at 146. "Whether an employee's speech

addresses a matter of public concern must be determined by the content, form, and

context of a given statement, as revealed by the whole record." Id. at 147-48. The

Second Circuit has interpreted Connick as directing courts to "look behind pretextual

'public concern' rationale proffered by the disciplined employee in order to discern

whether [his] conduct, taken as a whole, was actually meant to address matters of

public concern, or was simply a vehicle for furthering her private interests." Pappas v.

Guiliani, 290 F.3d 143, 153 (2d Cir. 2002) (citing Connick, 461 U.S. at 147-48). In other

words, "the court should focus on the motive of the speaker and attempt to determine

whether the speech was calculated to redress personal grievances or whether it had a

broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999).

"Speech on a purely private matter, such as an employee's dissatisfaction with the

conditions of his employment, does not pertain to a matter of public concern." Id. at

164 (citing Connick, 461 U.S. at 147).

There can be no doubt that Russo's communication with the federal investigators, insofar as it concerned alleged unlawful and corrupt practices of the Hartford Police Department, constitutes "speech on a matter of public concern."  In fact, "'discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern.'"  Johnson v. Ganim, 342 F.3d 105, 113 (2d Cir. 2003) (quoting Harman v. City of New York, 140 F.3d 111, 118 (2d Cir. 1998)).  The Police Defendants attempt to seize upon the Second Circuit's directive that courts examine the speaker's motive and argue that Russo's motivation for speaking, notwithstanding the content of his speech, was entirely personal and, thus, not entitled to First Amendment protection.  Indeed, the Second Circuit has noted that the fact "that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal."  Blum v. Schlegel, 18 F.3d 1005, 1012 (2d. Cir. 1994) (affirming denial of motion for preliminary injunction).

Defendants contend that Russo's cooperation with a federal investigation was not voluntary but rather compelled by the duties of his job.  Since his motivation was only to do his job, they argue, Russo's speech was not motivated by a broader public purpose as is required for it to fall within the ambit of First Amendment protection. Police Defs.' Suppl. Memo. at 6.  Russo appears to concede that, if his motivation for speaking was, in fact, his desire to do his job – that is, if he only spoke because he was ordered to do so – then he would not benefit from First Amendment protection.  He

argues, rather, that the record reveals that he was not compelled to give information to the federal investigators, but did so voluntarily because he believed that corruption was wrong.

In support of their competing assertions, both parties point to a passage in Russo's deposition in which he initially states that he was not ordered to cooperate with the investigators and moments later states that he was ordered. Specifically, defendants note that Russo testified: "The truth is I was asked about corruption. And being a sworn police officer in the State of Connecticut I was required to give information if I knew of any crimes being broken or if I had any knowledge." Russo Vol. IV at 97. To the question, "Is it your position that you were required to provide information?," he answered, "That's my position." Id. The Police Defendants argue that, if not motivated by something additional to Russo's desire to perform his job, the speech does not fall within the scope of the First Amendment.

The existence of one motive does not preclude the existence of another. Rather, as the Second Circuit has noted, "'[m]ixed motivations are involved in most actions we perform every day; we will not hold [plaintiffs] to herculean standards of purity of thought and speech.'" Johnson, 342 F.3d at 114 (quoting Moore v. City of Kilgore, 877 F.2d 364, 371-72 (5th Cir. 1989)). Indeed, moments before saying that he was ordered to answer questions, Russo stated that he "voluntarily gave information" regarding corruption. Russo Vol. IV at 96. Notwithstanding any inconsistencies in his testimony, a reasonable fact finder could infer that Russo was motivated, at least in part, by a

public concern regarding corruption within the HPD.[4]  On the current record, defendants have simply failed to establish the absence of all but personal motive.

Further, the court finds no support for the proposition that merely because an individual is compelled to speak as a job-related duty, that such speech is never afforded First Amendment protection.  See Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 140 (2d Cir. 1999).  In Dangler, the Second Circuit found that a public employee's accusation of improper and corrupt behavior by his co-workers "implicated particularly strong First Amendment issues."  Id.  Significantly, for purposes of the instant case, the Dangler court noted that the employer's own written policy made such reporting mandatory.  Id.; see also Piesco v. City of New York, Dep't of Personnel, 933 F.2d 1149, 1152 (2d Cir. 1991) (noting, in dicta, that compelled testimony under oath could receive First Amendment protection).

In Johnson v. Ganim, the Second Circuit vacated and remanded the district court's grant of summary judgment in defendant's favor on a First Amendment retaliation claim.  342 F.3d at 114.  Johnson, an employee of the City of Bridgeport and Union member, had sent a series of letters to the City Administration complaining about the Administration's policies and practices.  The City Director of Labor Relations conducted a hearing and, upon determining that the language used in the letters violated City workplace rules, terminated the plaintiff.  The district court granted summary judgment, reasoning that, in addition to constituting a threat, the nature of the

---

[4]  Defendants may well attempt to impeach Russo with any allegedly inconsistent statement, but the fact finder would be free to believe that Russo volunteered the information.

plaintiff's complaints – insofar as they were directed at the administration's policies regarding the Union with which plaintiff was heavily involved – was personal and, thus, unprotected.  The Second Circuit did not agree and expressly rejected the district court's rationale that the plaintiff's personal interest in the subject matter prevented his speech from implicating matters of public concern:

> There is no question that [plaintiff] took a personal interest in the matters about which he wrote.  He was heavily involved in Union activities, and its members, assuming the truth of his allegations, suffer from the administration's improper activities.  The thrust of the speech, however, is aimed at the alleged system-wide epidemic that affected not only the Union, but the administration itself and the voting public as a whole.  Indeed, if the letter is viewed as requesting that action be taken, the benefit of such action would inure more to the group than to him specifically.  Therefore, the "predominant content" of the letter addressed matters of public concern.

342 F.3d at 114.  The Second Circuit considered the content of the speech and expressly rejected "the proposition that a matter is not of public concern if it personally and directly affected the speaker."  Id.  To hold otherwise would have the impermissible effect of allowing "only those persons with the least amount of first hand knowledge about the subject matter [to] utter speech without fear of government reprisal."  Id.

Similarly, in the case at bar, the court can credit Russo's personal job-related interest in answering the questions of the federal investigators and, yet, based on the "predominant content" of the speech, determine that it satisfies the public concern inquiry.  As such, the Police Defendants have failed to establish that the speech was not of public concern simply by establishing that Russo had a personal motivation for engaging in such speech.

**ii. ____Adverse Employment Action.**  The Second Circuit
has held that "only retaliatory conduct that would deter a similarly situated individual of
ordinary firmness from exercising his or her constitutional rights constitutes an adverse
action."  Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001).  Adverse employment
actions include discharge, refusal to hire, refusal to promote, demotion, reduction in
pay, and reprimand.  See Kaluczky v. City of White Plains, 57 F.3d 202, 208 (2d Cir.
1995) (citing Rutan v. Republican Party, 497 U.S. 62, 75 (1990)).  Even lesser actions
may be considered adverse employment actions.  Bernheim v. Litt, 79 F.3d 318, 324-26
(2d Cir. 1996) (adverse employment actions may include negative evaluation letters,
express accusations of lying, assignment of lunchroom duty, reduction of class
preparation periods, failure to process teacher's insurance forms, transfer from library to
classroom teaching as an alleged demotion, and assignment to classroom on fifth floor
which aggravated teacher's physical disabilities).

The Police Defendants fail to argue, or even assert, that the actions in question
did not constitute adverse employment actions.  The court finds that the question of
whether the drug testing and investigation constitute adverse employment actions
creates an issue of material fact to be resolved by a jury.  The Second Circuit has found
that "the threat of disciplinary proceedings" and the suspension that would accompany
initiation of such proceedings "could have a deterrent effect on officers who wished to"
exercise their First Amendment rights.  Washington v. County of Rockland, 373 F.3d
310, 320 (2d Cir. 2004) (reversing district court finding that threat of disciplinary
proceedings and suspension could not, as a matter of law, constitute an adverse

employment action).  Drug testing and investigation share that potential deterrent effect.

Accordingly, Croughwell and Flaherty have not established that their actions do not

constitute adverse employment actions as a matter of law.

> **iii.    Causation.**  The causal connection must be sufficient

to warrant the inference that the protected speech was a substantial motivating factor in

the adverse employment action, that is to say, the adverse employment action would

not have been taken absent the employee's protected speech.  <u>See</u> <u>Mount Healthy</u>

<u>City</u>, 429 U.S. at 287.  The Police Defendants argue that the cause of the testing and

suspension and other alleged adverse employment actions was not Russo's alleged

speech, but rather his drug abuse.  The court finds that there is a question of fact as to

the cause of the employment actions.

Causation can be established either indirectly by means of circumstantial

evidence, for example, by showing that the protected activity was followed by adverse

treatment in employment.  <u>See</u> <u>Sumner v. United States Postal Serv.</u>, 899 F.2d 203,

209 (2d Cir. 1990) (discussing the causation prong of the retaliation test in the Title VII

context).  A plaintiff need not establish causation through temporal proximity, however,

if instead he can offer evidence of retaliatory animus.  <u>Mandell</u>, 316 F.3d at 384.  In

<u>Mandell</u>, the Second Circuit found that the plaintiff had adduced sufficient evidence of

retaliatory animus to create a triable question of fact where, <u>inter</u> <u>alia</u>, plaintiff's

superiors told him to learn to keep his mouth shut and, further, that his testimony might

adversely affect his career.  <u>Id</u>. at 383.

In the case at bar, the court finds there is evidence of retaliatory animus

sufficient to raise an issue of fact.  The court finds such animus evidenced in

Croughwell's telephone call to Russo informing him that, because of his cooperation

with the federal investigators, two of his subordinates wanted to physically hurt him.

Further, the court finds such animus evidenced in Flaherty's alleged threat to "get"

Russo.  See Pl.'s Joint Local Rule 56(a)2 Statement ¶ 29.

    **iv. Balancing Test.**  As noted earlier, a finding in

Russo's favor on the three prong test for First Amendment retaliation then leads to a

further analysis.  If Croughwell and Flaherty demonstrate either that: (1) the defendants

would have taken the same adverse action in the absence of the protected speech; or

(2) that disruption caused by the plaintiff's speech is sufficient to outweigh the First

Amendment interest in plaintiff's speech, there is no First Amendment retaliation.  See

Mandell, 316 F.3d at 382-83.  The second prong is not implicated here. With regard to

the first prong, the Second Circuit has held that summary judgment is precluded where

questions regarding an employer's motive predominate in the inquiry regarding how

important a role the protected speech played in the adverse employment decision.  See

Piesco, 933 F.2d at 1155.  Such is the case here, and accordingly, the court declines to

grant summary judgment on this claim.[5]

    **b.  Search and Seizure under the Fourth Amendment**

  Russo contends that the Police Defendants violated his Fourth Amendment

---

[5] Police defendants also move for summary judgment on Russo's claims for violation of his right to seclusion under the First Amendment.  Russo did not oppose and expressly withdrew this claim at oral argument.  Accordingly, the motion for summary judgment is granted on this claim.

rights by transporting him in the back of a police car to the drug testing facility, Am. Compl. ¶¶ 25(A), 35, and by requiring him to submit to drug tests without reasonable cause or suspicion. Am. Compl. ¶¶ 10, 35(C). As to the compulsory drug test, the Police Defendants argue that they had a reasonable suspicion that Russo was using drugs, thereby justifying the drug tests. As to the alleged detention which was incident to the administration of the drug tests, they argue that Russo was not in custody and, even if he was, it was not unreasonable. Russo responded by arguing that Roberts was not properly trained and Russo was not given a copy of the "just cause drug test," all in violation of the drug policy. Pl.'s Memo. in Opp'n at 10.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[C]ompulsory urinalysis of public employees qualifies as a 'search and seizure' within the meaning of the Fourth Amendment." Coppinger v. Metro-North Commuter R.R., 861 F.2d 33, 35 (2d Cir. 1988). However, public employees working in safety sensitive jobs may be subject to compulsory drug testing based upon a reasonable suspicion standard as opposed to the probable cause standard applied to other warrantless searches. Skinner v. Railway Labor Executives' Assoc., 489 U.S. 602, 622-23 (1989); see also Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989) (holding that drug testing of Customs Service employees seeking "promotion to positions having a direct involvement in drug interdiction or requiring the incumbent to carry firearms" need only meet standard of reasonableness in order to meet requirements of the Fourth Amendment).

-19-

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). The reasonable suspicion standard requires consideration of several factors: "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." Security & Law Enforcement Employees, Dist. Council 82 v. Carey, 737 F.2d 187, 205 (2d Cir. 1984) (reasonable suspicion to conduct strip search); see also Everett v. Napper, 833 F.2d 1507 (11th Cir. 1987) (holding reasonable suspicion existed when information regarding an employee's drug use was provided by a fellow employee and a known drug dealer). Reasonable suspicion "must be based on an analysis of all the circumstances as they appeared to the official making the judgment at the time." Nocera v. Rivera, 921 F. Supp. 192, 199 (S.D.N.Y. 1996).

In the case at bar, prior to ordering the initial drug test on January 9, 1997, Chief Croughwell had many objective facts from which he could have reasonably drawn the inference that Russo was abusing drugs. Although Chief Croughwell had not been aware of any current drug use by Russo, he did know that Russo had been arrested in 1988 for illegally obtaining prescription drugs, for which Russo was suspended without pay for 18 months. Additionally, he had personally listened to the recorded telephone message of Russo calling in sick, in which voicemail Russo's speech was slurred and

his thought pattern was disorganized.  He met with Russo's supervisors to discuss their concerns about Russo's work performance and their suspicions of his drug use.  He reviewed memoranda prepared by Sergeant Roberts and Sergeant Lilley that detailed a recent pattern of erratic work attendance and suspicious episodes when Russo did report to work.  Based on this knowledge, which Russo does not dispute,[6] Chief Croughwell had more than ample cause to order the January drug test based on a reasonable suspicion that Russo was using drugs.

Russo argues that the "just cause memo" was based only on telephone calls and thus Roberts "could not identify any physical signs of intoxication."  Pl.'s Memo. Opp'n at 9.  However, various portions of Sergeant Roberts' memorandum report in-person contact with Russo in January 1997.[7]  Defs' App. B at Ex. 8.  On January 6, Russo was at the Department and "talking a lot and speaking very very fast."  Id. at p. 3.  Further, on January 7, although by telephone, Roberts notes "physical signs": speech slurred, repeating himself frequently, disorganized speech pattern.  Id.  In addition, Sergeant Lilley's memorandum supported the decision to have Russo drug tested.  Sergeant Lilley reported that, for about a month, Russo exhibited "a wide range of mood and personality swings."  Id., Lilley Memo. at 3.

---

[6]  In some instances, Russo denies paragraphs in defendants' Rule 56(a)(1) Statement which are pertinent here.  However, the denials are unsubstantiated, and thus, the paragraph is taken as admitted.  See Local Rule 56(a).

[7]  Russo conclusorily argues that he denies the entirety of Sergeant Roberts' memorandum.  Plaintiff's Rule 56(c)(1) Statement - Police (Dkt. No. 480) at ¶¶ 35-48, 50.  However, at his deposition, when given the opportunity, he identified only limited portions of that memorandum which he claimed were false.  Defendants' Appendix A at Tab 3, Russo Dep. Vol. III at 5-10.  The court does not rely on any of those disputed portions.

Russo's argument rests on an assumption that Roberts did not receive training to identify intoxication, as required by the Policy. See Pl.'s Memo. in Opp'n at ¶¶ 9-10. However, his proffered Rule 56(c)(2) Statement at paragraph 123 is not supportive of this assumption nor is it supported.[8]  In fact, Roberts testified that, in addition to knowledge in this regard that he obtained as a narcotics officer, he was trained as a supervisor before January 1997.  Pl.'s Joint Local Rule 56(a)(2) Statement, Depo. Transcripts, Roberts Depo. at 124.

Prior to ordering the second drug test on November 4, 1997, Croughwell had acquired additional information which bolstered his reasonable suspicion that Russo was using drugs.  Namely, he had received information that, during the previous ten months, Russo had obtained more than 5,400 doses of Tylenol 3 (with codine), which is a controlled substance.  Contrary to Department Policy, Russo never told his supervisor that he was taking Tylenol 3 (with codine).  Chief Croughwell contacted a doctor at the EAP and inquired about the effect of taking such an amount of Tylenol 3 over that time period.  The doctor indicated that the effect could be adverse and recommended a drug test.[9]  Accordingly, the court finds that Chief Croughwell, again in November 1997, had

---

[8]  Russo asserts in paragraph 123 that "Roberts did not receive training as a Supervisor on how to identify physical signs of intoxication or drug abuse."  Joint Local Rule 56(a)(2) Statement at ¶ 123. He cites Roberts' deposition at page 125. However, the quoted line reads: "A.  Yes.  That came in traffic training when I was a DUI officer, driving while intoxicated."  This does not support Russo's asserted fact.  Further, Roberts testified within a page of this cited testimony that he had received training as a Supervisor.  Id., Roberts Depo. at p. 124, lines 1-9.  See also, id. at p. 116.

[9]  Russo denied Defs.' 56(a)(1) Stat. ¶ 91, which contains this fact.  However, the only support cited for the denial is Pl.'s Joint Local Rule 56(c)(2) Stat. ¶¶ 231-233 and ¶ 247, none of which is related to Dr. Braunsdorf of EAP or Chief Croughwell's contact of him.  Under Local

more than ample reasonable suspicion that Russo was using drugs.  Therefore,

summary judgment as to the Fourth Amendment search and seizure claim in Count

One against Chief Croughwell and Captain Flaherty is granted.

### c.   Interrogation in Violation of Fifth Amendment Right Against Self-Incrimination

Russo contends that the Police Defendants violated his Fifth Amendment right

against self-incrimination by "by taking him into custody; and then using the drug test

against him."[10]  Pl.'s Memo. Opp'n at 12.  The court first notes that no section 1983

action will lie for a <u>Miranda</u>[11] violation.  <u>See</u> <u>Neighbour v. Covert</u>, 68 F.3d 1508, 1510

(2d Cir. 1995) (per curiam).  Moreover, the Tenth Circuit has held, and this court

agrees, that "urine samples used for drug testing constitute non-testimonial evidence

and therefore do not implicate Plaintiff's Fifth Amendment right against

self-incrimination."  <u>Lucero v. Gunter</u>, 17 F.3d 1347, 1350 (10th Cir. 1994); <u>see</u> <u>also</u>

<u>Schmerber v. California</u>, 384 U.S. 757, 761 (1966) (holding that facts disclosed by a

blood sample tested for alcohol content are not "testimonial" and therefore do not

implicate the Fifth Amendment's protection against self-incrimination).  Accordingly,

Russo cannot maintain a section 1983 claim based on the alleged violation of his Fifth

Amendment right against self-incrimination as alleged in his complaint or pressed in

---

Rule 56(a)(1), therefore, ¶ 91 is admitted.

[10]  In his complaint, however, he claims that the Fifth Amendment violation occurred when he was interrogated at the drug testing facility, and he was not given <u>Miranda</u> warning. Am. Compl.  ¶ 25K, 35B.

[11]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

opposition.[12]

### d.    Procedural Due Process Violation under the Fourteenth Amendment

Russo contends in this Amended Complaint (Dkt. No. 126) that the Police

Defendants violated his right to procedural due process under the Fourteenth

Amendment with regard to his property rights in his job.  These defendants move for

summary judgment on the grounds that Russo did not avail himself of the process

contractually guaranteed to him by the City.  Russo's counsel stated at oral argument

that he does not press this claim.  Thus, the Motion for Summary Judgment is granted.

### e.    Qualified Immunity

Police Defendants have moved for summary judgment on qualified immunity

grounds.  The court considers that ground with respect to the only remaining federal

claim against the Police Defendants in this case, the First Amendment retaliation claim.

When exercising discretionary authority, a state official whose conduct deprives

another of a right secured by federal constitutional or statutory law may avoid liability for

damages under section 1983 under the doctrine of qualified immunity.  That doctrine

does not apply, however, where at the time and under the circumstances of the

challenged conduct all reasonable officials would have realized that it was proscribed

---

[12]  Apparently recognizing that a constitutional violation does not occur until compelled statements are used at trial, Chavez v. Martinez, 538 U.S. 760, 767 (2003),  Russo attempts to fashion an argument out of the exclusionary rule of Wong Sun v. United States, 371 U.S. 471 (1963).  See Pl.'s Memo. Opp'n at 13.  Russo seems to argue that all of the evidence adduced by the State during the criminal investigation into Russo should have been suppressed as fruits of an illegal search.  It is unknown whether Russo made this argument in his criminal proceedings.  However, he cannot sustain a section 1983 claim upon it here.

by the federal law on which the suit is founded.  See, e.g., Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  "When considering the issue of qualified immunity we must first determine whether – viewed in the light most favorable to the injured party – the facts alleged demonstrate that the officer's conduct violated a constitutional right.  If so, we must determine whether that right was clearly established."  Id. (internal citation omitted).  The requirement that the right was clearly established is, in part, a function of the issue of notice: "[p]ublic officials sued in their individual capacity are entitled to qualified immunity from suit unless 'the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir. 2004) (quoting Anderson, 483 U.S. 635, 640 (1987)).  That is not to say that the specific conduct alleged must have previously explicitly been held unlawful, but rather that immunity is unavailable "if 'in the light of pre-existing law the unlawfulness [is] apparent.'"  Id. (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

        The defendants cannot be held liable for official acts so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine the validity of the claim of qualified immunity, a two-step analysis applies. This court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation."  Conn v. Gabbert, 526 U.S. 286, 290 (1999); see also Wilson v. Layne, 526 U.S. 603, 609 (1999).  The second prong of the test, determining whether the right was "clearly established," considers whether the

unlawful nature of an officer's activity could have been known by the officer at the time of commission.  "If a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim." Sira v. Morton, et al., 380 F.3d 57, 69 (2d Cir. 2004).

As indicated earlier, see section III. B.1(a), supra., the court finds that, when the record is construed in a light most favorable to Russo, an issue of fact exists regarding a violation of Russo's constitutional right to free speech.  Therefore, the court must consider "whether that right was clearly established."  Caldarola, 298 F.3d at 160.  On this score, the Second Circuit has recently noted that "[i]t has 'long been established' that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government," Catletti v. Rampe, 334 F.3d 225, 231 (2003) (quoting Dobosz v. Walsh, 892 F.2d 1135, 1141 (2d Cir. 1989)).  The record before the court does not suggest that Russo's exercise disrupted the administration of the government.

Thus, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  No reasonable officer could believe that retaliating against Russo on the basis of Russo's statements would not have violated Russo's First Amendment rights.

The second prong of the test is normally objective.  It considers the actions of the "reasonable officer," not those of the particular defendant in question.  The constitutional violation alleged by Russo, however, incorporates a subjective element. Whether Croughwell and Flaherty violated Russo's rights hinges on their motivation for their actions.  As described above at section III.B.1(a), there is a triable issue of fact

regarding Croughwell and Flaherty's liability on the claim of First Amendment retaliation.

The Second Circuit has found that "[t]hough the qualified immunity inquiry is generally

an objective one, a defendant's subjective intent is indeed relevant in motive-based

constitutional torts." Johnson v. Ganim, 342 F.3d 105, 117 (2003). Further, "[w]here a

factual issue exists on the issue of motive or intent, a defendant's motion for summary

judgment on the basis of qualified immunity must fail." Id. To find otherwise would be

to allow defendants accused of motive and intention-based constitutional violations to

be entitled to immunity in any case where they could point to some arguably legitimate

grounds for their actions. Id. (citing Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001).

Therefore, in this case, because "specific intent of a defendant is an element of

plaintiff's claim under clearly established law, and Russo has adduced sufficient

evidence of that intent to defeat summary judgment, summary judgment on qualified

immunity grounds is inappropriate." Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir.

2002).

### f.    False Imprisonment[13]

In Count Four, Russo claims that Flaherty, Croughwell, and the City of Hartford

are liable for subjecting him to false imprisonment. "False imprisonment is the unlawful

restraint by one person of the physical liberty of another." Berry v. Loiseau, 223 Conn.

786, 820 (1992). In order to create a triable issue of fact with respect to false

imprisonment, Russo must allege and provide evidentiary support that "'his physical

liberty has been restrained by the defendant[s] and that the restraint was against his

---

[13]Russo also asserted a false arrest claim in Count Three, which his counsel withdrew at argument.

will, that is, that he did not consent to the restraint or acquiesce in it willingly.'" Id. at

820, (quoting LoSacco v. Young, 20 Conn.App. 6, 19, 564 A.2d 610, cert. denied, 213

Conn. 808, 568 A.2d 793 (1989)).  The restraint must be accomplished "through the

exercise of force."  Id.  In addition, liability attaches only if the "act is done for the

purpose of imposing a confinement, or with knowledge that such confinement will, to a

substantial certainty, result from it."  Green v. Donroe, 186 Conn. 265, 268, 400 A.2d

973, 974 (1982) (quoting 32 Am.Jur.2d, False Imprisonment § 9; Restatement

(Second), Torts § 35).

Russo claims that on November 4, 1997, Flaherty, on Croughwell's command,

removed Russo from a meeting at the U.S. Attorney's Office, demanded that he get in a

car with Flaherty, Hajdasz and Huertas, and required Russo to take a drug test.

According to Russo, he was intimidated and threatened by Flaherty, who also took

Russo's gun from him.  Russo claims that he did not speak due to a fear that he would

be pushed from the car.  In addition, upon reaching Hartford, Russo asked that he be

able to use the bathroom and Flaherty refused.

Viewing the facts in the light most favorable to the plaintiff, it is clear that Flaherty

and Croughwell acted intentionally.  They acted with "the purpose of imposing a

confinement."  Id.  That is, Flaherty, on Croughwell's command, confronted Russo in

New Haven with the full intention that he would be transported to a drug testing facility.

Russo claims that he had a reasonable fear that force would be used against him.  The

Connecticut Supreme Court has found that evidence that defendants "displayed a

revolver"; "used abusive and threatening language toward the plaintiff"; "took the

plaintiff by the arm and escorted him to [the defendant's] car," and that the plaintiff "did

not feel free to leave while he was in [defendant's] car" sufficed to create a triable issue of fact regarding the use of force as a necessary element of proving false imprisonment.  Berry, 223 Conn. at 821.  Further, the Connecticut Supreme Court concluded that the presence of the gun did not constitute the sole basis for plaintiff's claim that the defendants used force.  Id.  The plaintiff's evidence, primarily his own testimony, that force was used sufficed to create a question for the jury.  Id.  Russo need only submit minimal evidence to support his contention that the defendants used force to impose confinement.  The presence of three armed police officers, after Russo had been disarmed,  suffices to create a question of fact.

Russo must also prove, however, that "'he did not consent to the restraint or acquiesce in it willingly.'"  Id. at 820 (quoting LoSacco v. Young, 20 Conn.App. 6, 19, 564 A.2d 610, cert. denied, 213 Conn. 808, 568 A.2d 793 (1989)).  Russo consented to be subject to mandatory, random, and reasonable cause drug testing as a condition of his employment with the Hartford Police Department and to be transported in connection with such testing.  Pl.'s Joint Local Rule 56(a)2 Statement, Ex. D at § III.A.1.  Chief Croughwell, upon "a belief based on objective and articulable facts sufficient to lead a reasonably prudent supervisor to suspect that an employee is under the influence of drugs so that the employee's ability to perform the functions of the job is impaired," ordered a drug test.  Id. at §III.C.1; see supra, at section III.B.1(a)(iv) regarding reasonable suspicion basis.  Chief Croughwell then designated Flaherty to instruct Russo "to submit to reasonable suspicion urinalysis drug testing" and to provide Russo's "transportation to the designated testing agency."  Pl.'s Joint Local Rule 56(a)(2) Statement, Ex. D at §III.C.2(b); see also Police Defs.' Rule 56(a)(1) Statement

at ¶¶ 16-17.[14]  An employee can refuse to submit to a drug test but is then subject to

certain consequences.  An employee who refuses to submit to a drug test is sent home

or suspended with pay and subject to a departmental disciplinary hearing.  Pl.'s Joint

Local Rule 56(a)(2) Statement, Ex. D at §III.C.2(c).  Russo was aware of the drug

testing policy, including his right to refuse.  Police Defs.' Local Rule 56(a)(1) Statement,

¶¶ 14, 16 and 17.[15]

     Russo provides no facts to prove that Flaherty and Croughwell prevented Russo

from refusing to take the test.  He claims he was in fear while being transported.

However, he was first advised that he was to be taken for a drug test while in a meeting

at the U.S. Attorney's Office with, inter alia, a senior Assistant U.S. Attorney.[16]  Russo

voluntarily left that room with the HPD personnel, knowing where and why he was

going.  Had this not been his voluntary act, surely he could have safely refused in the

presence of federal law enforcement.

     Because Russo, as a condition of his employment, consented to the reasonable

suspicion drug test and, at the time he was instructed to submit to the test, did not

refuse to submit to testing, the confinement imposed by Flaherty at Croughwell's

---

     [14]  Russo denies the paragraphs in Pl.'s Rule 56(c)(1) Statement - Police, ¶¶16-17.
However, the denials are "supported" by paragraphs in his Local Rule 56(a)(2) Statement,
which paragraphs are not supported in the parts pertinent here, by the cited references.

     [15]  Again, Russo denies these paragraphs, but the cited support for the denials do not
support the denials in the parts pertinent to the court's reference.  Thus, they are deemed
admitted in those respects.

     [16]Russo's brief suggests that Flaherty approached Russo outside of the office.  The
deposition cited by Russo, however, is explicit that the officers approached Russo in the office
in the presence of Assistant United States Attorney Durham.  Pl.'s Supplemental Ex.'s in Supp.
of Local Rule 56(a)(2) Statement, Huertas Depo. at 80.

direction did not constitute false imprisonment as a matter of law.

### 2. Municipal Liability

Russo contends that the City is liable under 28 U.S.C. § 1983 for the unconstitutional actions of the Police Defendants.  Am. Compl. Count Two (Dkt. No. 126).  In light of the court's granting of summary judgment in favor of Chief Croughwell and Captain Flaherty as to all section 1983 claims except the First Amendment retaliation claim, that is the only claim with respect to which the court needs to consider the possibility of municipal liability.

The City argues that Russo cannot, as a matter of law, establish that his constitutional rights were violated as a result of its policy or custom. Russo argues that the City is liable because:  (1) Croughwell was responsible for establishing final government policy; (2) the HPD had a deliberate policy of failing to train or supervise its officers in the investigation of other officers; and (3) the HPD had such a history of interfering with officers like Russo as to imply constructive acquiescence by the policy makers.  The court finds that there are no issues of material fact and, as a matter of law, the City is not liable for the conduct of the individual defendants.

While a municipality can be held liable for a constitutional violation asserted in a claim under section 1983, liability cannot rest on a theory of respondeat superior. Jeffes v. Barnes, 208 F.3d 49, 56-57 (2d Cir. 2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  In fact, avoiding results that are indistinguishable from respondeat superior appears to be a primary concern of Supreme Court jurisprudence on municipal liability.  See, e.g., St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) (plurality opinion) ("If the mere exercise of discretion by an employee could

-31-

give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability."). For a municipality to be liable under 42 U.S.C. § 1983, the act that caused the violation of rights must have been committed pursuant to an official policy or custom. Monell, 436 U.S. at 691-94. Further, "[t]he official policy must be the 'moving force of the constitutional violation.'" Goldberg v. Town of Rocky Hill, 973 F.2d 70 (2d Cir. 1992) (quoting Monell, 436 U.S. at 694).

Where the act did not result from official municipal policy, the municipality may still be held liable where the injury is caused by one of its lawmakers or "'by those whose edicts or acts may fairly be said to represent official policy.'" Jeffes, 208 F.3d at 57 (2000) (quoting Praprotnik, 485 U.S. at 121-22). "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified, but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Id. A plaintiff may also establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision. Vann, 72 F.3d at 1049. "In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy." Vann v. The City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

### a.    Final policymakers

As an initial matter, the court must consider whether Chief Croughwell or Captain

Flaherty were final policymakers so as to render the City liable for their actions or

inactions.  Whether an official in question possessed final policy making authority in a

particular area is a legal question to be determined by reference to state law, local law,

and custom and usage having the force of law.  Jeffes, 208 F.3d at 57-58.  The

Supreme Court has provided some general principles to guide the court in its

consideration:

> When an official's discretionary decisions are constrained by policies not
> of that official's making, those policies, rather than the subordinate's
> departures from them, are the act of the municipality.  Similarly, when a
> subordinate's decision is subject to review by the municipality's authorized
> policymakers, they have retained the authority to measure the official's
> conduct for conformance with their policies.

Praprotnik, 485 U.S. at 127.  This court's review of Connecticut law, in light of these

principles, reveals that Chief Croughwell cannot be considered a policymaker for

purposes of section 1983 liability as alleged here nor can the actual policymakers be

considered to have either ratified the alleged conduct or expressed deliberate

indifference to it.[17]

     This case is distinguishable from Jeffes and Mandell, cases in which the Second

Circuit found that an elected sheriff and a county police commissioner, respectively,

possessed sufficient policy-making authority to support an allegation of municipal

liability under Monell.  See Jeffes, 208 F.3d at 61; Mandell, 316 F.3d at 385.  In Jeffes,

the Second Circuit found that state and county law did not provide for supervision or

control of an elected sheriff's policymaking "with respect to the existence or

---

[17]  While the analysis of this question with regard to Chief Croughwell raises substantial
issues, there is no basis for Flaherty to be a policy maker.  Russo does not so argue.

enforcement of a code of silence." Jeffes, 208 F.3d at 61.  The sheriff's ability to make

personnel decisions was circumscribed by county employment policy.  The sheriff's

elected status and his general authority under New York State law to attend to the

county jail and its inmates, however, allowed the court to find that with respect to an

alleged code of silence perpetrated by prison guards, the sheriff was the final

policymaking authority.  Id.  In Mandell, the court found that the defendant police

commissioner did have "authority to set department-wide personnel policies." Mandell,

316 F.3d at 385.  The instant case is distinguishable.  Croughwell did not have the

authority to set personnel policies.  Nor does Russo allege that Croughwell oversaw

some sort of unofficial department policy, like the code of silence alleged in Jeffes, for

which he did not have to answer to any more senior policy or policymaker.  Croughwell

remained accountable to department and city policy in all of the activities Russo alleged

violated his constitutional rights.

        The record reveals that Chief Croughwell did, in fact, exercise discretionary

authority in his decision to assign Russo to the CAPers division, to initiate an

investigation of Russo (including the attendant interrogation, detention, and drug tests),

and, ultimately, to suspend Russo.  However, the exercise of this discretion does not

necessarily compel the conclusion that Chief Croughwell was a policymaker for the

purpose of establishing municipal liability with respect to the duties and obligations of

his staff and himself to other staff differ.  See Pembaur, 475 U.S. at 484 n.12.  Rather,

here it is uncontroverted that the City Charter vests policymaking authority in the City

Council and the City Manager.[18]  The court also notes that, to the extent Russo

characterizes Chief Croughwell's exercise of his discretion as a de facto policy of the

municipality, Croughwell's discretion was necessarily kept in check by a formal review

mechanism.  City's Local Rule 56(a)(1) Statement ¶¶ 32, 34, 36, 40-42.[19]  As such, the

policymakers "retained the authority to measure the official's conduct for conformance

with their policies."  See Praprotnik, 485 U.S. at 127.  Accordingly, the court cannot hold

the municipality liable for the actions of Chief Croughwell as alleged in this action under

the theory that he was a municipal policymaker.

### b.     Inadequate Training/Supervision

Russo also argues that the City is liable as a result of "inadequate training and

supervision in deliberate indifference to [his] constitutional rights."  Memo. Opp'n at 12.

To establish a claim concerning inadequate training, Russo must show:

> (1) that "a policymaker of the municipality knows to a moral certainty that
> its employees will confront a given situation"; (2) that "the situation either
> presents the employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of employees
> mishandling the situation"; and (3) that 'the wrong choice by the employee
> will frequently cause the deprivation of a citizen's constitutional rights."

Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir. 1998) (quoting Walker v. City

of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal alterations omitted)).  While

the parties disagree on exactly how to characterize the situation that requires training or

---

[18]  Again, Russo denies the City's Rule 56(a) Statement in this regard.  See Pl.'s Rule
56(c) Statement-City at  ¶¶ 34-35.  However, he cites no evidence to support his denial or
create an issue of fact in this regard.  Thus, under Local Rule 56(a)(1), that fact is admitted.

[19]  Russo denies ¶34, but cites no evidence to support his denial and bald statement,
"Chief Marquis (sic) can create policy through practices and past practice."

supervision, the court views it as training regarding the treatment of fellow officers who are investigating corruption in the HPD and/or working with the federal government.[20] Pl.'s Memo. Opp'n at 13-14.  The City argues that training aimed at eradicating such behavior would be superfluous insofar as it should be obvious to all officers, in the absence of formal training, that they should not pursue vendettas against fellow officers for the latter's involvement in corruption investigations.  City's Memo. at 31-32.  Indeed, it has been recognized that, where a situation arises in the course of one's duties as a police officer and the proper response to that situation "is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." Walker, 974 F.2d at 299-300.  The court finds that, as a matter of law, Russo cannot establish the inadequacy of training and supervision.

The City cannot be liable if the need for such training was not obvious.  Vann, 72 F.2d at 1049 ("To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious.").  Here, Russo has come forward with no evidence from which a finder of fact could reasonably infer that the City could have suspected, let alone seen as obvious, that the training was inadequate.  Russo argues that the court should take notice of findings made in Galindez v. Miller, 285 F. Supp. 2d 190 (D. Conn. 2003), wherein that

---

[20]  Russo also asserts that this claim rests on failures to train and supervise the drug prevention program.  Pl.'s Memo. Opp'n at 13.  However, he offers no argument or evidence on this theory and the record established by the City reflects a detailed drug policy and training program.  See City's Memo. at 21.

district court found that the City of Hartford failed to reasonably investigate complaints of police misconduct, specifically, the use of excessive force against citizen/victims. The court there considered evidence of several similar complaints of excessive force that should have put the City on notice that training with regard to excessive force used against citizen/victims should be implemented.  Id. at 198.

In the instant case, however, Russo has not produced any evidence of any incidents similar to his, wherein officers in any way mistreated a fellow officer who was investigating corruption within the HPD.  He presents no evidence regarding any other officers cooperating with a federal investigation of corruption within the HPD, or retaliation against any officer for that officer's investigation or reporting of police corruption.  Indeed, Russo states:  "Hartford Police had a history of mishandling similar situations where officers are investigating misconduct of their brethren."  Memo. Opp'n at 15.  However, strikingly, he provides no cites and nothing within his Local Rule 56(a)(2) Statement states this, let alone offers cited support for it.

Russo argues only that "[a] reasonable inference from Galindez is that for some reason, Hartford Police investigating their fellow officers [for excessive force against citizens] had a difficult time gathering enough evidence to sustain complaints."  Opp. Memo. at 15.  As an initial matter, the court cannot take judicial notice of facts in the Galindez case as part of the record in the instant case.  The reasons for not doing so are legion, not the least significant of which is that Galindez was a ruling denying a motion for summary judgment filed by the municipal defendant.  As such, the denial of the motion was simply a finding that there were issues of fact as to whether the municipality had a custom or practice demonstrating deliberate indifference.  Most

-37-

certainly, the ruling is not an affirmative finding of any such custom or policy.  To avoid summary judgment on the Monell/training theory, Russo must first come forward with evidence that other officers had their constitutional rights violated as a result of their investigations into police misconduct.  Russo has completely failed to do so.

### c. ____History of Mishandling Investigations of Police Misconduct

Finally, Russo argues that "the City is liable because the practice of harassing, retaliating against, shunning and interfering with Hartford Police Officers who investigate other Hartford Police Officers or work with the Federal Government is permanent and well settled as to imply the constructive acquiescence of senior policy-making officials."  Mem. Opp. City's Mot. for Summ. J. at 10.  However, Russo has produced no evidence other than the details of his own situation.  "Since the existence of a policy of non-supervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence."  Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986).[21]  The only additional evidence offered in support of his claim that the City had a policy of retaliation is a bald reference to two actions against the City of Hartford also filed in this district, which "Statement of Fact" the court has stricken.  See Ruling on Motion to Strike (Dkt. No. 523) re: Pl.'s Local Rule 56(a)2 Statement., ¶ 273

---

[21]  To the extent that Ward v. New York City Transit Auth., 971 U.S. Dist. LEXIS 9621 (S.D.N.Y. 1999), as suggested by Russo, stands for the proposition that actions directed at the plaintiff, in and of themselves, may be sufficient to establish a systemic and widespread practice or policy, such a holding is inconsistent with Fiacco, 783 F.2d at 328, and thus cannot serve as support for his argument.

(citing Stack v. City of Hartford, et al., 3:01cv00260 (EBB) and Fago v. City of Hartford, 3:02cv01189 (AHN)).  Even if the court took judicial notice of these two cases, the court observes that they in no way support an inference or finding of a history of retaliation. With regard to Stack, the record reveals that, while suit had been brought against the City, the court granted summary judgment in the City's favor.  See Stack, 3:01cv260, Ruling Granting Motion for Summary Judgment for City of Hartford [Dkt. No. 104].  As to Fago, that matter is still pending and, accordingly, those allegations of retaliation contained therein are no more evidence of Russo's claims, as required to avoid summary judgment, than are his allegations in the instant case.[22]  Fago v. City of Hartford, 3:02cv01189 (AHN).

Accordingly, the City's Motion for Summary judgment [Dkt. No. 140] is granted.

---

[22]  The court also observes that Russo's attorney in the case at bar also appeared as plaintiff's attorney in these two cases and, accordingly, should have known that the City was vindicated in Stack and that there has been no disposition of Fago.

C.    **Russo v. Bailey, et al.**, 3:00-cv-1794 (JCH) [Dkt. Nos. 131, 122, 125]

In this action, Russo alleges that Chief Croughwell, Captain Flaherty, Lieutenant Kenary, Sergeant Roberts, Sergeant Lyons, Detective Lawlor, Detective Rovella, and Sergeant Lilley (collectively the "Police Defendants"); Acting Chief Rudewicz; the City of Hartford; and Lawrence Reynolds, Michael Wood, Thomas Hardwick, and the Hartford Police Union (collectively the "Union Defendants") deprived Russo of constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. Russo also makes claims under Connecticut common law.[23] Specifically, in his Sixth Amended Complaint [Dkt. No. 117], Russo alleges First Amendment retaliation by the Police Defendants (Count One); violation of his equal protection and substantive due process rights under the Fourteenth Amendment by the Police Defendants (Count Two); First Amendment retaliation and violation of his equal protection and substantive due process rights under the Fourteenth Amendment by Chief Rudewicz (Count Three); violation of his equal protection and substantive due process rights under the Fourteenth Amendment by Union Defendants (Count Four); breach of duty of fair representation by Union Defendants (Count Five); intentional infliction of emotional distress by Chief Croughwell, Sergeant Lyons, and Detective Lawlor (Count Six); First Amendment retaliation and violation of his equal protection and substantive due process rights under the Fourteenth Amendment by the City (Count Seven); and wrongful termination/constructive discharge by the City (Count Eight). Each defendant has moved for Summary Judgment on all claims against him or

---

[23]    The court previously granted a motion to dismiss all counts against the state defendants, including the first named defendant, the late-Chief State's Attorney, John Bailey.

it, except the City has not moved on Count Seven, the Monell claim.

### 1.     Police Defendants/Chief Rudewicz

Russo claims that defendants Croughwell, Flaherty, Kenary, Roberts, Lyons, Lawlor, Rovella, Lilley, and Rudewicz unlawfully retaliated against him for exercising his rights under the First Amendment and violated his rights to equal protection and substantive due process under the 14th Amendment.

### a.     Retaliation Under the First Amendment

As described above, Russo must create a triable issue of fact that the relevant speech is protected by the First Amendment, that the defendants took adverse employment action against him, and that a causal connection exists between the adverse employment actions and the protected speech.  See Section III.B.1(a).

### i. Protected Speech

As discussed above, see Section III.B.1(a)(i), Russo's communications with the federal officers with respect to corruption in the Hartford Police Department constitute protected speech under the First Amendment because they related to a matter of public concern.  Russo also alleges that the Police Defendants retaliated because Russo helped to solve a murder working with the federal authorities and because Russo filed a federal lawsuit against members of the HPD and the City of Hartford.

Russo's role in the apprehension of a murder suspect is also protected by the First Amendment.  Viewing the facts in the light most favorable to the plaintiff, Russo's First Amendment rights of association are violated if the HPD retaliated against him as a result of his association with federal law enforcement officials.  Additionally, while his role in the apprehension of a murder suspect was required by his employment, that fact

does not strip his association with the federal officials of its status as a matter of public concern. Russo claims that the HPD retaliated against him for participating in the arrest of a murder suspect by the Federal Gang Task Force. In the meantime, the Hartford Police Department arrested an innocent man in its attempt to solve that same murder. The charging of an innocent man and the arrest of a guilty man are both matters of public concern. Therefore, Russo has properly alleged First Amendment retaliation by members of the HPD for the role he played in that case.

Similarly, the lawsuit filed by Russo in November of 1997 constitutes protected speech. That lawsuit alleges that officials of the HPD retaliated against Russo for exercising his First Amendment rights in connection with a federal investigation regarding police corruption. See Russo v. Croughwell, et al., 3:97CV2380 (JCH). The Police Defendants argue that the subject matter of the complaint, during the relevant time frame, failed to satisfy the public concern "requirement." Pol. Defs.' Memo. Opp. at 17 (citing White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993)). Indeed, the Second Circuit has held that "the right to petition the government for a redress of grievances . . . is 'generally subject to the same constitutional analysis' as the right to free speech." White Plains Towing, 991 F.2d at 1059 (quoting Wayte v. United States, 470 U.S. 598, 610 n.11 (1985)). However, more recently, the Second Circuit has stated, without qualification, that "[t]he rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 91 (2002). While the claim involves Russo's own employment, "the question of whether [police department] officials had retaliated against [an] employee whistle-

blower[] in violation of the employees' First Amendment rights is a 'matter of political, social, or other concern to the community.'" Catletti ex rel. Catletti v. Rampe, 334 F.3d 225, 230 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  That the claim involves Russo's employment does not mean it is no longer a matter of public concern.  Id.

### ii.    Adverse Employment Action

Russo claims that the Police Defendants took adverse employment actions against Russo in retaliation for the protected First Amendment activities described above.  In order to determine whether the alleged actions on the part of these defendants constituted adverse employment actions, this court must consider what sorts of conduct "would deter a similarly situated individual or ordinary firmness from exercising his or her constitutional rights."  Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001).  The Second Circuit has found that

> "to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace."

Phillips v. Bowen, 278 F.3d 108, 109 (2d Cir. 2001).

Russo points to a number of employment actions that constitute retaliation.  One of these, his suspension, constitutes a classic example of an adverse employment action.  Another, Croughwell's phone call in October 1997, constitutes a reprimand or threat for Russo having exercised his First Amendment rights, and, therefore, is also a

classic example of an adverse employment action.[24]  Russo's claims against Croughwell with respect to First Amendment retaliation, therefore, survive defendant's Motion for Summary Judgement.

Because Lyons and Lawlor threatened Russo and were present when Croughwell placed that phone call, the claims against them also survive summary judgment.  Their threats explicitly were made in retaliation for Russo's statements to federal law enforcement officials.

Russo also claims that Flaherty, Kenary, and Lilley harassed and intimidated Russo by moving his desk and searching and removing contents from the desk but provides no evidentiary support for this claim.  There is not, therefore, a triable issue of fact with respect to this claim.

Russo alleges that Croughwell, Flaherty, and Kenary participated in the investigation of Russo with respect to his drug use.  As described above, see Section III.B.1(a)(ii), the defendants do not argue that the alleged actions undertaken in 1997 did not constitute adverse employment actions. Russo has created a triable issue of fact with respect to whether the investigation and arrest, automatically triggering suspension, may be considered adverse employment actions.  The Second Circuit has found that "the threat of disciplinary proceedings" and the suspension that would accompany initiation of those proceedings "could have a deterrent effect on other officers who wished to" exercise their First Amendment rights.  Washington, 373 F.3d at

---

[24]  The claim that Croughwell's phone call constitutes retaliation for Russo's exercise of his First Amendment rights likely duplicates a claim made in 3:97cv2380 (JCH) with respect to defendants Croughwell and Flaherty.

320.   Therefore investigation and arrest, sharing that potential deterrent effect, are adverse employment actions for the purposes of a First Amendment retaliation claim.

Russo alleges that Lieutenant Kenary required Russo to submit a doctor's note explaining his absence; contacted Russo's private physician; and required Russo to report his daily activities and provide a signed memo from the U.S. Attorney's Office supporting his report.  All of these actions may constitute overzealous supervisory actions but none creates an "unreasonably inferior and adverse" work environment. Phillips, 278 F.3d at 109; see also Weeks v. New York State (Division of Parole), 273 F.3d 76 (2d Cir. 2001).  In addition, Russo fails to allege how these actions disrupted or rendered his work environment inferior.

Russo alleges that Kenary, Roberts, and Lilley changed the locks and denied Russo access to the CAPers division.  Denying an employee access to his workspace and the ability to do his work renders the work environment "unreasonably inferior and adverse."  Allegedly, Roberts told Russo not to "bother coming back there won't be any desk for you."  However, Russo provides no evidence to support this claim.

Russo alleges that Rovella told Lyons and Lawlor that Russo was participating in a corruption probe of the Hartford Police Department with Federal officials.  Mere gossip does not constitute an adverse employment action, and Russo makes no allegation that Rovella's action created an unreasonably inferior workplace.  Therefore, the claim against Rovella is inadequate as a matter of law.

There are material questions of fact with respect to whether denial of access to workspace, October 1997 phone call, investigation, arrest, and suspension constitute adverse employment actions.  Therefore, Russo has created a material question of fact

with respect to Croughwell, Flaherty, Kenary, Roberts, Lyons, Lawlor, and Lilley's participation in adverse employment actions against Russo.  The claim against Rovella, however, is insufficient as a matter of law.

### iii.    Causation

The court must consider whether Russo has demonstrated that a causal connection exists between the alleged adverse employment actions and the inference that the actions were undertaken in retaliation for his exercise of his First Amendment rights.  See discussion supra at section III.B.1(a)(iii).  The court finds that a question of fact exists as to the cause of the adverse employment actions undertaken.  As already discussed, the phone call made by Croughwell, with Lawlor and Lyons in the room, provides sufficient evidence of animus to create a triable issue of fact as to causation.

Additionally, Russo has provided evidence that Kenary felt animus towards Russo.  Pl.'s Joint Local Rule 56(a)2 Statement ¶ 29.  Roberts testified that he felt that Russo had forgotten he was a police officer because of his work with the federal agents.  In addition, there is evidence that the Pope Park murder investigation did create animus in the Department.  As cited above, Flaherty allegedly threatened to "get" Russo.  Id.  Russo, however, provides no evidence that Lilley knew about his involvement with the federal law enforcement officials, much less acted in retaliation against Russo for that involvement.  There is, therefore, no issue of material fact regarding causation to be determined with respect to Lilley.

Russo can also demonstrate temporal proximity.  All of the events alleged, except for the failure to reinstate him following dismissal of criminal charges, occurred in 1997.  The second drug test occurred within a week after Croughwell and others

threatened Russo in retaliation for his communications with federal officials. The temporal proximity and animus on the part of Russo's colleagues and supervisors suffice to create a material question of fact regarding causation with respect to Croughwell, Flaherty, Kenary, Roberts, Lyons, and Lawlor.

### iv.    Balancing Test

A finding in Russo's favor with respect to the three elements described above requires a further analysis to determine whether the defendants Croughwell, Flaherty, Kenary, Roberts, Lyons, and Lawlor would have taken the same adverse actions in the absence of the protected speech or that disruption caused by Russo's speech is sufficient to outweigh the First Amendment interest in the plaintiff's speech.  See supra section III.B.1(a)(iv).

As discussed above, summary judgment is precluded where questions regarding motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.  See section III.B.1(a)(iv) supra. Therefore, the Motion for Summary Judgment is denied with respect to defendants Croughwell, Flaherty, Kenary, Roberts, Lyons, and Lawlor and is granted with respect to defendants Rovella and Lilley.

### b.  Russo's Claims of First Amendment retaliation by Rudewicz

In Count Three, Russo contends that Chief Rudewicz refused to reinstate Russo following the dismissal of felony charges against him on September 14, 2000.  He alleges that Chief Rudewicz refusal to reinstate him was in retaliation for Russo's role in investigating and exposing corrupt practices of the HPD and filing a federal lawsuit.

The facts material to this claim against Rudewicz differ significantly from those alleged against the other Police Defendants and warrant summary judgment in Chief Rudewicz's favor.

The temporal proximity between the protected conduct and the alleged retaliatory refusal to reinstate Russo precludes a finding of causation. Chief Rudewicz became Acting Chief on July 17, 2000. The protected conduct upon which Russo has staked his First Amendment retaliation claim – his cooperation with the federal government – had taken place (by the most favorable estimate) three years earlier. Morris v. Lindau, 196 F.3d 102, 113-14 (2d Cir. 1999) (holding that, absent other evidence of retaliatory motivation, no inference of causation follows from fact of adverse action occurring two years after speech). Moreover, there is no basis for imputing to Chief Rudewicz any retaliatory animus, in contrast to that animus evidenced, for example, by Chief Croughwell's telephone conversation with Russo or by the other police defendants.

In addition, Russo also asserts in this action that he was retaliated against for filing suit. While, as discussed above, the filing of a lawsuit may constitute protected speech, the record does not create any issue of fact to support Russo's argument that, in response to this lawsuit, Chief Rudewicz retaliated. Rather, the undisputed facts reveal that, in response to the dismissal of the criminal charge, Chief Rudewicz began making efforts to have Russo reinstated. Russo was, indeed, reinstated 36 days after he filed suit and 44 days after his criminal charge were dismissed, with an award of pay back to September 15, 2000.

Russo claims adverse actions in Rudewicz suspending him, denying him medical

benefits, and refusing to reinstate.  He also argues that "Rudewicz waited until the training elapsed before reinstating Russo, claiming that "past practice was to allow officers to train in other locations than Hartford."  Pl.'s Memo. Opp'n at 25.

Russo has created a triable question of fact whether his speech is protected by the First Amendment.[25]  Russo does not, however, show he suffered an adverse employment action by Rudewicz.  He argues in his Memorandum (without citations) that Rudewicz "suspended" him by refusing to reinstate him.  However, based on the evidence submitted by Rudewicz, and which evidence is not disputed by Russo, as of September 15, 2000, his criminal charges were dismissed by the trial court after it granted a Motion to Suppress.  Shortly thereafter, Rudewicz did reinstate Russo, on albeit provided that Russo met certain conditions.  Russo does not argue that the conditions were unreasonable and, in fact, these conditions applied to all Hartford police officers.  This does not constitute an adverse employment action.  Accordingly, there are no material issues of fact as to the First Amendment retaliation claim against Chief Rudewicz, and the court grants summary judgment on that claim against him.

### c.    Fourteenth Amendment Equal Protection and Substantive Due Process

In Count Two, Russo claims that the Police Defendants violated his right to equal protection and substantive due process as guaranteed under the Fourteenth Amendment.  The Police Defendants move for summary judgment on the grounds that

---

[25]  Rudewicz argues that Russo's original 1997 Complaint (in 3-97-cv-2380) did not address matters of public concern and no pleading did until after Rudewicz ended his term as Chief.  However, Russo alleges retaliation related to matters of public concern in his original complaint.  See Compl. (Dkt. No. 1); 3-97-cv-2380(JCH) ¶ ¶ 9-11.

Russo cannot prove that similarly situated individuals were treated differently and, even if he could, the defendants are entitled to qualified immunity.  Further, as to the substantive due process claim, the Police Defendants argue that record does not support a conclusion that their conduct shocks the conscience.  The court finds that there are no issues of material fact as to whether there were individuals situated similarly to Russo who were not subjected to investigation and reasonable suspicion drug tests and, accordingly, grants summary judgment as to the equal protection claim.

The right of equal protection "is violated when the state distinguishes between individuals based on unreasonable, arbitrary, or capricious differences that are irrelevant to a legitimate government objective."  Bernheim v. Litt, 79 F.3d 318, 323 (2d. Cir. 1996) (quotation marks omitted).  To prevail on an equal protection claim premised on a "class of one," a plaintiff must establish "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Harlen Assocs. Inc. v. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  The individuals with whom the court would compare Russo for an equal protection analysis "must be similarly situated in all material respects."  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (emphasis added).

Russo has not come forth with any evidence that he was singled out from such a group by any of the Police Defendants.  In support of his claim, Russo runs through a litany of individuals on the HPD who he alleges have somehow or another misbehaved, but were not investigated.  With regard to each instance of disparate treatment that Russo alleges, he either fails to come forward with evidence to support his allegation of

different treatment,[26] or the persons he claims received different treatment are not similarly situated to him.[27]  Of those Russo claims to be "similarly situated," not one involved the suspected illegal use of drugs.

As the first limiting factor of this "class of one," the court notes that it cannot compare Russo to his superiors whom he charges with investigating and disciplining him.  Moreover, even where he proffers another individual who is a detective, the particular problem for which Russo alleges that individual should have been investigated was not a pattern of illegal use of drugs.  Indeed, the Police Defendants made a substantial showing of the numerous reasons Russo was drug tested.  See discussion, section III.B.1(b), supra.  Russo has offered no evidence in support of his claim that other detectives or even police officers exhibited symptoms or signs of drug use, but were not investigated as Russo was.[28]  Accordingly, the court grants summary judgment in favor of the Police Defendants on the equal protection claim.

As to the equal protection claim against former Chief Rudewicz, Russo's

---

[26]  For example, Russo asserts criminal conduct by Detective Robert Lawlor in connection in the misuse of a "drug kit" which contained illegal drugs and the "planting" of evidence.  See Pl.'s Local Rule 56(a)(2) Stat. at ¶¶ 47, 56, 57, 60.  However, all these accusations of wrongdoing by Lawlor are unsupported by the cited record.  The cites to paragraph 56 do not support the stated "fact" with regard to Lawlor, and the court has stricken paragraphs 47, 57 and 60.

[27]  Some of Russo's statement of "fact" concern the Chief of the HPD, not a person similarly situated as he, a detective.  See Pl.'s Local Rule 56(a)(2) Statement ¶ 156 (the court also notes it has stricken this paragraph.)  See Ruling Re: Motion to Strike (Dkt. No.68).

[28]  Russo states Edelwich and Miele had possession of drugs (in a drug kit) that were not properly handled or accounted for.  Id. at ¶ 161.  However, Russo offers nothing to suggest there was a reasonable suspicion that either officer used the drugs.  Further, while Russo asserts there was no investigation of Miele or Edelwich, id. at 162, the court struck that paragraph.  Ruling Re: Motion to Strike (Dkt. No. 68), and Russo's cited record support reveals an investigation did occur.  See Miele Depo. at 131 ("Q: Did Internal Affairs investigate you?  A: No.  As far as I know, Lt. O'Connell was the investigating officer.")

argument suffers from the same fundamental flaw.  He simply has failed to establish that there were others similarly situated to him who were treated different by Chief Rudewicz.  Rudewicz reinstated Russo less than 45 days after he was cleared of felony charges on conditions requiring Russo to be recertified on his gun (which certification had lapsed) and to show he was fit for duty.  Russo has offered nothing to show that others, similarly situated, were treated differently.  Accordingly, the court grants summary judgment in favor of Chief Rudewicz as to the equal protection claim.

Russo also argues that the Police Defendants and Rudewicz violated his substantive due process rights secured by the Fourteenth Amendment insofar as their actions "shock the conscience."  See Smith ex. rel. Smith v. Half Hollow Hills Central Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (holding that "[t]he protections of substantive due process are available only against egregious conduct which goes beyond merely 'offend[ing] some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal' and 'offensive to human dignity' as to shock the conscience.") (internal citations omitted).  The Police Defendants argue that a substantive due process claim should not stand where the conduct complained of implicates other Constitutional doctrines.  The court agrees that "where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

In this instance, Russo argues that the defendants' overriding motivation in all

their conduct aimed at him was in retaliation for his exercise of his First Amendment rights.  He also asserts a disparate treatment claim under the equal protection clause. Accordingly, Russo need not, and cannot, resort to the more generalized notion of substantive due process when he has asserted such specific claims, including a triable claim of First Amendment retaliation.[29]

### 2.    Union Defendants

### a.    First Amendment and Fourteenth Amendment

In Count Four, Russo alleges that the Hartford Police Union is liable for the violation of his First Amendment and Fourteenth Amendment rights because it collaborated with the Police Defendants.  The Union Defendants move for summary judgment on the grounds that the Union was not a state actor and, therefore, cannot be liable.  However, Russo's claim is more aptly characterized as one resting on the theory that members of HPD and the Union conspired to deprive Russo of his constitutional rights, making all participants in the conspiracy liable under section 1983.  See Hughes v. Patrolmen's Benevolent Assoc., 850 F.2d 876, 880 (2d Cir. 1988).  Nevertheless, Russo fails to come forth with any facts that would create a material issue of fact as to such a cause of action.

Russo claims that the Union Defendants acted in concert with the Police

---

[29]  Alternatively, this court would find that the conduct alleged under this claim as set forth in Counts 2 and 3 does not satisfy the "shock the conscience" standard.  See Smith ex. rel. Smith v. Half Hollow Hills Central Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (holding that "[t]he protections of substantive due process are available only against egregious conduct which goes beyond merely 'offend[ing]' some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal' and 'offensive to human dignity' as to shock the conscience.") (internal citations omitted).

Defendants on one occasion: when Russo was taken to be drug tested on November 4, 1997.  Namely, he asserts that Larry Reynolds, a Union official at the time, was present during the transport of Russo from HPD headquarters to the drug testing facility on that date and failed to advocate on Russo's behalf.[30]  Reynolds was also an EAP Representative, which the Union offers to explain Reynolds' presence for the trip from HPD headquarters to the testing facility on November 4, 1997.  Russo did not dispute this statement of fact, nor the fact that Reynolds was in street clothes and not carrying a firearm.  Further, there is no evidence of a causal connection between any action by the Union and motivation to retaliate.  There is no triable issue of fact with respect to Russo's claim of First Amendment retaliation.  Further, Russo has failed to provide evidence to support a section 1983 claim for violation of the 14th Amendment and, therefore, the claim cannot lie against the Union with whom the state actors allegedly conspired or collaborated.

Russo also cites to correspondence with his attorney, James Brewer, in January of 1999.  Pl.'s Mem. in Opp. at (unno. ) 9-10, citing Exs. 17 and 18 to Pl.'s Local Rule 56(a)(2) Statement.  However, nothing in that correspondence, even in the context of the entire record before the court, would create a material issue of fact of conspiracy with the Police Defendants.  The two Exhibits cited by Russo do not support the proposition in his brief ("Reynolds was informed by Brewer that the Union was to represent Russo") and certainly do not evidence a section 1983 conspiracy with city actors involving the Union.  There being no other time when Russo claims the Union

---

[30]  Russo cites to Huertas Depo. at 79-85 and Flaherty Depo. at 223.  Pl.'s Memo. Opp'n at (unno.) p. 9.

conspired with the Police Defendants, the Union's Motion for Summary Judgment on Count Four is granted.

### b.    Breach of Duty of Fair Representation as to Union

In Count Five, Russo alleges that the Union breached its duty of fair representation owed to him by failing to file a grievance on his behalf following his suspension and by failing to effectuate his immediate reinstatement following the dismissal of criminal charges against him.  Pl.'s Memo. Opp'n at (unno.) 11.  The Union moves for summary judgment on the grounds that there was no basis for filing a grievance prior to September 15, 2000, and that shortly thereafter, the Union did press a then-pending grievance on Russo's behalf, securing him reinstatement as of October 29, 2000, as well as back pay to September 15, 2000.

In Connecticut, "[t]he duty of fair representation requires the Union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion in complete good faith and honesty, and to avoid arbitrary conduct.'"  Labbe v. Hartford Pension Comm'n, 239 Conn. 168, 194 (1996) (quoting Vaca v. Sipes, 386 U.S. 171, 177 (1967)).  Indeed, "[i]f a Union fails to submit a meritorious grievance to arbitration, an employee may sue the Union for breach of its duty of fair representation." Tedesco v. City of Stamford, 22 Conn. 233, 248 (1992).  The undisputed facts establish that the Union did file a grievance and that it was pending as of the moment Russo's criminal charges were dropped (the earliest instance at which a meritorious grievance could have been filed).

Russo asserts that from December 16, 1997 to the present, the Union defendant did not challenge the HPD's suspension of the plaintiff."  Mem. in Opp. at (unno. p.10).

-55-

The assertion is not supported by any citation.  Russo does quote Reynolds' deposition, in which Reynolds states there was no "outreach" to Russo and that Reynolds did not file a grievance after Russo was arrested and suspended.[31]  Reynolds Depo. at 164. Reynolds also testified that "normally" there would be a grievance when someone is suspended.  Id.

However, this evidence is insufficient, in light of the record as a whole, to create a material issue of fact on breach of the duty of fair representation.  The Union filed a Rule 56(a)(1) Statement, which relies on discovery evidence as well as Affidavits submitted in connection with its Motion for Summary Judgment.  Union Defs.' Local Rule 56(a)(1) Statement Ex.'s A and D, Decl's of Larry Reynolds and Michael Wood. Russo did not comply with F.R.Civ.P. 56(a) and Local Rule 56a: he failed to file a Rule 56(a)(2) Statement which admits or denies the Union's 56(a)(1) Statement.  Under the Local Rules, the Union's Statement is deemed admitted.  Local Rule 56(a)(1).  Contrary to Russo's unsubstantiated statement that the "Union defendants refused to take action to effectuate the plaintiff's immediate reinstatement to his position in the HPD," the Union did pursue a grievance on Russo's behalf which resulted, after the September 15, 2000 dismissal of the criminal charges, in Russo's reinstatement effective October 29, 2000, with back pay and benefits from September 15, 2000 to October 29, 2000.[32] See Union Defendants' Local Rule 56(a)(1) Stat. ¶¶ 37-42.  Given Russo's conviction

---

[31]  Russo overlooks the fact that Reynolds ceased to be a Union officer before Russo's charges were dismissed in 2000.  Before the dismissal, there was not anything the Union could grieve with respect to Russo's suspension because of the pending felony charges.  Union Def.'s Local Rule 56(a)(1) Statement Ex. D, Wood Decl. ¶ 14.

[32]  Prior to the September 2000 dismissal, there was no basis to grieve a suspension based on pending felony charges.  Union Def.'s Local Rule 56(a)(1) Statement, ¶¶ 37 50.

on most of the later-reinstated felony charges in 2003, the Union could not take any

steps subsequent to that conviction that would effectuate Russo's reinstatement.  Id. at

¶ 45.

The court finds that there are no material facts at issue and the Union, as a

matter of law, did not breach its duty towards Russo.  Accordingly, the court grants

summary judgment to the Union on this count.

### 3. Police Defendants (Croughwell, Lyons, and Lawlor) – Intentional Infliction of Emotional Distress

In Count Six, Russo alleges that the Chief Croughwell, Sergeant Lyons, and

Detective Lawlor intentionally inflicted emotional distress upon Russo by extreme and

outrageous conduct.  The defendants move for summary judgment on the ground that

their conduct was not extreme and outrageous under Connecticut law and when viewed

in the context of law enforcement.  The court agrees with the defendants and grants

summary judgment in their favor as to Count Six.

In order to prevail on a claim of intentional infliction of emotional distress, a

plaintiff must demonstrate: (1) that the defendants intended to inflict emotional distress

or knew or should have known that emotional distress was a likely result of their

conduct; (2) that the conduct was extreme and outrageous; (3) that the defendants'

conduct was the cause of the plaintiff's distress; and (4) that the emotional distress

sustained by the plaintiff was severe.  Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d

1337 (1986).  "Liability for intentional infliction of emotional distress requires 'conduct

exceeding all bounds usually tolerated by decent society, of a nature which is

especially calculated to cause, and does cause, mental distress of a very serious

kind.'" DeLaurentis v. City of New Haven, 220 Conn. 225, 266, 597 A.2d 807 (1991)

(quoting Petyan, 200 Conn. at 254 n.5).  The plaintiff must "prove conduct considerably

more egregious than that experienced in the rough and tumble of everyday life."

Whelan v. Whelan, 41 Conn. Supp. 519, 588 A.2d 251, 252 (Conn. Super. Ct. 1991).

"Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities."  Hiers v. Cohen, 31 Conn. Supp. 305, 329 A.2d 609,

611 (Conn. Super. Ct. 1973).

Russo has not come forward with evidence that raises a material issue of fact

with regard to whether the conduct of the defendants was extreme and outrageous.

Taking the record in the light most favorable to Russo, it reveals that Lyons and Lawlor

threatened Russo outside of Russo's presence and that Croughwell relayed that threat

to Russo over the phone.  While certainly such conduct is inappropriate, it was a mere

verbal threat, which was not repeated or acted upon.  While it may well evidence the

retaliatory animus required for Russo's First Amendment claim, it is not as a matter of

law, in itself, extreme and outrageous under the Connecticut common law standard.

Therefore, the court grants summary judgment on Count Six.

### 4.    Municipal Defendant

#### a.    Wrongful Termination/Constructive Discharge.[33]

In Count Eight, Russo alleges he was wrongfully terminated in violation of public

policy or, in the alternative, that all of the complained-of conduct has made it impossible

---

[33] Although not expressly addressed by the parties, it is the court's view that this claim
concerns the period from September 15, 2000 (when the criminal charges are dismissed on a
Motion to Suppress) to November 3, 2003 when Russo is convicted.  It is undisputed that a
convicted felon cannot serve as a HPD officer.

for him to return to work at the HPD and, therefore, the conduct constitutes constructive discharge. In response, the City argues that Russo has not been terminated nor has he resigned.

Wrongful discharge in violation of public policy is a common law tort that requires a plaintiff to prove that his employment was actually terminated and that such termination violates a clear mandate of public policy. See Cimochowski v. Hartford Pub. Schs., 261 Conn. 287, 306 (2002). Similarly, constructive discharge is a common law tort that requires a plaintiff to prove that, although his employment was not actually terminated, the employer intentionally created a work environment that compelled the plaintiff to quit voluntarily. See Brittel v. Department of Correction, 247 Conn. 148, 178 (1998).

With regard first to Russo's wrongful termination claim, the record reflects the undisputed fact that Russo has never been terminated. See City's Local Rule 56(a)(1) Statement, ¶ 2. While Russo denies this paragraph in his Local Rule 56(a)(2) response, his supporting citations do constitute evidence he has been terminated. The record reflects he was suspended when first indicted (Dec. 16, 1997), reinstated when the charges were dismissed (Oct. 28, 2000, with back pay to Sept. 15, 2000), and suspended when the charges were reinstated (May 31, 2002, although the Supreme Court reversed the ruling on a Motion to Suppress in February 2002). Russo argues his "status has fluctuated and changed" since his 2000 suspension. However, nothing he cites evidences his termination. Therefore, there is no material issue of fact concerning his claim of wrongful termination.

With regard to Russo's alternative claim of wrongful termination by constructive

discharge, Russo claims the City has failed to allow him to "return to work" and has "refused to take the necessary . . . actions to reinstate" him.  Sixth Amd. Complaint, ¶¶ 8, 10.  In his Joint Local Rule 56(a)(2) Statement, Russo relies on a letter from his doctor, Mark Hall, to Attorney Brewer, that states that the HPD is a "hostile work environment for Det. Russo," and that Dr. Hall advises Russo not to return.  This might raise an issue of fact on constructive discharge if there is a record basis on which a jury could determine the City created, or knowingly permitted to continue, the hostile work environment.  However, there is no evidence that Russo resigned his position in response to this hostile environment.  While the City did write Russo's attorney (when Russo had failed to report in response to Rudewicz's reinstatement of him) that if he did not report by November 20, 2000, he would be deemed to have resigned, City's Local Rule 56(a)(1) Statement, Ex. D at Ex. E, p.2), Russo's attorney immediately disputed this.  Id. at Ex. D at Ex. F, at p. 2, ¶ 4.  Further, subsequent correspondence between Attorney Apostolides and Attorney Brewer evidence that the City did not deem Russo to have resigned as of November 20, 2000.  Id. at Ex. D at Ex.'s H, K, L.

The court is unaware of case law in which a plaintiff claims constructive discharge without termination (i.e. resignation) of employment.  Russo has not cited any.  Nor has Russo resigned.  Therefore, the court concluded there is no material issue of fact on Count 8 and summary judgment is granted for the City.

**Russo v. Marquis, et al., 00cv2382 (JCH) [Dkt. Nos. 32 and 40]**

Russo filed this action in late 2000 against the then-Chief of Police, Bruce Marquis, and the City of Hartford.  In his Third Amended Complaint (Dkt. No. 21), Russo alleges that Marquis violated his constitutional rights under the First and Fourteenth Amendments, both equal protection and substantive due process, and is liable for intentional infliction of emotional distress.  Russo claims that the City is liable for Marquis' actions in violation of the First and Fourteenth Amendments.

In Count One of the Third Amended Complaint, Russo alleges a violation of his First Amendment right of association and to seek judicial redress, which violation arises out of Marquis' alleged refusal to reinstate him.  It should first be noted that Marquis became the Chief of Police of the City of Hartford on December 4, 2000.  Marquis' Local Rule 56(a)(1) Statement, ¶ 48.[34]  Nearly every "fact" relied upon by Russo in his Joint Local Rule 56(a)(2) submission pertains to events that occurred before that time.  Marquis argues that, at the time of his allegedly unlawful actions, Marquis was unaware of any history "concerning Russo and the HPD."  Id. at ¶¶ 50-61.  Russo denies almost all of these Local Rule 56(a) Statements.  Pl.'s Local Rule 56(c)(1) Statement ¶¶ 50-61.  However, as to nine of those paragraphs, Russo cites no evidence in support of his denials, and with respect to the two paragraphs (¶¶ 51 and 52) to which he does cite something, he cites to the defendants' Rule 56(a)(1) Statement ¶ 63.[35]  Since

_____

[34]  The pleading docketed in this case has a docket number 97-cv-2382.  See Pl.'s Local Rule 56(a)(2) Statement (Dkt. No. 47).  However, the replies appear to correspond to Marquis' Statement.  Russo appears to have admitted this Statement.

[35]  As to the last one he denies, ¶ 50, he bases his denial on the fact that Marquis was deposed in a case, Stack v. City of Hartford, on October 21, 2001.  The court notes Russo did not provide the deposition transcript or otherwise set forth what that testimony reveals as to

paragraph 50 of the defendants' Rule 56(a)(1) Statement relates to Marquis' lack of knowledge concerning Russo's lawsuits, the court is puzzled as to how the fact of a deposition in the <u>Stack</u> case (without providing the testimony itself) is supportive of a denial that Marquis knew about Russo's history with, and claims against, the HPD.

Marquis' Statement paragraph 63, which Russo also relies on, sets out the totality of Marquis' knowledge of Russo when Marquis became chief. That knowledge was based on a "brief" conversation with the out-going Acting Chief Rudewicz, on Marquis' first day at work. Marquis testified that Rudewicz indicated that Russo wanted his credentials returned to him but that, among other things, Russo's POST certification had lapsed. Marquis states that he made the decision not to return Russo's badge and credentials under these circumstances, and that he did not review Russo's personnel file or make any other inquiry before making this decision.

In order to state a claim for retaliation under the First Amendment, a plaintiff must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected; (2) he suffered an adverse employment decision; and (3) a casual connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was the motivating factor in the determination. <u>City School District Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 283-87 (1977). If a plaintiff establishes these three elements, a defendant may nonetheless avoid liability by showing one of two things: that he would have taken the same adverse action even in the absence of the protected activity, or that the protected

---

Marquis' knowledge. Further, the court notes that the current statement of Russo's claims is his Third Amended Complaint, filed in September 2001 (Dkt. No. 21).

activity was likely to disrupt governmental activities and that disruption was sufficient to outweigh the First Amendment value of plaintiff's association of speech.  Mandell v. The County of Suffolk, 316 F.3d 368, 384 (2d Cir. 2003).

Here, Russo's claim must fail.  Even assuming constitutionally-protected speech (see section III.B.1(a), supra) and adverse employment action taken by Marquis (continued suspension), there is no causal connection between such actions and Russo's protected conduct.  Russo's Memorandum sets out several pages of broad general principles of First Amendment rights.  Pl.'s Memo. Opp'n, pp. 9-13. However, he never connects that analysis with the alleged First Amendment conduct in which he purportedly engaged, and that is involved in the cause of action against Marquis. Russo's claim against Marquis must fail because there is no evidence to causally connect any "adverse action" by Marquis with any First Amendment activity on the part of Russo.

All of Russo's alleged protected activity occurred in 1997 or earlier, except for the prosecution of his lawsuits.  Clearly, the former activity did not occur in temporal proximity to any alleged adverse action by Marquis.  See Morris v. Lindau, 196 F.3d 102, 1103-12 (2d Cir. 1999)   The pending lawsuits (Russo v. Hartford, 3-97-cv-2380 (JCH) and Russo v. Bailey, 3-00-cv-1794 (JCH)) can be said to be temporally close to any action by Marquis because they were ongoing.  However, Marquis testified under oath that he was unaware of the prior lawsuits until his deposition in this case in June of 2002.  Marquis' Local Rule 56(a)(1) Statement ¶ 50.[36]  There is nothing in the record to

_____

[36]  Russo denies this, but merely states that Marquis was deposed in another lawsuit, Stack v. City of Hartford, in October of 2001.  However, Russo did not submit the deposition

support the causal connection element. Therefore, summary judgment enters for Marquis on Russo's First Amendment claim.

Russo also claims that he was not given a safe environment to which to return and, therefore, was not allowed to return to work and was "constructively discharged." If so, that would construe an adverse employment action. However, his allegations concerning claims of threats and harassment all occurred prior to Marquis' assumption of the position of Chief. After Marquis took the position of chief, he continued in the decision of his predecessor that Russo's badge should not be provided to him until Russo became re-certified. Russo also alleges some denial of medical benefits and pay. To the extent that this constitutes an "adverse employment action," the record is similarly devoid of evidence that Marquis took such actions as a result of Russo's protected activities. Marquis testified at his deposition in 2002 that he was not aware of either Russo's prior activities with federal corruption and homicide investigations, or of treatment of Russo from approximately 1997 through 2000 by members of the HPD as a result of Russo's involvement with federal investigations, including investigations of the HPD. Marquis' Local Rule 56(a)(1) Statement, ¶¶ 50-61.[37] Therefore, the Motion for Summary Judgment by Marquis with respect to Count One is granted.

In Count Two, Russo alleges a violation of his equal protection rights insofar as similarly situated individuals were not subject to the same treatment as Russo was, in effect, a "class of one" claim. Village of Willowbrook v. Oleck, 528 U.S. 562 (2000);

from that case, which appears not to be a Russo case. Without Marquis' deposition, there is no basis for Russo's bald denial.

[37] As described above, Russo denies these paragraphs, but submits no evidence to support his denials. Thus, they are deemed admitted. Local Rule 56(a)(1).

Harlem Assocs. Inc. v. Village of Mineola, 293 F.3d 494, 499 (2d. Cir. 2001).  The court

will not repeat here the previous discussion of the law generally with respect to this type

of claim.  See section III.C.1(b) supra.  The court will merely note that, in order to

establish such a cause of action, or at least to avoid summary judgment, Russo must

come forward with evidence that others who were situated similarly to himself, were

treated differently.  The only conduct alleged against Marquis appears to relate to

Russo's return to the police force and Marquis' refusal to reinstate Russo and return his

badge to him until Russo undertook, among other things, re-certification.  Therefore,

Russo must show that there were other detectives or officers within the police

department who had been suspended and that when they were invited to return, they

were treated differently.  Russo has come forward with absolutely no evidence in this

respect.  Accordingly, he has created no issue of material fact.  On this claim, summary

judgment is granted on Count Two for defendant Marquis.

       In Count Five, Russo claims that Marquis' refusal to reinstate him constituted a

violation of his substantive due process rights.  It appears that this claim is based on an

allegation that Marquis deprived Russo of his right to his job.  Substantive due claims

cannot stand where the conduct complained of implicates other constitutional doctrines

or claims.  "Where a particular provides 'an explicit textural source of constitutional

protection against a particular sort of government behavior,' that Amendment, not the

more generalized notion of substantive due process, must be the guide for analyzing

these claims."  Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor,

490 U.S. 386, 395 (1989)).  Russo's claims here against Marquis are based upon

conduct that Russo claims was motivated by the desire to retaliate for his First

Amendment protected activity and violations of his equal protection rights. Accordingly,

Russo need not, and cannot, resort to the more generalized notion of substantive due

process. See section III.C.1(b), supra. Further, nothing Marquis is alleged to have

done, or failed to have done, can be said to "shock the conscience." See Smith ex. rel.

Smith v. Half Hollow Hills Central Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (holding

that "[t]he protections of substantive due process are available only against egregious

conduct which goes beyond merely 'offend[ing] some fastidious squeamishness or

private sentimentalism' and can fairly be viewed as so 'brutal' and 'offensive to human

dignity' as to shock the conscience.") (internal citations omitted).

      In Count Seven, Russo asserts a Monell claim against the City of Hartford for the

alleged violations of the First and Fourteenth Amendments by Marquis. Given that the

court has granted Summary Judgment on all of the constitutional claims asserted by

Russo by Marquis, the claim against the City must fail. As discussed above, supra

section III.B.2, in order to assert a Monell claim against the City of Hartford, Russo must

allege and provide facts that either a lawmaker or other policymaker inflicted injury

violating Russo's federal rights or that the alleged conduct depriving Russo of

constitutional rights occurred under an official policy or custom. See Jeffes v. Barnes,

208 F.3d 49 (2d Cir. 2000). In this case, Russo's claims against the relevant city

representative, Marquis, fail. Therefore, Motion for Summary Judgment filed by the City

of Hartford is granted.

      Finally, in Count Eight, Russo asserts a claim against Marquis for intentional

infliction of emotional distress under Connecticut law. In order to establish such a claim

under Connecticut law, a plaintiff must prove: (1) that the defendant intended to inflict

emotional distress or knew or should have known that emotional distress was a likely result of the challenged conduct; (2) that the conduct in question was extreme and outrageous; (3) that defendant's conduct was the cause of plaintiff's distress; and (4) that plaintiff's emotional distress was severe.  See Appleton v. Bd. of Ed. of Stonington, 254 Conn. 205, 210 (2000) (citing Petyan v. Ellis, 200 Conn. 243, 253 (1986).  As this court has previously noted, the standard in Connecticut for this cause of action is stringent.  Russo v. City of Hartford, 184 F.Supp 2d. 169, 188 (citing Huff v. West Haven Bd. of Ed., 10 F.Supp. 2d 117, 112 (D.Conn. 1998)).

There is no evidence before this court which comes even arguably close to satisfying this standard in connection with any action by Marquis.  Therefore, Marquis' Motion for Summary Judgment on Count Eight is GRANTED.

## IV.    CONCLUSION

With regard to Russo v. City of Hartford, 3:97-cv-2380 (JCH), Chief Croughwell and Captain Flaherty's Motion for Summary Judgment [Dkt. No. 453] on Count One for section 1983 liability claim based on First Amendment retaliation is DENIED, but as to all other claims, it is GRANTED.  The City's Motion for Summary Judgment [Dkt. No. 459] is GRANTED in all respects.

With regard to Russo v. Bailey, 3:00-cv-1794, the Police Defendants' Motion for Summary Judgment [Dkt. No. 125] is DENIED as to Count One against Croughwell, Flaherty, Kenary, Roberts, Lyons, and Lawlor as to the section 1983 claim based on First Amendment Retaliation and GRANTED with respect to the claim based on violation of the Equal Protection Clause.  The Police Defendants' Motion for Summary Judgment [Dkt. No. 125] is GRANTED as to Count One against Rovella and Lilley as to

the section 1983 claim based on First Amendment Retaliation and violation of the Equal

Protection Clause.  The City's Motion for Summary Judgment [Dkt. No. 122] is

GRANTED in its entirety.  The Police Union and Union Officials' Motion for Summary

Judgment [Dkt. No. 131] is GRANTED in its entirety.

 With regard to <u>Russo v. Marquis</u>, 3:00-cv-2382 (JCH), Chief Marquis's Motion for

Summary Judgment [Dkt. No. 32] is GRANTED.  The City's Motion for Summary

Judgment [Dkt. No. 40] is GRANTED.

**SO ORDERED.**

 Dated at Bridgeport, Connecticut this 30th day of September, 2004.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge