## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICHOLAS O. RUSSO, JR. | : | CIVIL ACTION NO. |
| PLAINTIFF, | : | 3:00-cv-1794(JCH) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOSEPH CROUGHWELL, ET AL. | : | |
| DEFENDANTS. | : | February 23, 2005 |

### DEFENDANTS' CONSOLIDATED REPLY TO
### PLAINTIFF'S FEBRUARY 22, 2005 MEMORANDA
### IN OPPOSITION TO DEFENDANTS' INITIAL AND
### SUPPLEMENTAL MOTIONS FOR JUDGMENT ON THE PLEADINGS

Police Defendants, Joseph Croughwell, James Flaherty, David Kenary, Daryl Roberts, Robert Lawlor and Christopher Lyons, hereby submit this Consolidated Reply to Plaintiff's February 22, 2005 Memoranda in Opposition to their Initial and Supplemental Motions for Judgment on the Pleadings.

## I.    ARGUMENT

### A.    Plaintiff Construes *Heck v. Humphrey* and *Mozzochi v. Borden* Too Narrowly And Ignores Other Case Law.

- 1 -

Plaintiff argues that Heck v. Humphrey, 512 U.S. 477 (1994), is inapplicable to the present case because its holding is "limited to those cases contending that there was no probable cause, typically false arrest and malicious prosecution claims." Plaintiff's Memorandum ("Pl. Memo.") at 1. Plaintiff's reading of Heck is far too narrow. The case of Duamutef v. Morris, 956 F. Supp. 1112 (S.D.N.Y.), is particularly instructive on this issue.

In Duamutef, the plaintiff was arrested, tried and convicted for murder. Id. at 1114. Plaintiff alleged that the defendant police officers "prosecuted him with false testimony in order to retaliate against him for his exercise of his First Amendment rights...." Id. at 1116. Citing Mozzochi v. Borden, 959 F.2d 1174, 1179 (2d Cir. 1992), the Court in Duamutef observed that "a claim for retaliation cannot be sustained when the criminal prosecution was supported by probable cause." (internal quotation marks omitted). The Court went on to hold that "because plaintiff's retaliation claim would depend upon his demonstrating an absence of probable cause supporting the charges against him, that claim would necessarily call into question the validity of his conviction. The rule announced in Heck is designed to avoid just such parallel litigation over the issues of probable cause and guilt..." Duamutef at 1116 (internal quotation marks and citations omitted); see also

- 2 -

McCormick v. City of Lawrence, 253 F. Supp. 2d 1172, 1208 (D. Kan. 2003)(following

Duamutef in dismissing Plaintiff's First Amendment retaliation claim based on Heck).

Similarly, in this case, to the extent that Russo's First Amendment retaliation claim

is based upon any alleged acts by the defendants in connection with his arrest and

prosecution it must be dismissed.  Heck was intended to prevent a criminal defendant from

re-litigating whether there was probable cause for his arrest in civil court, *just as* Plaintiff

attempts to do in the present case.

In addition, Plaintiff also argues that his First Amendment retaliation claim (to the

extent it is based on his arrest and prosecution) would also survive under Mozzochi v.

Borden, 959 F.2d 1174 (2d Cir. 1992), because that case did not address the issues of

"whether a First Amendment action supported by probable cause could yield a First

Amendment claim when the attempt to silence a defendant was *successful*."  Pl. Memo. at 3

(emphasis in the original).  Apparently, Russo now argues for the first time that Defendants

conduct "chilled" his rights under the First Amendment.  As an initial matter, to state such

a claim, a plaintiff must prove: (1) he has an interest protected by the first amendment; (2)

defendants' actions were motivated or substantially caused by his exercise of that right; and

(3) defendants' actions effectively chilled the exercise of his First Amendment right."

Curley v. Suffern, 268 F.3d 65, 73 (2d Cir. 2001).  However, no where in Russo's

- 3 -

operative Complaint is there any allegation that his speech was chilled. Thus, on that basis alone, his First Amendment claim should be dismissed because he fails to state a claim upon which relief can be granted.

Even if the Court were to conclude that Russo has sufficiently pled that his speech was chilled – which is the *third prong* of his prima facie case, "the *second prong* cannot be sustained as a matter of law inasmuch as [Russo's] arrest and prosecution were supported by probable cause." Carter v. The City of New York, 2004 U.S. Dist. LEXIS 19324 at *12 (S.D.N.Y. Sept. 27, 2004)(emphasis added)[1] (citing Yajure v. DiMarzo, 130 F. Supp. 2d 568-74 (S.D.N.Y. 2004) citing in turn Duamutef, 956 F. Supp. at 1116, Mozzochi, 959 F.2d at 1179-80, and Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995)).

Plaintiff's attempt to limit Mozzochi's holding to only "unsuccessful attempt[s] to deter silence or criticism of the government" is unpersuasive. The existence of probable cause, as a matter of law, negates Plaintiff's ability to demonstrate the *second prong* of his prima facie case - that "defendants' actions were motivated or substantially caused by his exercise of [his First Amendment rights]," which is *separate and distinct* from the issue of whether Plaintiff's speech was actually chilled. In Singer, 63 F.3d at 120, the Second Circuit reaffirmed its earlier statement in Mozzochi that "if the officer either had probable

---

[1] Attached at Tab 1.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

cause or was qualifiedly immune from subsequent suit (due to an objectively reasonable belief that he had probable cause), then we will not examine the officer's underlying motive in arresting and charging the plaintiff." In this case, because there was probable cause for Russo's arrest, under <u>Mozzochi</u>, the Court cannot examine Defendants' motives. Accordingly, Plaintiff's claim fails as a matter of law.

> **B.    Plaintiff's Argument With Respect To Defendants' Motion For Judgment On The Issue Of Back Pay Seeks To Re-litigate Issues That Have Already Been Decided By This Court.**

In his Opposition to Defendants' Motion for Judgment on the Pleadings with respect to Plaintiff's Claim for back-pay, Plaintiff argues that "this is not the sort of issue that can be resolved on the pleadings alone," and that the issue of "whether a pervasive pattern of retaliation accounts for Mr. Russo's failure to return to work after the dismissal of his criminal case against him is the sort of factual question for which juries are empaneled." Pl. Memo. at 1. This argument conveniently *ignores* the Court's findings in its lengthy Ruling on Defendants' Motions for Summary Judgment.[2] The Court is allowing Plaintiff's case to go forward based on several distinct alleged adverse employment actions – none of

---

[2] For example, Plaintiff ignores the following findings by the Court: Russo's suspension was automatically triggered under the Collective Bargaining Agreement following his arrest (Ruling at 2, 6, 45); he was reinstated by then Acting Chief Rudewicz following the dismissal of the criminal charges against him (<u>Id.</u> at 49-50); and a convicted felon cannot serve as a police officer with the Hartford Police Department. (<u>Id.</u> at 60, n.33).

- 5 -

which involve any alleged "retaliation" following the dismissal and appeal of plaintiff's criminal charges in September 2000. Apparently, Plaintiff now attempts to either re-litigate issues that have already been decided or raise new claims that are not part of this case. The Court should take notice of its Ruling on these factual issues and dismiss Plaintiff's claim for back-pay. To do otherwise, will unnecessarily prolong and complicate this trial and will require Defendants to present extensive evidence – as they did in their motions for summary judgment – of the extensive communications back and forth between Plaintiff's counsel and the City about Plaintiff's reinstatement following the dismissal of the criminal charges in September 2000.[3]

---

[3] Furthermore, because Defendants had assumed that any claims based on Plaintiff's reinstatement had been dismissed based on the Court's Ruling on their Motion for Summary Judgment, they have not included in their Exhibit List the correspondence relevant to Plaintiff's reinstatement. Thus, if Plaintiff is allowed to resurrect this claim, it will be necessary for Defendants to supplement their Exhibit List.

**SHIPMAN & GOODWIN**® LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

DEFENDANTS,
JOSEPH CROUGHWELL, JEFFERY
FLAHERTY, DARYL ROBERTS, DAVID
KENARY, ROBERT LAWLOR and
CHRISTOPHER LYONS.


By _____
     Charles L. Howard (ct 05366)
     Linda Yoder (ct 01599)
     Gregg P. Goumas (ct 19095)
     For Shipman & Goodwin LLP
     One Constitution Plaza
     Hartford, CT  06103-2819
     (860) 251-5000
     Attorneys for Individual Defendants

SHIPMAN & GOODWIN® LLP  •  COUNSELORS AT LAW
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT  06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was faxed and mailed, postage prepaid, this 23rd day of February, 2005 to:

John T. Forrest, Esq.
Law Offices of John T. Forrest
142 Jefferson Street
Hartford, CT 06106

Attorney Helen Apostolidis
Office of Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

Norman Pattis, Esq.
P.O. Box 280
Bethany, CT 06524

John P. Shea Jr., Esq.
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, CT 06103

Erin O'Neil, Esq.
41A New London Turnpike
Glastonbury, CT 06033

Charles L. Howard

395757 v.01 S1

- 8 -

# TAB A

LEXSEE 2004 U.S. DIST. LEXIS 19324

**MICHAEL CARTER, SAL CIVITILLO, MICHAEL DESTEFANO, VICTOR FIORELLA, MATTHEW JAMES, THOMAS MANLEY, SEAN NEALON, and MICHAEL TIERNEY, Plaintiffs, - against - THE CITY OF NEW YORK, RUDOLPH GIULIANI, as Mayor of the City of New York; BERNARD KERIK, as Commissioner of the New York City Police Department of the City of New York; JOSEPH J. ESPOSITO, as Chief of Department, New York City Police Department; NEW YORK CITY POLICE DEPARTMENT; THOMAS VON ESSEN, as Commissioner of the Fire Department of the City of New York; POLICE OFFICER RAYMOND ALEXANDER, SHIELD # 07652; POLICE OFFICER MICHAEL CUSUMANO, SHIELD # 01406; POLICE OFFICER PATRICK DELLILO, SHIELD # 10940; POLICE OFFICER BRIAN KAHN, SHIELD # 10388; DET. DANIEL MASSANOVA, SHIELD # 02342; POLICE OFFICER VARON SHEPARD, SHIELD # 07647 and DET. RICHARD STARK, SHIELD # 06393, Defendants.**

**02 Civ. 8755 (RJH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 19324; 21 I.E.R. Cas. (BNA) 1650*

**September 24, 2004, Decided
September 27, 2004, Filed**

**PRIOR HISTORY:** *Carter v. City of New York, 2004 U.S. Dist. LEXIS 1308 (S.D.N.Y., Jan. 30, 2004)*

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted as to all of plaintiffs' claims.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Michael Carter, Sal Civitillo, Michael Destefano, Victor Fiorella, Matthew James, Thomas Manley, Michael Tierney, Plaintiffs: Ronald E. Kliegerman, LEAD ATTORNEY, Law Office Ronald Kliegerman, New York, NY.

For The City of New York, Rudolph Guiliani, Bernard Kerik, Joseph J. Esposito, New York City Police Department, Thomas Von Essen, Raymond Alexander, Michael Cusumano, Patrick Dellilo, Brian Kahn, Daniel Massanova, Varon Shepard, Richard Stark, Defendants: Leah Amber Bynon, LEAD ATTORNEY, NYC Law Department, Office of the Corporation Counsel, Lisa J.

Black, LEAD ATTORNEY, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** Richard J. Holwell, United States District Judge.

**OPINIONBY:** Richard J. Holwell

**OPINION:**

   Plaintiffs, all current or former firefighters in the New York City Fire Department ("FDNY"), bring this action seeking monetary damages for alleged violations of their federal and state constitutional rights, and of rights afforded them under New York common law, arising from their arrest and prosecution in relation to a rally and protest march in [*2] which they participated on November 2, 2001. n1 Defendants move for summary judgment as to all of plaintiffs' claims. For the reasons herein set forth, defendants' motion is granted and plaintiffs' complaint is dismissed in its entirety.

Case 3:00-cv-01794-JCH     Document 184     Filed 02/23/2005     Page 11 of 22

Page 2

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

n1 This case has been consolidated for trial purposes with another action, *Carbone et al. v. City of New York et al.,* No. 03 Civ. 1385 (RJH), brought by a different set of plaintiffs arising out of the same November 2, 2001 episode. A motion to dismiss in the latter action was briefed simultaneously with the summary judgment motion in the instant case.

## BACKGROUND n2

n2 The following facts are uncontroverted unless otherwise noted, and are drawn from the following documents and recordings, and are cited as indicated herein: Defendants' Statement Pursuant to *Rule 56.1* ("Defs.' 56.1 P      "), Declaration of Leah A. Bynon, Assistant Corporation Counsel, attorney for the municipal defendants ("Bynon Decl P      ") and attached exhibits; Reply Decl. of Jennifer A. Vazquez, Assistant Corporation Counsel, attorney for the municipal defendants ("Vazquez Reply Decl.") and attached exhibit; Plaintiffs' Rule 56.1 Statement ("Pls.' 56.1 P      "), and Declaration of Ronald E. Kliegerman, attorney for plaintiffs ("Kliegerman Decl. P      ") and attached exhibits.

[*3]

### The Attack on the World Trade Center

The devastating terrorist attacks on September 11, 2001 caused untold damage and anguish throughout this nation and the world, and their impact is still felt daily in public and private life here and abroad. New York City bore the brunt of the attack when two passenger aircrafts flown into the twin towers of the World Trade Center, located in lower Manhattan, destroyed the towers and killed thousands of people within and in the vicinity. Hundreds of public servants who responded to the emergency and attempted to rescue those trapped in the buildings before they collapsed were killed in the line of duty. In the days following the disaster, emergency workers labored around the clock at the World Trade Center site--which came to be known, and will be referred to herein, as "Ground Zero"--in an attempt to rescue survivors. When it became painfully evident that no more survivors would be found, the rescue effort became a mission to recover the bodies of the victims of the attack from the thousands of tons of rubble at the site. (Bynon Decl. Ex. L, Carter Dep. 65:21-66:4; Ex. M, Civitillo Dep. 125:18--126:7.) Scores of firefighters with

[*4] the FDNY volunteered their time and effort to the cause, endangering their health in the contaminated air and hazardous conditions at the site in order to help find the remains of the victims, including their fallen fellow firefighters. Firefighters were widely celebrated as heroes for their self-sacrificing bravery in their immediate response to the attack, and for their unswerving dedication to the recovery effort in the ensuing weeks.

### Restrictions on Access to Lower Manhattan

Immediately following the attacks, Mayor Giuliani declared a state of emergency and prohibited all pedestrian and vehicular traffic, except essential emergency vehicles and personnel, south of Fourteenth Street in Manhattan--that is, all of downtown Manhattan (hereinafter, the Restricted Zone). (Bynon Decl. Ex. C, Proclamations of a State of Emergency, September 11, 2001.) In the weeks that followed, Mayor Giuliani issued proclamations that gradually scaled back the area included within the Restricted Zone. (*Id.,* Proclamations dated September 25, 2001; October 29, 2001; November 2, 2001.) Common to all of these proclamations is the express recognition that the attack had caused "extensive [*5] damage to buildings and infrastructure in Lower Manhattan," and that "these conditions imperil public safety." (*Id.*) Also common to all the proclamations issued after the September 11 proclamation is the admonition that people authorized to perform some particular "valid purpose" within the zone must have and display a "valid authorization pass" and must "immediately leave the area" after performing the "approved activity." (*Id.*) Firefighters, as well as employees of other selected agencies did not have to obtain special passes to enter the Restricted Zone but were required to show their agency ID and either a badge or a secondary piece of identification (Kliegerman Decl. Ex. 1). The Office of Emergency Management ("OEM") of New York City issued a memorandum on September 28, 2002, urging "all agencies" to remind their personnel that "Red Zone access is for official business only and that unauthorized visits could lead to arrests and prosecution. (Bynon, Decl. Ex. E, OEM memorandum.)

It is undisputed that prior to and on the day of the rally, the mayoral proclamation then in effect stated that vehicular and pedestrian traffic could be prohibited an area south of Canal Street. [*6] (Bynon Decl. Ex. C, Proclamations of a State of Emergency dated October 29, 2001 and November 2, 2001.) It is likewise undisputed that at that time OEM had in fact declared that the Restricted Zone encompassed an area that included West Street from Warren Street (three to four blocks north of Ground Zero to Albany Street (south of Ground Zero). (Bynon Decl. Ex. F, map.) In spite of the fact that several

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 12 of 22

Page 3

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

plaintiffs deny knowledge of, or express doubt as to the existence of, practices, procedures, or structures designed to restrict access to this area at the time in question (Bynon Decl. Ex. N, Fiorella Dep. 51:18--21; Ex. O, Tierney Dep. 49:2-16), rules relating to such procedures indisputably existed. (Bynon Decl. Ex. N, Fiorella Dep. 56:17--20.) The police were responsible for enforcing the restrictions. (Bynon Decl. Ex. I, Esposito Dep. 81:2-82:3.)

Several plaintiffs also assert that as firefighters they were exempt from any such restrictions and were authorized to be in the Restricted Zone at any time and for any reason, whether they were on or off duty and whether or not they were participating in the recovery effort. (Bynon Decl. Ex. L, Carter Dep. 47:11--15, 49:18--22; Ex K, [*7] James Dep. 42:13--24, 47:24--48:24, 79:2--7; Ex. H, Gorman Dep. 62:22--63:6; Ex. M, Civitillo Dep. 175:14--19, 179:10--22, pg 184:4--24, 248:3--13; Ex. J, Manley Dep. 39:21--40:4, 128:9--25; Ex. G, Gallagher Dep. 40:23--25; Ex. P, DeStefano Dep. 80:17--23; Ex. N, Fiorella Dep. 44:11--22, pg 47:11--25; Ex. O, Tierney Dep. 51:6--12.) However, the OEM "exemption" to which plaintiffs refer is limited on its face to the need to exhibit a special "WTC 2001 picture credential" in order to gain access to the Restricted Zone. (Kleigerman Decl. Ex. 1.) It does not purport to authorize exempted personnel to enter the area for unauthorized purposes, such as the staging of a demonstration. (*Id.*

### Facts Concerning the Rally and March Common to All Plaintiffs

After September 11, 2001, a large number of firefighters were assigned to work at the disaster site. In late October 2001, the Uniformed Firefighters Association ("UFA") and the Uniformed Fire Officers Association ("UFOA"), unions representing FDNY firefighters and officers (collectively "the unions"), received information about a plan to reduce significantly the number of FDNY personnel assigned to work at Ground Zero at any given [*8] time. (Bynon Decl. Ex. L, Carter Dep. 68:5--20; Ex. K, James Dep. 62:12--20.) This was unwelcome and disappointing information for firefighters and family members of victims of the attacks, who believed that a staffing reduction would compromise the recovery effort. (Bynon Decl. Ex. G, Gallagher Dep. 21:10--13.) Some firefighters allegedly believed that the cutback in FDNY labor power at Ground Zero was premature. (Bynon Decl. Ex. L, Carter Dep. 74:2--4.) They feared that because not all the bodies had then been found, restricting the number of workers would transform the painstaking process of locating and removing intact remains from the site into a "scoop and dump operation," resulting in victims' remains ending up

in the Staten Island landfill amid the debris that had been transported there from the World Trade Center site. (Bynon Decl. Ex. G, Gallagher Dep. 21:21--25; Ex. K, James Dep. 62:18--20; Ex. L, Carter Dep. 110:3--14.) After some reduction had apparently already been implemented, some union officials became aware of reports that seemed to bear out this fear: whereas prior to the change, only small bone fragments and the like were found at the Staten Island landfill, after [*9] the cutback began, workers at the landfill allegedly found large body parts among the refuse. (Bynon Decl. Ex. G, Gallagher Dep. 32:16--17; Ex. H, Gorman Dep. 40:15--24; Ex. J, Manley Dep. 65:2--14.).)

Union officials believed that then-Mayor Giuliani's office, not the fire department administration, was the driving force behind the decision to cut labor hours. (Bynon Decl. Ex. L, Carter Dep. 75:6--23.) Kevin Gallagher, then president of the UFA and a plaintiff in the companion suit, communicated the UFA's opposition to the cutback to City Hall staff. (Bynon Decl. Ex. G., Gallagher Dep. 24:11--20.) While these communications were taking place, family members of fallen firefighters allegedly proposed a protest action, which they allegedly indicated they would organize with or without the participation of the FDNY or the unions. (Bynon Decl. Ex. L, Carter Dep. 78:11--15, 80:3-10; Ex. G, Gallagher Dep. 36:16--18.) Union officials met with mayoral staff on November 1, 2001, and informed them that a rally would take place on November 2 unless the City abandoned the staffing reduction plan. (Bynon Decl. Ex. L, Carter Dep. 79:24--80:6; Ex. G., Gallagher Dep. 26:6--12.) Not having heard from [*10] the mayor or his staff as of the evening of November 1, the union boards voted to go forward with the rally. (Bynon Decl. Ex. G, Gallagher Dep. 31:17--20; Ex. H, Gorman Dep. 24:22--25.) Union board members faxed a one-page flyer to firehouses and phoned firehouse delegates asking all off-duty firefighters to attend a rally the next morning at West and Chambers Street, approximately one block north of the Restricted Zone in effect at the time of the rally and a few blocks north of Ground Zero. (Bynon Decl. Ex. L, Carter Dep. 82:14--21; Ex. A, Compl. P 27; Ex. D, OEM document, 2; Ex. F, map.) The rally was not sponsored or sanctioned by the FDNY. (Bynon Decl. Ex. G., Gallagher Dep. 104:14--25.) The City did not issue a permit or otherwise grant permission for the rally. (*Id.* at 39:19--21.) The organizers did not contact the police department with information about the planned action. (*Id.* at 37:4--22, 53:1--18.)

Several hundred firefighters showed up the next morning at the site of the planned rally, many of whom wore clothing identifying them as members of the FDNY, as the rally organizers had encouraged them to do. (Bynon Decl. Ex. J, Manley Dep. 94:25--95:3,

Case 3:00-cv-01794-JCH   Document 184   Filed 02/23/2005   Page 13 of 22

Page 4

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

210:11--13; Ex. **[*11]** H, Gorman Dep. 38:18--19; Ex. K, James Dep. 68:16--19; Ex. P, DeStefano Dep. 127:2--8, 148:4--7.) Civilians, including family members of fallen firefighters, also attended, and members of the press came to cover the event. (Bynon Decl. Ex. H, Gorman Dep. 38:19--20; Ex. N, Fiorella Dep. 101:3--7; Vazquez Reply Decl. Ex. AA, Schiumo Dep. 17:21--25:10.) As noted, the rally site was not within the Restricted Zone. (Bynon Decl. Ex. I, Esposito Dep. 30:23--31:1.)

A large police detail was present to police the demonstration, although they were significantly outnumbered by the participants in the demonstration. (Vazquez Reply Decl. Ex. AA, Schiumo Dep. 45:11--22.) Before the rally began, members of the union spoke with some of the higher-ranked members of the police department. During one of these conversations, ranking police department personnel informed fire department personnel and members of the unions that notwithstanding any plan on the part of the rally's organizers to march south into Ground Zero, the police department was not prepared to provide crowd control for the protesters in the restricted area and did not want them to march to Ground Zero. (Bynon Decl. Ex. G, Gallagher Dep. **[*12]** 56:11--22; Ex. I, Esposito Dep. 47:18--24.) The police suggested that participants in the protest march instead to City Hall. (Bynon Decl. Ex. G, Gallagher Dep. 56:11--22; Ex. I, Esposito Dep. 48:22--24.) While defendant Esposito, the Chief of Department of the New York City Police Department and the person in charge of the police detail providing crowd control for the rally, alleges that the union agreed on this alternative march route prior to the rally (Bynon Decl. Ex. I, Esposito Dep. 5:21), union officials alleged that no such agreement was reached, and that the unions made the decision to march to Ground Zero despite the police department's position after civilian and FDNY attendees of the rally expressed support for marching to Ground Zero (Bynon Decl. Ex. G, Gallagher Dep. 49:16--50:12.) One of the rally organizers, plaintiff Kevin Gallagher, tried to convince the families and firefighters to march to City Hall, but after word got out, the crowd began chanting "we're going to Ground Zero, we're going to Ground Zero" and, according to Gallagher, "that was it." (Bynon Decl. Ex. G, Gallagher Dep. 62:9-63:9.)

At the rally, several individuals--including union officials--spoke **[*13]** from a platform erected by Ground Zero construction workers for that purpose. (Id. at 39:12--15, 54:22--25.) Some if not all spoke critically of a reduction in labor power at the World Trade Center site at that time. (Bynon Decl. Ex. J, Manley Dep. 99:15--22; Ex. L, Carter Dep. 110:21--111:10; Ex. M, Civitillo Dep. 152:19--153:12.) At least one of the speakers, Gallagher, announced that at the conclusion of the rally

there would be a procession into Ground Zero to say a prayer. (Bynon Decl. Ex. G, Gallagher Dep. 62:19--63:17; Ex. L, Carter Dep. 113:25--114:4; Ex. J, Manley Dep. 105:14--22; Ex. K, James Dep. 70:22--25.) After the speeches were concluded, the assembly moved en masse south on West Street into the Restricted Zone and toward Ground Zero. En route, the demonstrators encountered first one and then another police barricade, one positioned just south of the demonstration and one situated a few blocks further south, both stretching across some portion of West Street. (Bynon Decl. Ex. J, Manley Dep. 107:5--112:24; Ex. I, Esposito Dep. 56:13--58--10, 67:8--69:18; Ex. K, James Dep. 72:5--10; Ex. Q, Nealon Dep. 46--48; Ex. T, videotaped footage.)

At the first barricade **[*14]** Police Chief Esposito stood in front of the barricade and told the crowd that they could not march south through the barrier. (Bynon Decl. Ex. I, Esposito Dep. 63:10--64:16.) The same warning was being given by a second officer using a megaphone. (Id.) While most of the plaintiffs stated that they did not hear any such warnings (Bynon Decl. Ex. H, Gorman Dep. 45:21--23; Ex. K, James Dep. 73:9--11; Ex. G, Gallagher Dep. 79:2--10; Ex. J, Manley Dep. 113:3--12; Ex. P, DeStefano Dep. 150:11--13; Ex. O, Tierney Dep. 123:20--22), former plaintiff Sean Nealon testified that he did in fact hear a police officer at the first barrier tell the demonstrators over a megaphone "that we were not permitted to go down to Ground Zero." (Bynon Decl. Ex. Q, Nealon Dep. 19:22--20:14; 47:11--18.) According to Police Chief Esposito, the demonstrators picked up the barriers, pushed them aside and continued to march south (Bynon Decl. Ex. I, Esposito Dep. 64:17--21.) Police photographs taken at the time appear to show firefighters removing police barriers. (Bynon Decl. Ex. R, photos # # 37, 38 & 39.) Further, a television news reporter who had attended the rally and march and had videotaped the events **[*15]** for broadcast, stated, in narrating his unedited footage, "These firefighters ... broke through this first barricade and started making their way south," and "We came to yet another barricade, where police did their best to stop the group." (Bynon Decl. Ex. T, videotape). Nevertheless, one plaintiff and one of the demonstrators stated that they saw certain blue-shirted police officers n3 move the barriers out of the way and let the crowd through. (Bynon Decl. Ex. J, Manley Dep. 107:5--10; 108:6--11; Kliegerman Decl. Ex. 2, Steadman Dep. 45:6--17.)

n3 Several of the plaintiffs, in their deposition testimony, distinguished between "blue shirts" and "white shirts," signifying respectively rank-and-file police officers and ranking officers.

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

(Bynon Decl. Ex. J, Manley Dep. P. 111:17--24; Ex. L, Carter Dep. 125:6--7.)

After the demonstrators passed through the first barrier, Police Chief Esposito directed his officers to move south in front of the demonstrators and form a second line to stop them. (Bynon Decl. [*16] Ex. I, Esposito Dep. 66:15--19). If there was any confusion as to the intention of the police at the first barricade, it was quickly dispelled. As the crowd moved south, plaintiff Michael Carter, one of the rally organizers, observed "a wall of white-shirted police officers standing in front of a barricade." (Bynon Decl. Ex. L, Carter Dep. 124:5--8.) Carter clearly understood their intent:

> Q. What did you think of, the purpose was of the barricades and the white shirts in front of you?
>
> A. I thought they were there to deny us any access past that point.
>
> Q. Why?
>
> A. Because they didn't want us there.
>
> Q. When you say, "There," what do you mean by that?
>
> A. I think they put that line up to stop us prior to getting to the perimeter of the site. There was several blocks still--at least a couple of blocks ahead of the site. So it was my feeling that they had made a decision that that's as close as we were going to get to the site.
>
> Q. That was your understanding of it at the time when you saw them?
>
> A. It was just a thought that I had. When you see a line of police officers standing behind a barricade, I would think one would gather that they don't want you to pass that. n4

(Bynon [*17] Decl. Ex. L, Carter Dep. 125:8--126:5.)

n4 Another rally organizer, plaintiff Thomas Manley, had the same understanding:
> Q. Were the NYPD officials [...] trying to stop you from going past the metal barriers?
> A. At that point, yes.
> Q. How do you know they were trying to stop you from going through?

> A. Because they were standing there with the barriers.

(Bynon Decl. Ex. J, Manley Dep. 112:17--24.)

As the crowd approached the second barricade, "the police officers were basically pushing everybody back when they got to the barricade." (Bynon Decl. Ex. Q, Nealon Dep. 48:19--49:24.) It appears that tempers flared on both sides, and there were some aggressive exchanges, both physical and verbal, between police and the protesters at the front of the march. (Bynon Decl. Ex. L, Carter Dep. 127:12--128:12; Ex. H, Gorman Dep. 46:4--17; Ex. R, photos; Ex. T, videotape. n5) Some of the firefighters were arrested during these confrontations (Bynon Decl. Ex. U, criminal complaints), many of them at the behest [*18] of Police Chief Esposito. (Bynon Decl. Ex. L, Carter Dep. 132:22--133:5; Ex. N, Fiorella Dep. 116:9--15; Ex. O, Tierney Dep. 116:22--24.) Several police officers were treated for injuries, all apparently sustained at or near the corner of West and Vesey Streets, which was at the northern perimeter of the World Trade Center site, indisputably within the Restricted Zone. (Bynon Decl. Ex. V, medical treatment reports; Ex. S, Police Department memorandum.) Some of these injuries were sustained when officers were hit by barricades or other objects or persons, or pushed to the ground. (Bynon Decl. Ex. V, medical treatment reports.)

n5 Plaintiffs contend that the photographs and videotape, Exhibits R and T, should be excluded from the court's review, since they have not been authenticated as required under the Federal Rules of Evidence. (Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. 39--40.) Plaintiffs have not explained, and the court cannot discern, how or, why the process used by defendants' counsel at deposition in introducing the photographs and videotape fails to satisfy the authentication requirements of *Fed. R. Evid. 901(b)(1)*. Each of the deponents was shown photographs or the videotape and asked questions about them. Deponents' answers to the questions indicated that, based on personal knowledge, they recognized the images depicted therein as what they claimed to be, namely photographic depictions of the events of November 2, 2001. Furthermore, *Rule 56(d) of the Federal Rules of Civil Procedure* requires that materials submitted in support of and in opposition to summary judgment "set forth such facts as would be admissible in evidence," although such facts need not even necessarily be in admissible form at the

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 15 of 22

Page 6

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

summary judgment stage. The court finds that the pictorial evidence has been sufficiently authenticated for the purposes of this motion.

[*19]

The altercations and arrests did not stop the march. (Bynon Decl. Ex. J, Manley Dep. 112:8--16; Ex. Q, Nealon Dep. 49.) The procession continued into Ground Zero, where two union officials climbed onto a piece of heavy machinery, addressed the crowd through a megaphone provided by a police officer prior to the start of the rally, and led the group in a moment of silence and a prayer. (Bynon Decl. Ex. G, Gallagher Dep. 47:17--25, 72:18--21; Ex. H, Gorman Dep. 48:1--9.) At that point, some union board members in the group directed the protesters to exit Ground Zero and to proceed to City Hall. (Bynon Decl. Ex. G, Gallagher Dep. 80:5--8; Ex. J, Manley Dep. 137:12--138:12.) The group then marched to City Hall, then to the Brooklyn Bridge, and soon thereafter dispersed. (*Id.* at 141:9--142:20.)

By the end of the morning of November 2, it became known and was reported by news media that several police officers had been injured during the rally and march, and that several participants in the action had been arrested. (Bynon Decl. Ex. L, Carter Dep. 204:22--210--4; Ex. M, Civitillo Dep. 222:9--226:10.) Subsequent arrests were made the following week, including the arrests of plaintiffs [*20] James and Manley and the re-arrest of plaintiff DeStefano. (Bynon Decl. Ex. K, James Dep. 88:18--25; Ex. P, DeStefano Dep. 245:11--246:10.) All of the arrestees were released on their own recognizance after being processed through the system and arraigned on charges of trespass in the third degree. n6 (Bynon Decl. Exs. L, M, N, O, P.) Following the arrests, Mayor Giuliani allegedly stated publicly that the arrestees would lose their jobs. (Bynon Decl. Ex. N, Fiorella Dep. 204:24--25.) Apparently, they did not. On December 18, 2001, the district attorney moved to dismiss all charges arising from the demonstration in the interests of justice. (Bynon Decl. Ex. Y, Criminal Court transcript 3:9--4:7.) The judge dismissed the charges on this ground, noting the "mitigating circumstances ... in light of the extraordinary emotional situation underlying these actions." (*Id.* at 4:8--13.)

n6 While some of the plaintiffs allegedly were arrested and initially charged with other offenses, including riot in the first degree, obstruction of governmental administration, and using a spray device (Bynon Decl. Ex. A, Compl. PP 31, 47, 65, 100), no plaintiff was arraigned on any charge other than criminal trespass in the third degree.

[*21]

This action was filed in late 2002, alleging false arrest, malicious prosecution, assault and battery, intentional infliction of emotional distress, and violations of plaintiffs' rights under the *First, Fourth, Fifth,* and *Fourteenth Amendments to the U.S. Constitution* n7 against the City of New York; the Police Department of the City of New York; Rudolph Giuliani, Mayor of New York City at the time of the incident in question; Bernard Kerik, Commissioner of the Police Department at the time; Thomas Von Essen, then Commissioner of the FDNY; Joseph J. Esposito, then Chief of the Police Department; and the arresting officers. n8

n7 Plaintiffs have not opposed defendants' argument that plaintiffs' claim that they were deprived of due process should be dismissed. Accordingly, these claims are deemed conceded.n8 Two of the police officers listed in the caption, Detective Massanova and Officer Cusumano, were undisputedly not involved in the arrests of any of the plaintiffs in this action; rather, they were allegedly the arresting officers of two of the plaintiffs in the companion case, *Carbone v. City of New York.* Plaintiffs' puzzling insistence that these two defendants belong in the instant case notwithstanding (Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. 6 n.4), the court is not aware of any theory on which a person may be subjected to suit in a case in which no allegations are made against him. All claims against these defendants must be dismissed.

[*22]

*Facts Concerning Individual Plaintiffs* n9

n9 No facts concerning Sean Nealon, a plaintiff when this case was filed and therefore included in the caption, are provided, as he has withdrawn from the action.

### 1. Michael Carter

Michael Carter was a vice president of the UFA at the time of the rally, and had been involved in voting for and organizing the rally. Carter attended the rally, and after the speeches were concluded made his way through the marching crowd toward the front of the group. (Bynon Decl. Ex. L, Carter Dep. 122:12--15.) At a

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 16 of 22

Page 7

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

certain point Carter encountered a "wall" of police officers that appeared to him intended to deny the demonstrators access beyond that point. (*Id.* at 124:7--8, 125:8--126:5.) Carter alleges he witnessed an angry verbal exchange between a nearby firefighter and a police officer and, allegedly hoping to avoid escalation into a physical conflict, grabbed hold of the firefighter and urged him to calm down. According to Carter, defendant Esposito, **[*23]** standing nearby, ordered another police officer to arrest Carter. (*Id.* at 132:13--135:6.) The officer allegedly responded, "But Chief, he didn't do anything wrong." (*Id.* at 141:11--12.) Carter was arrested by Police Officer Varon Shepard. Shepard states in the complaint filed against Carter that Carter and others were observed in a restricted area at or near the intersection of West and Vesey Streets after the crowd had been told they should leave the premises. The complaint states that Carter was past the barricade, while Carter states he was arrested in front of the barricade. (Bynon Decl. Ex. U, criminal complaint.) There is no dispute, however, that Carter was participating in a demonstration in the Restricted Zone at the time of his arrest.

### 2. Victor Fiorella

Victor Fiorella, a firefighter, attended the rally and was in the back of the group as it proceeded south down West Street. (Bynon Decl. Ex. N, Fiorella Dep. 114:6--115:21.) At a point where Fiorella could see the marchers ahead of him going toward Ground Zero, he encountered defendant Police Chief Esposito ahead and to his right. According to Fiorella, Esposito told him that if he crossed a line that **[*24]** Esposito had drawn in the dirt with his foot, Fiorella would be arrested. (*Id.* at 116:7--13.) Fiorella answered in words to the effect of "Are you kidding me?", whereupon Esposito ordered nearby police officers to arrest him. (*Id.* at 116:13--15.) According to the complaint filed by arresting officer Dellilo, Fiorella was observed by Dellilo at the intersection of West and Vesey Streets after Delillo heard police officials announce over a bullhorn that the demonstrators were not allowed to march into the Restricted Zone. (Bynon Decl. Ex. U, criminal complaint.) According to Fiorella, however, the arresting officer asked Police Chief Esposito, "For what?", to which Esposito replied, "Back me up on this, arrest him." (Bynon Decl. Ex. N, Fiorella Dep. 142:18--33.) In any event, it is undisputed that Fiorella was participating in a demonstration in the Restricted Zone at the time of his arrest.

### 3. Michael Tierney

Michael Tierney, a firefighter, attended the rally and walked down West Street with the rest of the assembly.

Tierney was yelling and protesting along with other demonstrators when he reached a point that he alleges was at the intersection of West and Vesey **[*25]** Streets. (Bynon Decl. Ex. O, Tierney Dep. 115:18--24) At that point, the crowd stopped moving forward, and Esposito told Tierney that Tierney was under arrest. (*Id.* at 115:24--116:24; 122:20--123:5.) The criminal complaint reflects that the arresting officer, Varon Shepard, was informed by Sgt. William Viscardi that Tierney was observed pushing through the barricade at Vesey and West Streets which area Shepard knew to be a restricted area. (Bynon Decl. Ex. U, criminal complaint.) Whether Tierney was arrested in front of or behind the second barricade, it is not disputed that he was in the Restricted Zone at the time.

### 4. Sal Civitillo

Sal Civitillo, a firefighter, attended the rally, during which he states he witnessed a police inspector move part of a barricade to let the crowd move so that they could hear the speeches better. (Bynon Decl. Ex. M, Civitillo Dep. 164:15--165:8; 172:8--10.) This appears to have occurred before the demonstrators marched south into the Restricted Zone. (*Id.*) As Civitillo walked with the group headed toward Ground Zero, he observed a scuffle between a firefighter and several police officers a short distance in front of the entrance to **[*26]** Ground Zero. (*Id.* at 165:20--166:3.) A barrier was off to one side, but he did not know who moved it. (*Id.* at 172:8--15.) When Civitillo paused to see what was going on, a ranking police officer asked him what he was doing; when Civitillo answered, "I'm just walking," the officer told Civitillo to "turn around and walk on." (*Id.* at 169:4--12.) Civitillo continued to walk toward Ground Zero, but when he was within approximately 200 feet from the site, a ranking officer told him that he was under arrest and physically pulled him out of the site. The ranking officer turned Civitillo over to two police officers and told them to handcuff him. According to Civitillo, the officers protested that Civitillo "didn't do anything." However, it is undisputed that Civitillo was in the Restricted Zone marching to Ground Zero at the time of his arrest. (Bynon Decl. Ex. V, criminal complaint.)

### 5. Michael DeStefano

Michael DeStefano, a firefighter, attended the rally and participated in the march toward Ground Zero. He was in the back half of the procession and had seen no barricades before he noticed firefighters being arrested by police less than a block from the entrance to **[*27]** the World Trade Center site, witnessed an altercation between a police officer and a firefighter, and was himself arrested by a police lieutenant at the command of a superior officer. (Bynon Decl. Ex. P, DeStefano Dep.

Case 3:00-cv-01794-JCH     Document 184     Filed 02/23/2005     Page 17 of 22

Page 8

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

147:19--22, 150:14--151:18, 164:3--14, 174:21--175:21--25.) He was in the Restricted Zone participating in the demonstration at the time of his arrest. DeStefano was taken with several of the other plaintiffs to the 28th Precinct, and later to the courthouse to be processed. (Id. at 190:9--220:15.) While in the holding cell at the courthouse, a court officer informed DeStefano and another detained firefighter that they were free to go. (Id. at 221:6--8.) DeStefano was released but was later informed that he was to be rearrested and would have to turn himself in to the police the following week. (Id. at 222:7, 245:14--246:10, 248:11--21.) DeStefano turned himself in at the First Precinct and was processed there and at the courthouse, and released some hours later after being arraigned. (Id. at 252:12--256:23.)

### 6. Matthew James

Matthew James, a former firefighter, was a union trustee at the time of the incident at issue, and participated in [*28] the decision to hold a rally. (Bynon Decl. Ex. K, James Dep. 18:4--11, 65:18--67:10.) James was among those marching at or near the front of the procession of marchers moving toward Ground Zero. (Id. at 71:20--22.) While marching, James encountered a barrier and moved with the crowd beyond the barrier, but allegedly did not know how or by whom the barrier was moved. (Id. at 73:19--74:18; Bynon Decl. Ex. R, photos.) As he approached the World Trade Center site, James observed police officers handcuffing firefighters. (Bynon Decl. Ex. K, James Dep. 77:24--78:3.) James proceeded into Ground Zero, participated in the group prayer, and then accompanied the group on its march to City Hall. (Id. at 83:19--86:22.) Several days after the rally and march, James was informed by his attorney that he had to turn himself into the police to be arrested, which James did. (Id. at 88:24--89:9.) The arrest was apparently based upon police identification of James in a photograph taken on November 2 in the restricted area. (Bynon Decl. Ex. X, criminal complaint.)

### 7. Thomas Manley

Thomas Manley, a firefighter, was a UFA officer at the time of the incident at issue, and participated [*29] in the vote to hold a rally. (Bynon Decl. Ex. J, Manley Dep. 76:13--18.) Manley attended the rally and joined the group in marching toward Ground Zero. Manley, who was in the front of the group, alleges that when the group approached the first set of wooden barricades, police moved the barricades out of the way. (Id. at 106:23--107:2, 107:7--10.) However, Manley alleges that the marchers then encountered a line of white-shirted police officers in front of a second set of barricades. (Id. at 110:15--112:24.) Manley testified that it appeared to him that the officers were trying to prevent the marchers

from entering the site, and that when the barricades were breached, the officers started grabbing and pushing people. (Id. at 118:25--120:10.) Manley allegedly yelled to the crowd to calm down. (Id. at 123:3--4.) After he entered the World Trade Center site, Police Chief Hale and a police captain approached Manley and grabbed his arms and pushed him backwards, telling him in words or substance to "get back." (Id. at 125:16--126:6.) The confrontation ended when the police and Manley stepped away from one another, and Manley remained at the site for the recitation of [*30] the prayer. (Id. at 130:15--131:6, 134:15--16.) On the following Monday, Manley was informed later that day that he had to turn himself in for arrest at the First Precinct, which he did. (Id. at 149:5--7; 163:24--164:4.)

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record, the district court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*31]

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247--48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. Id. at 256; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Mack v. Otis Elevator Co., 326 F.3d 116, 120 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 248). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under governing law.'" Kinsella v. Rumsfeld, 320 F.3d 309, 311 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 248).

Conclusory allegations are never alone sufficient to create a genuine issue of material fact. Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)

Case 3:00-cv-01794-JCH     Document 184     Filed 02/23/2005     Page 18 of 22

Page 9

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

[*32] (quoting *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)*). A party seeking to oppose a motion for summary judgment must offer more than speculation and conjecture in support of its factual claims. *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11--12 (2d Cir. 1986)*; *Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)* (per curiam).

## II. False Arrest

Plaintiffs assert that their arrests violated both New York common law and the *Fourth Amendment*. A claim for false arrest brought under *42 U.S.C. § 1983*, based on the *Fourth Amendment's* guarantee of freedom from unreasonable seizures (including arrest without probable cause), is substantially the same as a claim for false arrest brought under New York law. *Weyant, 101 F.3d at 852*. A plaintiff alleging false arrest must prove that "the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)* A showing that probable cause existed for the arrest defeats any showing of lack of justification, and provides a complete defense to both the [*33] federal constitutional and the state law claims. *Weyant, 101 F.3d at 852*; *Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)*. Defendants assert that such probable cause existed as to all plaintiffs, because all were arrested after they marched into the Restricted Zone without authorization to do so. Defendants further argue that even if probable cause were not manifestly present, they are entitled to qualified immunity as to the arrests as long as they can show "arguable probable cause." *See Escalera, 361 F.3d at 743.*

### A. Existence of Probable Cause

Probable cause to arrest exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002)* (quoting *Weyant, 101 F.3d at 852*). The probable cause inquiry is an objective one: the court, considering the totality of the circumstances based on those facts available to the officer at the time [*34] of the arrest and immediately before it, *Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)*; *Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996)*, must ask "whether a reasonable officer could have believed that his actions were lawful, in light of clearly established law and the information the officer possessed." *Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)* (quoting *Wilson v. Layne, 526 U.S. 603, 119 S. Ct. 1692, 1700, 143 L. Ed. 2d 818 (1999))* (brackets omitted). This inquiry must be made "without regard to the individual officer's subjective motives or belief as to the existence of probable cause." *United States v. $ 557,933.89. More or Less, in U.S. Funds, 287 F.3d 66, 85 (2d Cir. 2002)*. While probable cause is frequently a question of fact, if there is no dispute as to the material facts and the knowledge of the officers, the existence of probable cause is a legal question determinable by the court. *Weyant, 101 F.3d at 852*; *Singer v. Fulton County Sheriff, 63 F.3d at 118--19*; *Stanyard v. Safir, 2003 U.S. Dist. LEXIS 775, No. 00 Civ. 3657, 2003 WL 151999, [*35] at *1 (S.D.N.Y. Jan. 21, 2003)*.

The criminal offense which plaintiffs were all charged with violating, criminal trespass in the third degree, makes a person guilty of a Class B misdemeanor "when he knowingly enters or remains unlawfully in a building or upon real property ... which is fenced or otherwise enclosed in a manner designed to exclude intruders." *N.Y. Penal Law § 140.10* (McKinney 1999 & Supp. 2004). Although many of the plaintiffs state that they did not see barricades blocking entrance to the Restricted Zone or observe police attempting to keep demonstrators from proceeding south along West Street, and although one plaintiff (and a third-party witness) allegedly observed police moving the first set of barricades to allow the marchers to pass, it is undisputed that access to the World Trade Center site was restricted and that the police did attempt, using a human chain of officers in vicinity of West and Vesey Streets, to block further entrance into the restricted area and to keep the demonstrators from proceeding into Ground Zero. The leaders of the demonstration, including plaintiff Manley, were aware before the rally began that the police did [*36] not want them to march to Ground Zero. Further, no plaintiff asserts that the wall of white-shirted officers in front of the second barricade were inviting the demonstrators to continue south to Ground Zero. Whether any particular plaintiff knew about those efforts to exclude them from the site is not relevant to the probable cause inquiry, although it would be relevant to a legal determination of guilt or innocence, since what is at issue in determining probable cause is the knowledge of the police officers. It is beyond dispute that the police were aware of the efforts to restrict access, since they were generally charged with the duty of enforcing the restrictions (Bynon Decl. Ex. I, Esposito Dep. 81:2--82:3), and Police Chief Esposito was clearly instructing his detail, including his arresting officers, to keep the demonstrators out of the Restricted Zone. Indeed, many of the plaintiffs concede they observed police attempting to prevent the crowd from proceeding further south into the Restricted Zone. (Bynon Decl. Ex. J, Manley Dep. 112:17--24; Ex. L, Carter Dep. 125:8--126:5). Given these uncontroverted facts, probable cause to arrest for trespassing is facially present.

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 19 of 22

Page 10

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

Plaintiffs [*37] seem to rest their false arrest claim on the argument that the police could not have reasonably believed their actions to be lawful, (1) because all firefighters had authority to be in the Restricted Zone for any purpose (including, necessarily, conducting a protest march with non-firefighter demonstrators), or (2) because police invited them to proceed into the Restricted Zone on the day in question. Several of the plaintiffs expressed in their deposition testimony the understandable conviction that as firefighters they had an unqualified right or license to enter the restricted area. (Bynon Decl. Ex. G, Gallagher Dep. 40:23--25; Ex. J, Manley Dep. 113:25--114:6; Ex. O, Tierney Dep. 16:2--5; Ex. P, DeStefano Dep. 157:18--25.) Not only had many of the plaintiffs spent countless hours--many of them unpaid--in the recovery effort at the site over the preceding weeks, but they were all profoundly aware of the fact that the bodies of many of their fallen fellow firefighters might still be buried in the rubble. Moreover, many had never had to show a pass or any identification when they entered the site to work up to the time of the rally. (Bynon Decl. Ex. P, DeStefano Dep. 76:2--6; Ex. [*38] O, Tierney Dep. 51:6--12.)

Some of the plaintiffs also recount having seen some rank-and-file police officers moving the first set of barricades or allowing them to be moved out of the path of the demonstrators, walking alongside the procession down to Ground Zero, or cheering the demonstrators as they marched from Ground Zero to City Hall. (Bynon Decl. Ex. K, James Dep. 73:13--16, 82:7--21; Ex. M, Civitillo Decl. 159:8--9; Ex. P, DeStefano Dep. 148:19--22; Ex. J, Manley Dep. 107:7--10, 109:2--20; Ex. L, Carter Dep. 141.) The plaintiffs cite this as evidence that even if they did not have a general authorization to enter the Restricted Zone at any time for any purpose, then they were being allowed to enter the site on that day.

However understandable plaintiffs' expectations may have been on the day of the rally, this court's inquiry must be into the undisputed facts grounding the police officers' actions that day. Ground Zero was without question still unsafe at the time of the rally, a fact acknowledged by plaintiffs. (Manley Dep. 45:24--51:13; Ex. P, DeStefano Dep. 90:23--91:25.) Civilians were undisputedly among those marching down West Street toward the site. [*39] At the time of the rally, the City had unambiguously restricted access on West Street below Warren Street. Moreover, the City's restrictions on access to the site explicitly required authorized personnel including firefighters to leave the site after they had performed their authorized activity, see supra. Some of the plaintiffs expressed the belief that participating in the march was an extension of their work as firefighters, because they hoped that their protest would stop the work force reduction and thereby

preserve the recovery effort. (Bynon Decl. Ex. P, DeStefano Dep. 159:3--9; Ex. M, Civitillo Dep. 180:13--15, 182:9--183:2.) But none of the plaintiffs has claimed that he was actually performing any official work-related duty during the rally or march. (Bynon Decl. Ex. P, DeStefano Dep. 157:18--25; Ex. M, Civitillo Dep. 180:6--12, 181:12--182:8; Ex. N, Fiorella Dep. 131:25--132:3; Ex. O, Tierney Dep. 146:24--147:3.) A protest march into the restricted area was not an authorized activity by any definition, and especially in light of security concerns following September 11, 2001, it is reasonable to expect that the City would closely regulate the form and location of such [*40] protests. See United for Peace and Justice v. City of New York, 243 F. Supp. 2d 19, 28--29 (S.D.N.Y. 2003). In spite of plaintiffs' sincerely held beliefs that they were permitted on the site, plaintiffs cannot establish that they had some form of general authorization to march into the Restricted Zone on the day of the demonstration. The undisputed evidence reveals that the opposite was true.

Moreover, a careful review of the record reveals that the only evidence of being given permission on the day of the rally consists of the testimony of one plaintiff and one non-party witness who state that they saw blue-shirted police officers move the first set of barricades. (Bynon Decl. Ex. J, Manley Dep. 107:7--109:4; Kliegerman Decl. Ex. 2, Steadman Dep. 45:11--46:23.) By contrast, it is uncontroverted that Police Chief Esposito formed a wall of white-shirted senior officers before the second barricade, that their intent to stop the demonstrators from proceeding further into the Restricted Zone was obvious, and that the crowd pushed or was propelled through the police line while the police were trying to push them back. (Bynon Decl. Ex. I, Esposito Decl. 71:5--6; Ex. J, [*41] Manley Dep. 112:8--24; Ex. L, Carter Dep. 125:8--126:5; Ex. Q, Nealon Dep. 20.)

Given the conditions obtaining during the rally, and given that police knew they were charged both with enforcing the restrictions on access and with ensuring the safety of the participants in the rally, there is no genuine issue of material fact as to the existence of probable cause for the arrests of rally participants who marched into the Restricted Zone. At the moment these arrests were made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information--namely, that each defendant was observed in the Restricted Zone, and that none of the defendants were engaged in authorized relief work, but rather were part of a mass of demonstrators attempting to make an unauthorized march to Ground Zero--were sufficient to warrant a prudent officer in believing that the suspect had committed or was committing the offense of criminal trespass. See

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 20 of 22

Page 11

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

*Miloslavsky v. AES Engineering Soc., Inc., 808 F. Supp. 351, 354 (S.D.N.Y. 1992)* (quoting *Adams v. Williams, 407 U.S. 143, 148, 92 S. Ct. 1921, 1924, 32 L. Ed. 2d 612 (1972))*. **[*42]**  n10 Furthermore, the subjective beliefs of any rank-and-file officers who disagreed with the propriety of the arrests directed by Police Chief Esposito are irrelevant to the determination of whether an objective basis for finding probable cause existed. *See United States v. Gagnon, 373 F.3d 230, 239 (2d Cir. 2004)* ("[A] law enforcement officer's mistaken belief that probable cause did not exist at the time is irrelevant to a court's later determination of whether probable cause existed at the time."). n11

> n10  The fact that three of the plaintiffs, DeStefano, Manley, and James, were arrested days after the rally does not affect the analysis. The arrests were based on the plaintiffs' being identified by police officers from photos taken in the Restricted Zone during the protest. Probable cause may be grounded upon reasonable, good faith reliance upon observations and identifications made by other law enforcement personnel. *Bernard v. United States, 25 F.3d 98, 102--03 (2d Cir. 1994)*. Plaintiffs have presented no evidence that the arresting officers' reliance on their colleagues' identification was unreasonable or in bad faith. **[*43]**

n11  Although some plaintiffs were arrested for other offenses in addition to criminal trespass in the third degree, *see supra note 6*, this fact does not affect the probable cause inquiry; "the issue is whether the circumstances, viewed objectively, provided probable cause to arrest plaintiff even if the probable cause was for a crime different from what the police officers believed to have been committed." *Clarke v. City of New York, Nos. CV-96-5762, CV-96-7297, 1999 WL 608857, at *6 (E.D.N.Y. July 22, 1999).*

## B. Qualified Immunity

Even if there were any doubt as to the existence of probable cause, the individual defendants have properly invoked their entitlement to qualified immunity. Public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996)*. This defense is available where a "reasonable officer could have believed" his action **[*44]** "to be lawful, in light of clearly established law and the information he

possessed." *Anderson v. Creighton, 483 U.S. 635, 641, 97 L. Ed. 2d 523 (1987)*. This standard is referred to as "arguable probable cause." *Escalera, 361 F.3d at 743.* "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quoting *Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)).* Plaintiffs strenuously argue that since two or three blue-shirted police officers objected to their superiors when ordered to make arrests, there was no reasonable basis for the arrests. (Pl. Mem. at 32). However, even if the court were to discount the probative value of the uncontroverted evidence showing the existence of probable cause, the allegations that some police officers expressed disagreement with the propriety of the arrests of some of the plaintiffs does not negate the existence of probable cause; at worst, it demonstrates the existence of disagreement among officers of reasonable **[*45]** competence as to whether probable cause existed. The undisputed fact that each of the plaintiffs was within the Restricted Zone engaged in an unauthorized activity when he was arrested provides a basis for "arguable probable cause" at the very least, and warrants summary judgment on plaintiffs' false arrest claims. n12 *Escalera, 361 F.3d at 744* ("If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issues of qualified immunity ....").

> n12  Since ample evidence of probable cause justifies dismissal of the false arrest claim on summary judgment, the court does not reach defendants' argument for absolute immunity.

## C. State Law Assault and Battery Claims

Plaintiffs base their assault and battery claims on the fact of the arrests, which they have contended were unlawful, rather than on any alleged excessive use of force. (Bynon Decl. Ex. A, Compl. PP 115--117.) Such a claim is cognizable; *see Sulkowska v. City of New York, 129 F. Supp.2d 274, 294 (S.D.N.Y. 2001)* **[*46]** ("If an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest.") (citing *Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 665 N.Y.S.2d 440, 440 (2d Dep't 1997))*. However, since the evidence in the record creates no material factual dispute as to the existence of probable cause, and since plaintiffs have not argued for nor submitted evidence in

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 21 of 22

Page 12

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

support of any other theory of liability for assault and battery, summary judgment is granted as to these claims.

### III. Malicious Prosecution

Because a claim of malicious prosecution brought pursuant to *42 U.S.C. § 1983* is governed by state law, *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)*, plaintiffs' federal and state claims are analyzed together. In order to prove malicious prosecution under New York law, plaintiffs must show (1) that the defendants either commenced or continued criminal proceedings against them; (2) that the proceedings terminated in plaintiffs' favor; (3) that there was no probable cause for the [*47] criminal proceedings; and (4) that the proceedings were instituted with actual malice. *Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991)*. While evidence of the first prong of this test is plain, since criminal proceedings were unquestionably commenced against all plaintiffs, the other three prongs are at best in doubt. While factual disputes may exist as to whether the proceedings terminated in plaintiffs' favor n13 and, theoretically, as to whether actual malice motivated the proceedings, the existence of probable cause for the proceedings defeats plaintiffs' malicious prosecution claim.

> n13 The parties disagree as to whether the state court dismissed the cases "in the interest of justice" and, further, whether such a dismissal would constitute a termination in plaintiffs' favor. In light of the court's conclusion that there is no material dispute as to the existence of probable cause, the court need not and does not reach these issues.

Probable cause to arrest and probable cause to commence [*48] a criminal proceeding are not interchangeable concepts, and the existence of the former does not necessarily imply the existence of the latter. However, when an officer effects an arrest with probable cause, and there is no evidence that authorities became aware of exculpatory evidence undermining the probable cause to arrest between the time of the arrest and the ensuing prosecution, then probable cause to proceed exists to defeat a claim of malicious prosecution. *See Lowth v. Town of Cheektowaga, 82 F.3d at 571* ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.") Plaintiffs attempt to suggest lack of probable cause to proceed by contending that the arresting officers intentionally misrepresented the facts underlying the arrests, and therefore there was no probable cause to prosecute the plaintiffs. Specifically, they argue that the officers were

aware that plaintiffs were not trespassing, that the police had removed any barricades that had stood in the demonstrators' path, and that the arrests had been effected absent probable cause, but did not provide the prosecutors [*49] with complete information as to these purported facts. (Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. 23--24.) The court, of course, has found that the undisputed evidence shows that plaintiffs did not have authorization to stage a demonstration in the Restricted Zone, that the police did not remove at least the second set of barricades or otherwise authorize the demonstrators to march to Ground Zero, and, therefore, that there was probable cause for the arrests. Moreover, the record does not suggest that any facts later emerged to contradict the essential facts underlying the arrests. Since no reasonable jury could find that probable cause for plaintiffs' arrests was vitiated by any subsequently emerging facts, summary judgment is appropriate as to plaintiffs' malicious prosecution claims.

### IV. First Amendment Claims

Plaintiffs have alleged that defendants arrested and prosecuted them in retaliation for plaintiffs' exercising their *First Amendment* right to petition for redress of their grievances against the City. (Bynon Decl. Ex. A, Compl. PP 107--110.) "To establish a *First Amendment* retaliation claim, a plaintiff must prove: (1) he has an interest protected by the *First* [*50] *Amendment*; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his *First Amendment* right." *Cardew v New York State Dep't of Corr. Servs., 2004 U.S. Dist. LEXIS 7670, No. 01 Civ. 3669, 2004 WL 943575, at *6 (S.D.N.Y. Apr. 30, 2004)* (quoting *Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)*. Plaintiffs have demonstrated a constitutionally protected interest, in that the right to petition is clearly encompassed in the *First Amendment's* guarantee of the right of free speech. However, the second prong cannot be sustained as a matter of law inasmuch as defendants' arrest and prosecution were supported by probable cause. *Yajure v. DiMarzo, 130 F. Supp. 2d 568, 573-74 (S.D.N.Y. 2001)* (citing cases). Probable cause defeats a *First Amendment* retaliation claim even where a plaintiff is prosecuted in an "unsuccessful attempt to deter or silence criticism of the government." *Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992)*. Plaintiffs have in any event offered only conjecture in support of their claim that the arrests and prosecutions were [*51] in retaliation for speaking out against the plan to reduce staffing at Ground Zero, and that some of the plaintiffs were targeted because they were recognizable as union officials. (Bynon Decl. Ex. A, Compl. PP 40, 78, 87.) It is not contended that any arrests were made at the rally at West and Chambers

Case 3:00-cv-01794-JCH    Document 184    Filed 02/23/2005    Page 22 of 22

Page 13

2004 U.S. Dist. LEXIS 19324, *; 21 I.E.R. Cas. (BNA) 1650

Street; the only people arrested were those who marched south into the Restricted Zone. Because this claim fails as a matter of law, summary judgment is granted as to plaintiffs' *First Amendment* claim.

## V. *Monell* Liability of the City of New York

A municipality is considered a "person" subject to direct suit under *42 U.S.C. § 1983* for deprivations of constitutional rights that are grounded in an official policy or custom. *Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 690, 56 L. Ed. 2d 611, 98 S. Ct. 2018--91, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018, 2036 (1978)*. No genuine issue of material fact has been raised as to the existence of a constitutional violation. Moreover, even if a constitutional violation has been shown, the plaintiffs have failed to raise a material issue of fact as to the existence of any municipal policy or custom [*52] leading to the arrests or prosecution of any of the plaintiffs. Therefore, the claims against the City of New York may not proceed. n14

> n14 It is well settled that the Police Department of the City of New York, as merely a subdivision of the City of New York, is not a suable entity. *East Coast Novelty Co., Inc. v. City of New York, 781 F. Supp. 999, 1010 (S.D.N.Y. 1992)*. See also *Rojas v. Iannatto, 2003 U.S. Dist. LEXIS 938, No. 01 Civ. 9131, 2003 WL 169798, at *3 (S.D.N.Y. Jan. 24, 2003)* ("[A] police department is not a proper defendant in a *Section 1983* action, since it is merely a vehicle through which the City fulfills its policing functions.") Therefore, had plaintiff brought any claims specifically against the NYPD, those claims would also be dismissed.

## VI. Claims against Giuliani, Kerik, and Von Essen

Plaintiffs also assert claims under *42 U.S.C. § 1983* against defendant supervisory officials Giuliani, Kerik, and Von Essen in their individual capacities. [*53] "A supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation." *Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997)*. Plaintiffs have failed to raise a triable issue of fact as to the existence of any constitutional violations that could provide a predicate for supervisor liability. Even if such

an issue had been raised, plaintiffs have offered no evidentiary basis for a reasonable jury to find that Giuliani, Kerik, or Von Essen participated in the decision to arrest any of the plaintiffs, or in the decision of the district attorney to prosecute. These defendants are entitled to summary judgment as to all claims against them.

## VII. Intentional Infliction of Emotional Distress

Plaintiffs claim that their arrests and prosecution so "transcended the bounds of decency as to be regarded as atrocious and intolerable in a civilized [*54] society," and caused them emotional distress. (Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. 22.) Defendants argue that plaintiffs failed to properly present this theory of liability in its notice of claim to the City, warranting dismissal of this claim. (Defs.' Mem. in Support of Mot. for Summ. J. 37.) Even if plaintiffs had provided evidence that could lead a reasonable jury to conclude that defendants' behavior was so outrageous as to rise to the level of intentional infliction of emotional distress, which they have not, it is clear that the practice of New York State courts to construe the notice of claim requirements strictly requires the dismissal of this claim as to the City. See *Hemrie v. City of New York, 2000 U.S. Dist. LEXIS 12600, No. 96 Civ. 213, 2000 WL 1234594, at *2 (S.D.N.Y. Aug. 31, 2000)*.

## CONCLUSION

The events that gave rise to this action were unquestionably distressing and demoralizing for the arrested firefighters and their friends and loved ones, particularly under the grim circumstances facing the FDNY at the time. The November 2, 2001 episode was regrettable and no doubt created tensions among New York City's public safety workers at a time when unity was sorely [*55] needed. Any residual harm still suffered by the plaintiffs from this incident, however, cannot be remedied by this court. For the reasons set forth above, the court grants defendants' motion for summary judgment as to all of plaintiffs' claims, and dismisses this action in its entirety. The Clerk is directed to close the case.

SO ORDERED.

Dated: New York, New York

September 24, 2004

Richard J. Holwell

United States District Judge